**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                     No. CR 10-1534 JB

EDWARD CHRISTY,

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on (i) the Defendant's Motion to Suppress Evidence and Statements, filed February 14, 2011 (Doc. 41); and (ii) the United States' Motion to Strike Defendant Edward Christy's Motion to Suppress Evidence and Statements (Doc. 41), filed February 14, 2011 (Doc. 45). The Court held a hearing on April 21, 2011 and on April 22, 2011. The primary issues are: (i) whether the Court should strike Defendant Edward Christy's motion to suppress because it is untimely; and (ii) whether the Court should suppress all evidence seized in Christy's home as well as statements that Christy allegedly made, because the police entered Christy's home without a warrant and not pursuant to the exigent-circumstances exception to the warrant requirement. The Court will not strike Christy's motion to suppress, because it finds that the motion was timely. The Court finds that the deputies' actions of walking around the corner of Christy's house, peering through a crack in the window shades, and entering Christy's house were not justified by exigent circumstances. Plaintiff United States of America has not met its burden of proving that the exigency exception applies, because the deputies did not have an objectively reasonable basis to believe that there was an immediate need to protect the safety of the sixteen year-

old girl who was in Christy's residence.  The Court will suppress Christy's statements to Detective

Weylin Proctor as fruit of the illegal searches.  The Court will also suppress the evidence that the

deputies found when they executed their search warrants for Christy's residence, vehicle, person,

and the warrant for Christy's and the sixteen year-old girl's cellular telephones, because, excluding

the illegally obtained information, the remaining information in the warrants is not sufficient to

establish probable cause.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P.

12(d)("When factual issues are involved in deciding a [pretrial] motion, the court must state its

essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order

shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these

findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge

to decide preliminary questions relating to the admissibility of evidence, including the legality of

a search or seizure and the voluntariness of an individual's confession or consent to search.  See

United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).

In deciding such preliminary questions, the other rules of evidence, except those with respect to

privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay

in ruling on a motion to suppress.  See  United States v. Garcia, 324 F. App'x 705 (10th Cir.)("We

need not resolve whether Crawford's[1] protection of an accused's Sixth Amendment confrontation

right applies to suppression hearings, because even if we were to assume this protection does apply,

---

[1] Crawford v. Washington, 541 U.S. 36 (2004).

we would conclude that the district court's error cannot be adjudged 'plain.'"), cert. denied, 130 S. Ct. 223 (2009); United States v. Merritt, 695 F.2d at 1269.

1.      On November 8, 2009, a man made a report regarding a missing juvenile (hereinafter "K.Y.") -- his daughter -- to the Westminster Police Department in Westminster, California. See Transcript of Hearing at 64:8-17 (taken April 21, 2011)(Rees, Carvo)("Apr. 21, 2011 Tr.").[2]

2.      The report stated that K.Y's parents saw her the night before, on November 7, 2009, and that when they woke up on November 8, 2009, they found a note from her saying that she had run away and that she would contact them later. See Apr. 21, 2011 Tr. at 64:18-24 (Rees, Carvo).

3.      The report stated that K.Y. had previously run away, had previously attempted suicide, and that K.Y.'s father believed that she was going to see or was running away with a boyfriend, who lived in Orange County, California. See Apr. 21, 2011 Tr. at 64:25-65:5 (Rees, Carvo).

4.      The report also stated that K.Y.'s father had returned to the Westminster Police Department on the afternoon of November 8, 2009, after he spoke with one of K.Y.'s friends, and found out that K.Y. had been in contact with an adult male on the internet. See Apr. 21, 2011 Tr. at 65:24-66:3 (Rees, Carvo).

5.      K.Y.'s father had gained access to K.Y.'s Yahoo! internet electronic mail account and found an exchange of electronic mail transmissions between K.Y. and an unknown person, which contained sexually explicit conversations and photographs. See Apr. 21, 2011 Tr. at 66:5-16 (Rees, Carvo).

6.      K.Y. was sixteen-years old at the time. See id. at 65:6-7 (Rees, Carvo).

_____

[2] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

7.      Task Force Officers Paul Carvo and Claudia Fletes -- who are both members of the Federal Bureau of Investigation ("FBI") Sexual Assault Felony Enforcement Team -- conducted the investigation of K.Y.'s disappearance.  <u>See</u> Apr. 21, 2011 Tr. at 67:3-9 (Rees, Carvo).

8.      Carvo obtained K.Y.'s cellular telephone number and electronic mail address, and used both exigent-circumstance documents[3] and administrative subpoenas to get records for her cellular telephone and electronic mail address.  <u>See</u> Apr. 21, 2011 Tr. at 68:15-20 (Carvo).

9.      The investigators obtained K.Y.'s telephone records and learned that three telephone calls, which were made close in time to when K.Y. was last seen, were received from a telephone number with a 505 area code.  <u>See</u> Apr. 21, 2011 Tr. at 69:4-10, 72:3-18 (Rees, Carvo); Verizon Wireless Emergency Information Request at 1 (Government's Exhibit E).

10.     Carvo used database searches on the area code and prefix of the telephone number to determine to what geographic area the 505 telephone number belonged and determined that the telephone number traced to Albuquerque, New Mexico.  <u>See</u> Apr. 21, 2011 Tr. at 72:24-73:7 (Rees, Carvo).

11.     The 505 telephone number's subscriber was T-Mobile, and Carvo sent a Request for Immediate Disclosure of Subscriber Information to T-Mobile.  <u>See</u> Apr. 21, 2011 Tr. at 75:10-22 (Rees, Carvo).

12.     T-Mobile sent the name, birth date, social security number, address, and telephone number of the account's owner.  <u>See</u> Apr. 21, 2011 Tr. at 77:8-9 (Carvo).

13.     The account owner's address was 2265 Kelly Road SW in Albuquerque and the

---

[3] Exigent-circumstances documents are documents in which law enforcement requests disclosures pursuant to an emergency.  <u>See, e.g.,</u> Emergency Situation Disclosure Request by Law Enforcement at 1 (Government's Exhibit C).

account owner's name was Edward S. Christy.  See id. at 77:8-14 (Rees, Carvo); Facsimile Transmission from Ron Witt to Investigator Wade Walsvick at 1 (dated November 9, 2009)(Government's Exhibit G)("T-Mobile Fax").

14.     The investigators also received cellular telephone tower information -- information regarding which cellular telephone towers Christy's cellular telephone accessed when it made or received calls.  See Apr. 21, 2011 Tr. at 77:15-22 (Rees, Carvo).

15.     On November 7, 2009, at 9:25 p.m., Pacific time, Christy's cellular telephone made a telephone call to K.Y.'s cellular telephone number and accessed a cellular telephone tower in Needles, California.  See Apr. 21, 2011 Tr. at 77:23-78:1 (Rees, Carvo); T-Mobile Fax at 3.

16.     On November 8, 2009, at 1:45 a.m., Pacific time, Christy's cellular telephone made a telephone call to K.Y.'s cellular telephone number and accessed a cellular telephone tower called North Coast California, which includes the city of Westminster -- an area close to K.Y.'s residence. See Apr. 21, 2011 Tr. at 78:1-12 (Carvo); T-Mobile Fax at 3.

17.     On November 8, 2009, Christy's cellular telephone received a call at 4:03 p.m. and accessed a cellular tower in Holbrook, Arizona.  See Apr. 21, 2011 Tr. at 78:13-16 (Rees, Carvo); T-Mobile Fax at 3.

18.     On November 9, 2009, at 7:51 a.m., Christy's cellular telephone called a 505 number and accessed a cellular telephone tower in Albuquerque, New Mexico.  See Apr. 21, 2011 Tr. at 78:17-19 (Carvo); T-Mobile Fax at 3.

19.     Based on this information, the investigators believed that Christy likely picked up K.Y. and took her to Albuquerque.  See Apr. 21, 2011 Tr. at 79:2-4 (Rees, Carvo).

20.     The investigators also sought information regarding K.Y.'s electronic mail account -- madamepineapple@yahoo.com -- and the electronic mail account of the person with whom she had

been communicating -- b553n2@yahoo.com.  See Apr. 21, 2011 Tr. at 79:5-7 (Rees, Carvo).

21.     Carvo served an administrative subpoena and a Yahoo! Emergency Disclosure Request Form on Yahoo! seeking information regarding registration information, and current Internet Protocol ("IP")[4] history and payment information for b553n2@ayahoo.com and for madamepineapple@yahoo.com.   See Apr. 21, 2011 Tr. at 79:5-80:13 (Rees, Carvo); U.S. Department of Justice/Federal Bureau of Investigation Subpoena (dated November 9, 2009)(Government's Exhibit A); Yahoo! Emergency Disclosure Request Form (dated November 9, 2009)(Government's Exhibit A).

22.     Yahoo! provided the user names that madamepineapple@yahoo.com and b553n2@ayahoo.com gave when they set up their Yahoo! electronic mail accounts and the recent IP addresses associated with the computers from which the users accessed their electronic mail accounts.  See Apr. 21, 2011 Tr. at 81:24-82:2 (Carvo); Facsimile Message from Julia Albert to Investigator Paul Carvo (dated November 9, 2009)(Government's Exhibit B).

23.     Carvo ran the IP address that b553n2@ayahoo.com used through the American registry of internet numbers to see which internet service provider owned that IP address.  See Apr. 21, 2011 Tr. at 84:12-19 (Rees, Carvo).

24.     The IP address came back to Comcast.  See Apr. 21, 2011 Tr. at 84:12-19 (Rees, Carvo).

25.     The investigators submitted an emergency disclosure request to Comcast asking for

---

[4] An IP address is an address specific to every computer attached to the internet -- anytime a computer logs onto the internet it has to have a unique IP address to transmit information and to receive information through the internet.  See Apr. 21, 2011 Tr. at 83:16-20 (Carvo).  IP addresses can either be static or dynamic.  A dynamic IP address means that, after a user logs off the internet, when the user logs back on the user is periodically assigned a new IP address from the service provider.  See Apr. 21, 2011 Tr. at 83:20-23 (Carvo).

subscriber information for that IP address. <u>See</u> Apr. 21, 2011 Tr. at 84:22-24 (Carvo).

26.     Comcast responded by telephone, and provided Carvo with the name and address of the subscriber who had that IP address on the specific date and time that Carvo had requested. <u>See</u> Apr. 21, 2011 Tr. at 86:13-20 (Rees, Carvo).

27.     The subscriber's name was Edward Christy and his address was 2265 Kelly Rd. SW, Albuquerque; the subscriber's telephone number was 505-480-8797, which was the cellular telephone number the investigators had been tracking. <u>See</u> Apr. 21, 2011 Tr. at 87:12-20 (Rees, Carvo); Federal Bureau of Investigation Memorandum at 1 (transcribed November 11, 2009)(describing phone call on November 9, 2009)(Government's Exhibit D).

28.     Carvo notified Fletes and advised her that he believed K.Y. was either at 2265 Kelly Rd. SW, Albuquerque or en route to that address. <u>See</u> Apr. 21, 2011 Tr. at 87:25-88:5 (Carvo).

29.     At approximately 5:00 p.m. Pacific time on November 9, 2009, the investigators contacted the Bernalillo County Sheriffs Office ("BCSO") -- the local law enforcement -- so that local law enforcement officers could respond to the address, and attempt to locate and rescue K.Y. <u>See</u> Apr. 21, 2011 Tr. at 88:20-89:5 (Rees, Carvo).

30.     The investigators told BCSO's dispatch that they had a missing juvenile who ran away from Orange County, California, that the missing juvenile had been communicating with an unknown male adult online, and that she had been exchanging sexually explicit emails and photographs with that person. <u>See</u> Apr. 21, 2011 Tr. at 89:11-14 (Carvo).

31.     BCSO deputies responded to Christy's residence at 2265 Kelly N.W., Albuquerque as a result of this dispatch. <u>See</u> Apr. 21, 2011 Tr. at 8:24-11:2 (Kastrin, Littlefield).

32.     Deputies David Littlefield and Justin McKinney were dispatched at approximately 6:18 p.m. on November 9, 2009 to Christy's residence to conduct the welfare check for K.Y. <u>See</u>

id. at 6:19-12:7, 9:9-17, 11:1-7 (Kastrin, Littlefield); id. at 119:13-20 (Rees, McKinney); Bernalillo County Sheriff's Department Computer Aided Dispatch Report at 1 (dated November 9, 2009)(Government's Exhibit H)("CAD Report").

33.     When they were dispatched, Littlefield and McKinney knew the information in the CAD Report, which stated:

> WESTMINSTER CNTY WANTS UNITS TO 10-10 REF A 10-28 . . . 10-28 FRM CALI SHES A 16 YR OLD FEMALE IS [K.Y.] DOB/09/29/93 LS ON SUNDAY . . . AFTER A 27 CALI FOUND OUT THAT SHE HAD BEEN EMAILING A MALE EDWARD S CHRISTY DOB/6/08/52 AND THE MALE WAS ALSO SENDING HER NUDE PICS OF HIMSELF . . . CALL PINGED THE 21 OF THE MALE ON SUNDAY AND IT HIT IN WESTMINSTER CALI AND TODAY ITS HITTING NEAR THE 20 IN ALBUQ FEMALE IS 16 YRS OLD 5'5 100 LBS BLUE/BLONDE

CAD Report at 1.[5]

34.     Based on the information in the CAD Report, Littlefield believed that it was likely K.Y. was in Christy's company, that she had an inappropriate relationship with Christy, and that it was an emergency situation because K.Y. was possibly in danger and was being abused or sexually exploited. See Apr. 21, 2011 Tr. at 12:17-13:10 (Kastrin, Littlefield).

35.     Littlefield and McKinney arrived at Christy's residence at 6:27 p.m., and parked a little distance away from the residence. See id. at 13:16-18 (Kastrin, Littlefield); Apr. 21, 2011 Tr. at 15:15 (Littlefield); CAD Report at 1.

36.     As Littlefield and McKinney made their approach to the residence, Littlefield checked the mailbox to determine whether there was anything addressed to an Edward Christy to

---

[5] A 10-10 is a welfare check, and a 10-28 is a run away. See Apr. 21, 2011 Tr. at 11:17 (Littlefield). A 20 is a residence. See Transcript of Hearing at 28:6 (taken April 22, 2011)(Rees)("Apr. 22, 2011 Tr."). Although the Court is not aware of any testimony at the hearing relating to the definition of a 21 or 27, it appears in context that 21 means cellular telephone and 27 relates to law enforcement.

verify the information that the California agency provided and to make sure they were at the right residence. See Apr. 21, 2011 Tr. 15:15-16:1 (Kastrin, Littlefield).

37.     In the mailbox, there was a letter addressed to Ed Christy, verifying the information they received from the California agency. See Apr. 21, 2011 Tr.15:22-16:3 (Kastrin, Littlefield).

38.     Littlefield walked down the residence's driveway, because it appeared to him that the residence's rear entrance was the main entrance or the entrance which was used the most, because the leaves were disturbed going towards the rear entrance, and the front porch was dark and did not look used. See id. at 16:14-25 (Kastrin, Littlefield).

39.     While Littlefield was walking down the driving path, he noticed that the blinds covering one of the windows were askew, and he looked in the window to determine the circumstances within the residence. See id. at 17:11-25 (Kastrin, Littlefield).

40.     Littlefield wanted to check on the circumstances, because he had concerns for K.Y.'s safety and his own safety. See id. at 18:2-7 (Kastrin, Littlefield).

41.     When Littlefield looked in the window, he saw a young female who matched K.Y.'s description. See Apr. 21, 2011 Tr. at 18:19-20 (Littlefield).

42.     The young female was standing in what appeared to be the living room wearing only a brassiere and underwear. See id. at 18:20-21 (Littlefield).

43.     She was smiling. See id. at 38:10-12 (McMillian, Littlefield).

44.     Children sometimes smile in pictures or images of child pornography, and that they are smiling does not indicate that they are not being abused. See Apr. 21, 2011 Tr. at 179:10-18 (Rees, Proctor).

45.     Littlefield did not know whether the young female was being directed or coerced into smiling. See id. at 50:6-9 (Kastrin, Littlefield).

46.     Littlefield saw a rope attached to the ceiling; the young female was hanging onto the rope, and there was a much older adult man walking around in his underwear and a T-shirt.  See id. at 18:20-24, 19:7 (Littlefield).

47.     Littlefield advised dispatch that a young female matching K.Y.'s description was in the residence and told dispatch to "secure the air," which means that the air was secure for "our traffic [or radio transmissions] only."  Apr. 21, 2011 Tr. at 19:13-23 (Kastrin, Littlefield).

48.     Deputies do not tell dispatch to secure the air for every call.  See id. at 19:21-25 (Kastrin, Littlefield)("Q. And do you [ask dispatch to secure the air] in every call out that you have? A.  Not on every call out, no, ma'am.").

49.     Littlefield asked his sergeant for permission to force entry into the residence.  See Apr. 21, 2011 Tr. at 20:5-7 (Littlefield).

50.     He asked for approval to force entry into the residence because, usually, forced entry is not something that BCSO officers do on an average welfare check.  See id. at 20:20-22 (Littlefield).

51.     Forced entry was approved at 6:35 p.m.  See Apr. 21, 2011 Tr. at 21:12-22 (Kastrin, Littlefield); CAD Report at 1.

52.     Littlefield also requested backup, because he needed to secure the perimeter of the residence to keep anyone from escaping.  See Apr. 21, 2011 Tr. at 20:1-9 (Kastrin, Littlefield).

53.     Littlefield and McKinney also did not have a tool with which they could force entry into the house.  See id. at 136:20-22 (McMillian, McKinney).

54.     Littlefield gave instructions that all backup units should cut their lights and sirens before entering the area, because he did not want to alert the individuals inside the residence that law enforcement was in the area.  See Apr. 21, 2011 Tr. at 20:10-16 (Kastrin, Littlefield).

55.     Littlefield checked on the young female's status while he was waiting for the backup units to arrive.  See id. at 21:2-11 (Kastrin, Littlefield).

56.     When he checked on the young female's status, he saw that the young female was no longer wearing a brassiere, and, instead of just holding the rope, she appeared to be restrained by the rope.  See id. at 21:2-11 (Kastrin, Littlefield).

57.     Littlefield also saw what looked like camera flashes that came from the window as he was waiting for the backup units to arrive on the scene.  See id. at 22:2-13 (Kastrin, Littlefield).

58.     Deputies John McCauley and Santiago Roybal were two of the deputies who responded to Littlefield's call for assistance.  See Apr. 21, 2011 Tr. at 143:11-20 (Kastrin, McCauley); id. at 162:19-25 (Kastrin, Roybal).

59.     When the backup deputies arrived, the deputies made a quick plan regarding entry of the residence and lined up at the residence's back door.  See Apr. 21, 2011 Tr. at 144:21-25 (Kastrin, McCauley).

60.     McCauley breached the door with a sledgehammer he had brought and the deputies entered the residence.  See id. at 144:25-145:2.

61.     The team made forced entry at 6:42 p.m.  See id. at 23:8-11 (Kastrin, Littlefield); CAD Report at 1.

62.     When the deputies entered the residence, Roybal noted that Christy had an erection; he did not note Christy's erection in his report, however, because he was too embarrassed.  See Apr. 21, 2011 Tr. at 166:2-8 (Kastrin, Roybal).

63.     Once inside the residence, deputies ordered Christy to the ground.  See Apr. 21, 2011 Tr. at 24:2-10 (Kastrin, Littlefield).

64.     After Christy laid on the ground, Littlefield stepped over him and moved towards the

living room to check on the victim.  See id. at 24:11-19 (Kastrin, Littlefield).

65.     Roybal handcuffed Christy.  See id. at 165:11-17 (Kastrin, Roybal).

66.     In the living room, Littlefield saw the young female -- K.Y. -- who was, at that point,

nude.  See id. at 24:24-25:3 (Kastrin, Littlefield).

67.     Littlefield told K.Y. to come to him; she appeared startled and said she had to get her

clothes.  See id. at 25:4-10 (Kastrin, Littlefield).

68.     K.Y., who, at the time, had restraints on her wrists, started ripping the restraints off

her wrists and running towards the back of the residence.  See id. at 25:6-8 (Littlefield).

69.     Littlefield told her to "stop, wait," and started looking for some clothes for her.  See

id. at 25:8-10 (Littlefield).

70.     While Littlefield was assisting K.Y., the other deputies were conducting a sweep of

the residence, in which they looked to make sure that there was no one else in the residence who

could harm the officers or K.Y., and securing Christy.  See id. at 25:11-14, 25:18-22 (Kastrin,

Littlefield); id. at 145:3-11 (Kastrin, McCauley)(stating that, after the deputies entered the house,

they "secured it, meaning . . . we took all persons to make sure . . . that we weren't going to be hurt,

made sure that there was no one else hiding in the residence").

71.     As McCauley cleared the residence, he saw pornographic material, such as videos

and photographs, on top of a desk and on a closet floor.  See Apr. 21, 2011 Tr. at 154:14-24

(McMillian, McCauley).

72.     It took the officers approximately two minutes to complete the protective sweep of

the residence.  See id. at 25:23-26:4 (Kastrin, Littlefield); id. at 139:21-23 (Rees, McKinney); CAD

Report at 1.

73.     One of the deputies advised Christy of his Miranda[6] rights.  See Apr. 21, 2011 Tr. at 146:3-147:22 (Kastrin, McCauley); Bernalillo County Sheriff's Department Miranda Warning (Government's Exhibit S).

74.     After the deputy read Christy his Miranda rights, he asked whether Christy understood each of the rights and whether, having those rights in mind, Christy wanted to talk to the deputies.  See Apr. 21, 2011 Tr. at 147:24-148:2 (McCauley); Bernalillo County Sheriff's Department Miranda Warning at 1.

75.     Christy appeared to the deputies to understand his Miranda rights and did not invoke his right to remain silent.  See Apr. 21, 2011 Tr. at 148:3-10 (Kastrin, McCauley); id. at 167:1-4 (Kastrin, Roybal)(stating that Christy appeared to understand his Miranda rights and did not invoke his right to remain silent).

76.     Roybal asked Christy who the juvenile girl was, and Christy responded that her "name's [K.];" when Roybal asked Christy how old she was, Christy stated that she was eighteen; Christy also told Roybal that he met her on an adult website.  See Apr. 21, 2011 Tr. at 167:8-13 (Roybal).

77.     Roybal asked Christy where he picked the juvenile up, and Christy told him California.  See id. at 167:18-19 (Roybal).

78.     Roybal stopped asking Christy questions when another deputy told him that detectives were in route.  See Apr. 21, 2011 Tr. at 167:22-168:1 (Kastrin, Roybal).

79.     After the protective sweep was completed, Littlefield made sure the young female was dressed and called for Sergeant Taylor, a female deputy, to secure the young female.  See id.

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

at 26:14-18 (Kastrin, Littlefield).

80.     Approximately ten or fifteen minutes after the deputies entered the residence, and as soon as the young female was dressed and Taylor arrived to secure the young female, the deputies left the residence.  See id. at 148:19-23 (McCauley); id. at 27:1-12 (Kastrin, Littlefield).

81.     After the deputies left the residence, they secured the residence by parking a unit in the back to watch the back entrance and one in the front to watch the front entrance to make sure that no one could go in an tamper with any evidence.  See Apr. 21, 2011 Tr. at 28:2-8 (Kastrin, Littlefield).

82.     Proctor was called to investigate the situation with the missing sixteen-year old girl from California.  See id. at 179:22-180-8 (Rees, Proctor).

83.     When Proctor arrived at Christy's residence, there was no one inside the house.  See id. at 181:12-16 (Rees, Proctor).

84.     When Proctor arrived at the residence, Littlefield described the underlying facts to him; Littlefield did not misrepresent the underlying facts.  See Apr. 21, 2011 Tr. at 181:20-182:5 (Rees, Proctor).

85.     Proctor first had contact with Christy at the law enforcement center at 400 Roma SW, Albuquerque.  See id. at 183:25-184:6 (Rees, Proctor).

86.     Proctor interviewed Christy; when Proctor began the interview, he took Christy's handcuffs off.  See id. at 214:1-9 (McMillian, Proctor).

87.     Proctor also got Christy some water.  See id. at 214:10-12 (McMillian, Proctor).

88.     Christy was arrested without pants on, and he asked Proctor if he had any pants, to which Proctor responded that he unfortunately did not.  See id. at 216:4-14 (McMillian, Proctor); Transcript of Video Interview of Edward Christy at 3:22-24 (transcribed March 17,

-14-

2011)(Government's Exhibit V)("Transcript of Interview").

89.     Proctor read Christy an Advise of Rights Form, which states:

**Before we ask you any questions, you must understand your constitutional rights.**

\_\_\_\_\_   You have the right to remain silent.

\_\_\_\_\_   Anything you say can be used against you in a court of law.

\_\_\_\_\_   You have the right to talk to a lawyer for advise before we ask you any questions, and to have a lawyer present while we ask you questions.

\_\_\_\_\_   If you cannot afford a lawyer, one will be appointed before we ask you any question at no cost to you, if you desire.

\_\_\_\_\_   If you decide to answer questions without a lawyer present you will still have the right to stop answering questions at any time, until you talk to a lawyer.

\_\_\_\_\_   I have been advised of an understand my Constitutional Rights.

\_\_\_\_\_   I have read and understand my Constitutional Rights.

Signature _____ Date: _____

Witness _____ Date: _____

**Waiver of Rights**

\_\_\_\_\_   I have read this statement of my rights and understand what my Constitutional Rights are.  (I have been advised of and understand my Constitutional Rights).

\_\_\_\_\_   I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made against me and no pressure or coercion of any kind has been used against me.

Signature _____ Date: _____

Signature _____ Date: _____

Bernalillo County Sheriff's Department Special Victims Unit Interrogation -- Advise of Rights

(Government's Exhibit T).  See Apr. 21, 2011 Tr. at 185:20-25 (Proctor).

90.     Christy acknowledged his understanding of these rights, initialed each line on the Advise of Rights Form, and signed the form, waiving his rights at 11:53 p.m.  See Advise of Rights Form at 1; Apr. 21, 2011 Tr. at 186:5-8 (Rees, Proctor).

91.     Approximately five hours passed between the time that Christy was arrested and the time that Christy signed the Advise of Rights Form.  See CAD Report at 2; Advise of Rights Form at 1.

92.     Christy appeared to understand his rights, he did not have any questions, and he was willing to speak to Proctor.  See id. at 186:17-25 (Rees, Proctor).

93.     Proctor described Christy as very talkative and willing to talk; Proctor did not do anything to threaten or coerce Christy to participate in the interview.  See Apr. 21, 2011 Tr. at 189:2-8 (Rees, Proctor).

94.     There was nothing which suggested that Christy was under the influence of drugs or alcohol, and thus did not understand what was going on.  See Apr. 21, 2011 Tr. at 189:20-190:1 (Rees, Proctor).

95.     Christy was not under the influence of drugs or alcohol.  See id. at 189:20-190:1 (Rees, Proctor).

96.     Christy understood what was happening.  See Apr. 21, 2011 Tr. at 189:9-11 (Rees, Proctor).

97.     Proctor's interview with Christy was video-taped and later transcribed.  See Transcript of Interview (transcribed March 17, 2011).

98.     Christy told Proctor that he met K.Y. on a dating website called agematch.com, and that, because he met her on the website, he believed she was eighteen or older.  See Apr. 21, 2011

-16-

Tr. at 190:16-18( Proctor).

99.     Christy told Proctor that he knew that K.Y.'s psychological condition was fragile, and that he believed her father was verbally and psychologically abusive.  See id. at 190:16-22 (Proctor).

100.     Christy told Proctor that he felt bad for her, and made a snap decision to go help her and/or rescue her.  See id. at 190:16-24.

101.     Through the course of the interview, Christy told Proctor how he and K.Y. made plans for him to go get her, which demonstrated some inconsistencies with his statement that he made a snap decision to go get her.  See Apr. 21, 2011 Tr. at 190:25-191:3 (Proctor).

102.     Christy told Proctor that he picked her up in California, stopped at Needles on the way back, and had sex with her there.  See id. at 191:4-7 (Proctor).

103.     Christy told Proctor that, after sleeping a bit, they continued to Albuquerque, where they had sex again.  See id. at 191:4-9 (Proctor).

104.     During this time, Proctor was in contact with the Westminster Police Department, and it sent him a copy of an electronic mail transmission that Christy sent to K.Y. in which he said  he was upset at her for lying about her age and that he could not believe that she was only sixteen.  See Apr. 21, 2011 Tr. at 192:4-12 (Proctor).

105.     Proctor told Christy about the electronic mail transmission after a break in the interview, and Christy relented and said that K.Y. was under eighteen years of age.  See Apr. 21, 2011 Tr. at 192:13-18 (Proctor).

106.     Soon after, Proctor told Christy that the FBI was investigating the incident, that the FBI were sitting in his house, and that they were going through his house, or that they would soon go through his house if they had not yet.  See Transcript of Interview at 39:18-25 (Proctor).

107.     Proctor asked Christy what the FBI would find.  See Transcript of Interview at 39:25-

40:1 (Proctor).

108.   Christy told Proctor that they would find K.Y.'s clothes and personal items, electronic communications between himself and K.Y. on his computer, and pictures of K.Y.  See Transcript of Interview at 40:2-23 (Christy, Proctor).

109.   Proctor asked Christy about video equipment or cameras, stating that the deputies said they saw Christy taking pictures of K.Y. in bondage, and in response, Christy stated that he took a picture of K.Y. in her underwear when she was making dinner and that he had three pictures of her. See Transcript of Interview at 42:11-46:16 (Proctor, Christy).

110.   Towards the end of the interview, Christy began asking Proctor if he should talk to a lawyer.  See Apr. 21, 2011 Tr. at 194:7-13 (Rees, Proctor); Transcript of Interview at 55:3-5 (Christy)("And do you think, just as kind of a question, that it's probably best to do the lawyer thing at this point?").

111.   Proctor told him that he could not advise him what he should do regarding a lawyer; soon after -- discussing what would happen if Christy requested a lawyer --that they would ask no questions until he had a lawyer, that Christy would be booked, and that he then have an ability to talk to an attorney -- Proctor terminated the interview.  See Apr. 21, 2011 Tr. at 194:16-23 (Rees, Proctor); Transcript of Interview at 55:3-61:11 (Proctor, Christy).

112.   In her interview with an FBI special agent, K.Y. stated that she met Christy over the internet and that, after two or three communications, she told Christy her real age; she described them making plans for him to get her, and stated that they had sex in Needles and in Albuquerque.  See Apr. 21, 2011 Tr. at 196:1-22 (Rees, Proctor).

113.   Proctor prepared search warrants, which sought to search Christy's residence, his cellular telephone, his vehicle, his computer, and his person.  See Apr. 21, 2011 Tr. at 197:4-13

(Rees, Proctor).

114.    Proctor incorporated K.Y.'s statements and Christy's statements in his search-warrant affidavits.  See Apr. 21, 2011 Tr. at 196:20-197:3 (Rees, Proctor).

115.    Proctor also incorporated the Littlefield's observations when he looked in the window and the deputies' observations when they entered Christy's residence.  See, e.g., Search Warrant at 5 (dated November 10, 2009)(Government's Exhibit W)("Residence Search Warrant").

116.    As the grounds for issuance of the search warrants, Proctor stated:

> On November 9[th], 2009 at about 1900 hours, I was called out regarding a welfare check that was made at 2265 Kelly SE in reference to a missing 16 year old female juvenile from California.  For the purpose of this Affidavit, the Juvenile will be know [sic] as K.Y.. [sic]  Upon arriving on scene at 2265 Kelly SE, I learned that Deputies were dispatched to the above mentioned address to perform a welfare check that was requested by Westminster Police Department out of California.  According to Westminster PD, they had discovered information that K.Y. had possibly left the state of California with Edward Christy.  Deputies were also given K.Y.'s description and given Christy's address of 2265 Kelly SW.

> Once Deputies received this information and arrived at 2265 Kelly SW, they approached the residence and looked through the window.  As they did this, they noticed what appeared to be a young female matching K.Y.'s description tied up by her wrists and neck with bondage materials (straps).  Deputies also noticed white flashes that made them believe that photographs were being taken of K.Y.. [sic]  Upon making this observation, Deputies made entry into the house and were able to make contact with Edward Christy and identify the young female in bondage as K.Y.. [sic]  Both K.Y. and Christy were detained for investigation.

> It was at this point where Christy was transported to the Law Enforcement Center, located at 400 Roma NW, to be interviewed by myself and K.Y. was transported to the FBI office, located at 4200 Luecking Park Ave NE, where she was interviewed by Agent Mary Adkins.  Before I started my interview with Christy, he was read his rights and he signed an Advise of Rights form stating that he understood his Constitutional rights.

> During my interview with Christy, he informed me that he met K.Y. on the internet approximately one and a half months ago on a dating website called Age Match.  During this time, he stated that he developed a friendship with K.Y. . [sic]  Christy also stated that he believed K.Y. to be 18 years of age and that he had asked her to send him photographs of her, of which he received two.  Christy then stated

that on or about 11/6/09, K.Y. told him that if she could not leave her home and stay with him, she was going to kill herself. According to Christy, this threat of suicide was the reason why he drove to California, picked K.Y. up, and drove her back to Albuquerque. During this portion of the interview, I asked Christy if he had sexual intercourse with K.Y. and he stated "yes, twice." Christy stated these were in a motel in Needles, California, and once Sunday night (11/08/09) at his residence in Albuquerque. He maintained that he believed K.Y. to be 18 years of age.

It should be noted that I obtained a copy of an email that was sent from Christy to K.Y. on 11/06/09. This copy was sent to me from the Westminster Police Department. The email indicated that Christy knew that K.Y. was only 16 years of age. I confronted Christy with this email and at that time he did admit to knowing that K.Y. was only 16 years old. In these later admissions, Christy also admitted to performing oral sex on K.Y., having her touch and rub his penis, and buying dog cages and bondage items to facilitate her sexual fantasies.

After talking with Christy, I was contacted by [an FBI agent]. She informed me that in her interview, K.Y. disclosed two occasions where she had sexual intercourse with Christy. These disclosed incidents happened once at a Motel and once at Christy's residence in Albuquerque. She also stated Christy had requested naked photographs of her over the internet and that she sent him two of these photographs. These disclosures made to Agent Adkins are consistent with admission [sic] made by Christy.

Residence Search Warrant at 5-6. See Search Warrant at 2-3 (dated November 12, 2009)(Government's Exhibit X)(same)("Vehicle Search Warrant"); Search Warrant (dated November 12, 2009)(Government's Exhibit Y)(same but adding that the Westminster Police Department discovered information that K.Y. possibly left the state with Christy, because of electronic mail transmissions recovered from her account and that the electronic mail transmissions not only helped identify Christy but contained two naked photographs Christy sent of himself)("Search Warrant for Christy's Person"); Search Warrant (dated November 19, 2009)(Government's Exhibit Z)(same but adding that the cellular telephone were seized during the execution of a previous search warrant because they were capable of taking photographs and storing digital images, including images of child pornography)("Cellular Telephone Search Warrant").

117. The Honorable Albert S. Murdoch, New Mexico State District Judge, approved the

-20-

search warrant for Christy's residence around 7:00 a.m. on November 10, 2009.  See Apr. 21, 2011 Tr. at 199:5-11 (Rees, Proctor).

118.    Proctor executed a return and inventory of the items seized on November 12, 2009. See Apr. 21, 2011 Tr. at 201:1-6 (Rees, Proctor); Search Warrant Return and Inventory at 1 (dated November 12, 2009)(Government's Exhibit W).

119.    On November 12, 2009, Judge Murdoch approved the search warrant for Christy's vehicle.  See Apr. 21, 2011 Tr. at 201:15-202:23 (Rees, Proctor); Vehicle Search Warrant at 1.

120.    The return of the seized items was filed on November 13, 2009.  See Apr. 21, 2011 Tr. at 203:17-19 (Rees, Proctor).

121.    Judge Murdoch approved the search warrant for Christy's person on November 12, 2009.  See Apr. 21, 2011 Tr. at 204:3-205:5 (Rees, Proctor); Search Warrant for Christy's Person at 1.

122.    The return for the search warrant for Christy's person was filed November 13, 2009. See Apr. 21, 2011 Tr. at 206:19-21 (Rees, Proctor).

123.    The search warrant for the cellular telephones related to K.Y. and Christy was approved on November 19, 2009; the warrant was executed on November 19, and a return was filed November 20, 2009.  See Apr. 21, 2011 Tr. at 206:17-208:1 (Rees, Proctor); Cellular Telephone Search Warrant at 1; Return and Inventory at 1 (dated November 20, 2009)(Government's Exhibit Z).

124.    Pursuant to the search warrants, the deputies seized used condoms, multiple sex toys, K.Y.'s personal items, blue pills, a cellular telephone battery, a computer, and computer-related media, which were later determined to contain visual depictions of minors engaged in sexually explicit conduct, including pictures of K.Y.   See Search Warrant Return and Inventory (Government's Exhibit W); Search Warrant Return and Inventory (Government's Exhibit X).

125.    Proctor acquired a state arrest warrant for Christy for Criminal Sexual Penetration, Custodial Interference, and Sexual Exploitation of a Minor. See Warrant for Arrest at 1 (dated November 10, 2009)(Government's Exhibit BB); Apr. 21, 2011 Tr. at 208:2-10 (Rees, Proctor).

126.    The arrest warrant is dated November 10, 2009. See Warrant for Arrest at 1.

127.    Although the Criminal Complaint and Arrest Warrant Affidavit states that it was sworn to on November 11, 2009, Proctor testified that it was a typographical error and should state November 10, 2009. See Criminal Complaint and Arrest Warrant Affidavit at 1-2 (dated November 10, 2009)(Government's Exhibit AA); Apr. 21, 2011 Tr. at 209:5-7 (Rees, Proctor).

128.    The arrest warrant and supporting affidavit would have been submitted to a judge at the same time, and they were both submitted on November 10, 2011. See Apr. 21, 2011 Tr. at 209:14-201:8 (Rees, Proctor).

## PROCEDURAL BACKGROUND

On May 26, 2010, a federal grand jury returned an Indictment charging Christy with one count of violating 18 U.S.C. § 2423(a) -- Transportation with Intent to Engage in Criminal Sexual Activity -- and three counts of violating 18 U.S.C. §§ 2252(a)(4)(b), 2252(b)(2), and 2256 -- Possession of a Matter Containing Visual Depictions of Minors Engaged in Sexually Explicit Conduct. See Doc. 2.  On April 26, 2011, the grand jury returned a Superceding Indictment, also charging Christy with one  count of violating 18 U.S.C. § 2423(a) -- Transportation with Intent to Engage in Criminal Sexual Activity -- and three counts of violating 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 2256 -- Possession of a Matter Containing Visual Depictions of Minors Engaged in Sexually Explicit Conduct. See Doc. 94.

On February 14, 2011, Christy filed his Motion to Suppress Evidence and Statements. See Doc. 41. Christy asks the Court to suppress evidence allegedly illegally obtained from his residence

during a warrantless search, followed by a search pursuant to a warrant, as well as his statements obtained as a result of the search. On February 15, 2011, Christy filed his Brief in Support of Motion to Suppress Evidence and Statements. See Doc. 46 ("First Brief"). Christy argues that there were not exigent circumstances to justify the invasion of his home. He argues that, had the deputies not forced entry into his home and searched his home, arrested him, and interviewed him, "none of the material used in the search warrant and affidavit would have been available to establish probable cause for the issuance of the warrant." First Brief at 3. He further argues that, even if the deputies' entry into his home was justified, the search that followed was unreasonable.

On February 14, 2011, the United States filed its Motion to Strike Defendant Edward Christy's Motion to Suppress Evidence and Statements. See Doc. 45. The United States moves the Court to strike as untimely Christy's Motion to Suppress. The United States contends that the Court set a pre-trial motions deadline in this case, which expired on June 23, 2010. The United States contends that Christy filed his motion nearly eight months late and, because he failed to mention the timeliness of his motion, he fails to establish that good cause exists to relieve him of the constraints of rule 12(e)'s provision that a party's failure to comply with a pretrial motions deadline constitutes a waiver of the argument and that a court may grant relief from this waiver only based on a showing of good cause. The United States further contends that good cause does not exist.

On February 28, 2011, the United States filed the United States' Response to Defendant's Motion to Suppress *(Docs. 41, 46 and 47)*. See Doc. 54. The United States asks the Court to deny the Defendant's Motion to Suppress. The United States contends that the officers had a right to lawfully enter Christy's residence under the emergency aid/exigent circumstances exception to the Fourth Amendment's search requirement. The United States further contends that, once inside the residence, the officers did not exceed the Fourth Amendment's limitations. The United States asserts

-23-

that Christy's subsequent interviews and his recorded incriminating admissions were in accordance with <u>Miranda</u> and a product of his free will.  The United States contends that there is not any fruit of a poisonous tree evidence that merits suppression.  The United States further asserts that, if the Court finds that the basis of the search warrants defective, it should find application of the good-faith exception to the exclusionary rule.

On April 1, 2011, Christy filed the Defendant's Amended Brief in Support of Motion to Suppress Evidence and Statements.  <u>See</u> Doc. 66 ("Second Brief").  In his amended brief, Christy argues that the deputies' act of walking around the corner of the house past the normal front entrance and peering into a crack in the window shades constitutes an illegal warrantless search.

Also on April 1, 2011, Christy filed the Defendant's Response to United States' Motion to Strike Defendant's Motion to Suppress Evidence and Statements (Doc. 45).  <u>See</u> Doc. 68.  In his response, Christy argues that he has not waived any right to a motion invoking his rights under the Fourth Amendment and that a motion to suppress is timely if it is filed before trial.  He argues that, at a hearing on March 1, 2011, the Court extended the time for filing pretrial motions to April 1, 2011, and thus his motion to suppress and brief are timely.  Christy further argues that, even if the Court finds that he did not timely file his motion to suppress, the Court may grant relief upon a showing of good cause.  Christy argues that good cause exists to grant relief from any waiver of an argument invoking his rights, because the United States provided inadequate discovery.

On April 6, 2011, the United States filed the United States' Response to Defendant's Amended Brief in Support of Motion to Suppress *(Doc. 66)*.  <u>See</u> Doc. 80.  The United States contends that the only new information and/or argument in the Second Brief is that the deputies were wearing tactical gear, a reference to the BCSO exigent circumstance policy, and that the deputies' act of peering into the crack in the window shades is an illegal search.  The United States reiterates

its argument that the officers had a right to enter the resident under the emergency aid/exigent circumstances exception and its request that the Court deny Christy's motion to suppress.

At the hearing, Christy argued that Littlefield violated the Fourth Amendment by being at the window, that he violated the Fourth Amendment by looking in the window, and that there were no exigent circumstances justifying entry into the residence. He argued that, assuming there were exigent circumstances, they passed before the deputies entered the residence and that the deputies had the obligation to obtain a search warrant. Christy also argued that the police exceeded the scope of a permissible protective sweep. He further argued that Christy was denied counsel in violation of the Fifth and Sixth Amendments to the United States Constitution. See Apr. 22, 2011 Tr. at 15:21-25 (McMillian)("The next problem I have, Your Honor, is in detaining Mr. Christy . . . for four hours without his pants, without a phone call, without anything to drink and in hand[cuffs] and then -- and then interrogated him . . . without counsel."); id. at 16:25-17:2 ("Deception is not a constitutional problem, Your Honor, unless it's used to coerce -- coerce what amounts to a [denial] [of] counsel.").

At the hearing, the Court asked the United States about the its argument regarding exigent circumstances.

> THE COURT: . . . [T]here's two components to the exigent circumstances. One which requires probable cause and one [which] . . . doesn't. Maybe the [United States] is just not going under the probable cause one at all. If it is [not], then I can eliminate that half of the exigent circumstances and just focus on the one that doesn't require probable cause. Is it that prong that the United States . . . -- is the United States saying they don't have to have probable cause here.
>
> MS. REES: For purposes of exigency I do not believe we would have n[eeded] to have probable cause. We w[ould] have only needed to have probable cause . . . when Detective Carvo indicated in his testimony that he believed he had probable cause for crimes.
>
> THE COURT: But you . . . are jet[isoning] the probable cause portion of the exigent circumstances, then aren't you forced to -- I agree it's a reasonable suspicion or you can give me the exact language, and I certainly agree it's less than probable cause,

but now you have to establish that the young girl was in immediate danger of harm.

MS. REES:  That is correct . . . .

THE COURT:  So the crime [aspect] goes out the window.

MS. REES:  That is correct for Deputy Littlefield's purposes when we're [l]ooking at his testimony and assessing his objective reasonable belief whether exigency existed you look at whether he reasonably believe[d] a emergency existed . . . .  Of the danger of . . . the another.

THE COURT:  I think I agree with you that doesn't require any probable cause . . . .

MS. REES:  Absolutely.

THE COURT:  So it's kind of irrelevant, then -- It's kind of irrelevant what crime could have been ch[arged], what crime could have been suspected, what he was actually charged with. . . .  The thing we're focusing on is whether the ju[venile] girl was in immediate danger of harm.

MS. REES:  For Deputy Littlefield in that initial entry you are absolutely correct . . . .

Apr. 22, 2011 Tr. at 24:16-26:3 (Court, Rees).  The United States argued that the deputies had exigent circumstances based on the information they received from California in the CAD report.  The United States argued that the deputies had exigent circumstances when they pulled their police car up and conceded that, if they did not have exigent circumstances when Littlefield read the CAD Report, Littlefield could not have had exigent circumstances looking in the window.

MS. REES:  . . . It's the United States position that Deputy Littlefield lawfully approached that window and looked through the window and he had sufficient information based upon the CAD report to believe that this missing child was in danger.  It is a 16 year old female who went missing from Westminster, California with a 57 year old male.  The fact that she's missing suggests some degree of danger.  It's been reported that she is missing, and then they found Deputy Littlefield also was aware that . . . s[h]e had been e-mailing naked photographs between herself and this adult male.  And as Deputy Littlefield suggest that fact in and of itself indicated some t[ype] of sexual interest.  So just based on the age difference you would have a danger to the child because we know it is unlawful to have any type of sexual

-26-

re[lationship] with a m[]an.[7]  From there.

THE COURT:  Is what you're arguing is that they had exigent circumstances when they pull their police car up.

MS. REES:  Absolutely.

THE COURT:  Two blocks away or so radi[u]s.

MS. REES:  Absolutely.

THE COURT:  So would you agree with me that if they didn't have exigent circumstances that he couldn't have been in the . . . window.

MS. REES:  I would agree with that.

THE COURT:  So he needs exigent circumstances before he even looks in the window . . . .

MS. REES:  I would agree with that because the window would be a search.

THE COURT:  And so what I understand the Government to be arguing is that from this CAD report these -- this information is enough to constitute exigent circumstances

[MS. REES:] [A]bsolutely. [And also] the fact that California had pinged the cellular telephone of this male and found it hit in Westminster, California, the same location that in the missing juvenile was from and now today it is pin[g]ing in Albuquerque, that suggests recent travel.  So now they have reason to . . . belie[ve] that the missing juvenile is in the company of this . . . adult who is substantially older than who her, who has been engaged in sending and receiving naked pictures.  So that further raises the bar.

. . . .

MS. REES: I believe that the exigent circumstance . . . arose when this juvenile went missing and the facts and circumstances which were available to Deputy Littlefield . . . suggested she was in custody of this older male whom she[] had been exchanging

---

[7] The Court notes that the CAD report does not state that K.Y. had sent naked pictures of herself through electronic mail transmissions; it states only that Christy sent K.Y. nude pictures of himself.  See CAD Report at 1.  The Court agrees with Ms. Rees that exigent circumstances would have justified the deputies' actions had it been unlawful for K.Y. to have a sexual relationship with Christy.  That is not the case, however.

with and that naked pictures is key.

Apr. 22, 2011 Tr. at 26:10-28:25 (Court, Rees)(emphasis added).  It argued that, once Littlefield

looked in the window, he saw circumstances that heightened the exigency suggesting child abuse.

The United States asserted that it was not contesting that Christy was in custody and not free to leave,

but argued that Christy was properly advised on his <u>Miranda</u> rights and knowingly and intelligently

waived his right to counsel.  <u>See</u> Apr. 22, 2011 Tr. at 34:4-7 (Rees)("[I]n terms of the interview itself,

first of all, the United States is not contesting that the defendant was . . . in [custody] and not free to

leave.").

## RELEVANT LAW REGARDING RULE 12

Rule 12(b)(3) of the Federal Rules of Criminal Procedure states that a motion to suppress

evidence "must be raised before trial."  Fed. R. Crim. P. 12(b)(3).  Rule 12(c) states that "[t]he court

may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make

pretrial motions and may also schedule a motion hearing."  Fed. R. Crim P. 12(c).  "A party waives

any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule

12(c) or by any extension the court provides."  Fed. R. Crim. P. 12(e).  "For good cause, the court

may grant relief from the waiver."  Fed. R. Crim. P. 12(e).

The United States Court of Appeals for the Tenth Circuit, in <u>United States v. Bryant</u>, 5 F.3d

474 (10th Cir. 1993), stated that the record clearly indicated that the defendant failed to show cause

for his failure to make a timely motion.  <u>See</u> 5 F.3d at 476.  "The fact that trial counsel, who had been

serving as co-counsel in Defendant's case, was not officially appointed by the court until two days

before trial was not sufficient cause."  5 F.3d at 476.  "Defendant has made no allegations that prior

defense counsel was prevented from filing the motion or that trial counsel, during the time he served

as co-counsel, was prevented from filing, or urging Defendant's second counsel to file the motion."

5 F.3d at 476.  The Tenth Circuit found that, because the defendant failed to show cause for failing

to raise his selection prosecution claim prior to trial, he waived the claim.  See 5 F.3d at 476.

In United States v. Gonzales, 229 F. App'x 721 (10th Cir. 2007), the Tenth Circuit held that

the district court did not abuse its discretion when it determined that the defendant's motion to

dismiss and motion to disclose the identity of the confidential informant were untimely.  See 229 F.

App'x at 726.  The defendant filed his motions one business day before his trial was set to begin,

after the deadline for pretrial motions.  See 229 F. App'x at 726.  The Tenth Circuit noted that the

defendant did not argue that the facts upon which his motions relied could not have been fully

discovered by the date set for those motions.  See 229 F. App'x at 726.

> He does argue that the district court should have inquired whether there was
> good cause for the untimely motions before summarily dismissing them.  Had the
> court done so, he contends, it would have recognized that the eight continuances
> during the course of Mr. Gonzales's representation by two separate counsel resulted
> in the filing of no substantive motions on his behalf.  He argues that "[t]he issues in
> the[ present] motions were, essentially, Mr. Gonzales'[s] only legal defense." Aplt's
> Br. at 34.  Mr. Gonzales suggests that the district court should have exercised its
> discretion to hear his untimely motions "in the furtherance of justice."  Id. at 35.
>
> . . . .
>
> When the district court appointed Mr. Bierly in August 2005, it informed him
> that there would be no more continuances and to be prepared for trial beginning in
> October 2005.  Mr. Gonzales did not indicate that he disagreed with his counsel's
> tactics before trial. There is no cause given for the belated filings, apart from Mr.
> Gonzales's present contention of ineffective assistance of counsel, which we address
> below.  Moreover, the district court also dismissed the motions on the merits, further
> undermining Mr. Gonzales's argument.  Accordingly, we hold that the district court
> did not abuse its discretion when it determined that Mr. Gonzales's motion to dismiss
> and motion to disclose the identity of the confidential informant were untimely.

229 F. App'x at 726.

## RELEVANT LAW REGARDING FOURTH-AMENDMENT SEARCHES

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people

to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV). It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

"[T]he Fourth Amendment protects people, not places," and the Supreme Court of the United States has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a "constitutionally protected area." Katz v. United States, 389 U.S. 347, 351 (1967). The proper inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable. See id. ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); Katz v. United States, 389 U.S. at 361 (Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home. The "chief evil" from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth Amendment's warrant requirement." United States v. Thompson, 524 F.3d at 1132. See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right

of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'")(quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); Payton v. New York, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").

1.      **Search Warrants Require Probable Cause.**

The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant. See Illinois v. Gates, 462 U.S. 213, 239 (1983). A magistrate judge must consider the totality of the circumstances described in the warrant affidavit to determine probable cause, which exists when there is a 'fair probability' that contraband or other evidence will be found in a particular place." United States v. Biglow, 562 F.3d 1272, 1280-81 (10th Cir. 2009)(quoting Illinois v. Gates, 462 U.S. at 238). A magistrate judge's decision to issue a search warrant may not be solely a ratification of the law-enforcement officials' conclusion that a suspect has committed a crime; rather, affidavits supporting a search-warrant request must provide the magistrate judge with a substantial basis on which to issue a warrant. See United States v. Bigelow, 562 F.3d at 1281; United States v. Prince, 593 F.3d 1178, 1186 (10th Cir. 2010)("An affidavit submitted in support of a search warrant must provide the magistrate with a substantial basis for determining the existence of probable cause.")(internal quotation marks omitted). In other words, the magistrate judge must perform his or her own unbiased and independent review of the facts presented. See United States v. Leon, 468 U.S. 897, 914 (1984).

To assure that warrants are not based on bare conclusions, the Supreme Court has mandated the courts to "conscientiously review the sufficiency of affidavits on which warrants are issued." Illinois v. Gates, 462 U.S. at 239. See United States v. Biglow, 562 F.3d at 1281. A magistrate judge's finding of probable cause is nevertheless given great deference, with the court's role in

reviewing the probable-cause finding limited to the sufficiency of the warrant affidavit; the Supreme Court prohibits after-the-fact *de novo* scrutiny of the probable-cause determination.  See United States v. Biglow, 562 F.3d at 1281 (quoting Illinois v. Gates, 462 U.S. at 238-40, and Massachusetts v. Upton, 466 U.S. 727, 733 (1984)).

### 2. **Warrantless Searches: Limited Fourth Amendment Exceptions.**

Not all searches require a warrant.  The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. at 357).  See Payton v. New York, 445 U.S. at 586.  As the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d at 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

### 3. **Exigent Circumstances.**

"One exception to the warrant requirement is when police reasonably believe an emergency exists that makes it infeasible to obtain a warrant."  United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008).  "The government bears the burden of proving the exigency exception to the warrant requirement applies."  United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)(citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citation omitted).  Generally, a warrantless entry under the exigent-circumstances exception requires

probable cause and exigent circumstances.  See Kirk v. Louisiana, 536 U.S. 635, 638 (2002);

Manzanares v. Higdon, 575 F.3d 1135, 1142-43 (10th Cir. 2009).  The Tenth Circuit, however,

appears to have recognized a subset of exigent-circumstances cases -- what the Court refers to as

"emergency-aid" cases -- that do not require probable cause.  See United States v. Najar, No. CR

03-0735, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.), aff'd, 451 F.3d 710 (10th

Cir. 2006)("For probable cause in the usual [evidence-of-crime] sense not to be needed, the police

must be responding to a true emergency rather than a crime, and the police must reasonably believe

a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid

serious injury.")(emphasis in original).  In the Tenth Circuit's opinion in United States v. Najar, the

Tenth Circuit held that the exigent-circumstances exception to the warrant requirement authorized

a warrantless police entry in an emergency-aid situation without a showing of probable cause.  In so

doing, the Tenth Circuit noted that the Supreme Court in Brigham City, Utah v. Stuart, which was

determining "whether the risk of personal danger created exigent circumstances," did not "require

probable cause in this type of exigent circumstances."  United States v. Najar, 451 F.3d at 718

(emphasis added).

     In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine

whether emergency circumstances justify a warrantless entry into a home, which examines: "whether

(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect

the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."

United States v. Najar, 451 F.3d 710, 717-18 (10th Cir. 2006).  A court is "guided by the realities of

the situation presented by the record," and should consider the facts from the viewpoint of "prudent,

cautious, and trained officers."  United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation

omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than

the probable cause standard." United States v. Porter, 594 F.3d at 1258 (citation omitted).  "Officers

do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid

exception." United States v. Porter, 594 F.3d at 1258 (citation omitted).  A court must also, however,

remember that officers cannot create their own exigent circumstances to justify a warrantless entry.

See United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003).  In the limited circumstances

where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does

not require a separate showing of probable cause.  See United States v. Najar, 451 F.3d at 718.

## RELEVANT LAW REGARDING *MIRANDA* RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "custodial

interrogation."  United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing Miranda v.

Arizona, 384 U.S. at 444)(internal quotations omitted).  A person is in custody if "his freedom of

action is curtailed to a degree associated with formal arrest."  United States v. Hudson, 210 F.3d at

1190 (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984))(internal quotations omitted).  The

court must examine "whether a reasonable [person] in the suspect's position would have understood

his situation . . . as the functional equivalent of formal arrest."  United States v. Hudson, 210 F.3d

at 1190 (brackets in original)(internal quotations and citations omitted).  The Tenth Circuit has

articulated the "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what

were the circumstances surrounding the interrogation; and second, given those circumstances, would

a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).

### 1.    Waiver of Rights Under *Miranda v. Arizona*.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made

"voluntarily, knowingly and intelligently."  United States v. Burson, 531 F.3d 1254, 1256 (10th Cir.

2008 (citations omitted).  An express statement of waiver is not required; the waiver can be inferred

from the defendant's actions and words.  See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir.

2006)(citation omitted).  "Whether this standard is met 'depends in each case upon the particular

facts and circumstances surrounding that case, including the background, experience, and conduct

of the accused.'"  United States v. Burson, 531 F.3d at 1256 (citations omitted).  The government

generally bears the burden of proving that a valid waiver by a preponderance of the evidence.  See

United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11 (citation

omitted).  The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with a full awareness of both
> the nature of the right being abandoned and the consequences of the decision to
> abandon it.  Only if the totality of the circumstances surrounding the interrogation
> reveal both an uncoerced choice and the requisite level of comprehension may a
> court properly conclude that the Miranda rights have been waived.

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(citations omitted).  In determining

whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the

circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citation omitted).  A

waiver is knowingly and intelligently made when it is made  "with a full awareness of both the nature

of the right being abandoned and the consequences of the decision to abandon it."  United States v.

Burson, 531 F.3d at 1257 (citations omitted).  "In determining whether rights were voluntarily

waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed

of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or

threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270 (10th Cir.

2010)(citations omitted).

**2.      Invocation of Right to Remain Silent.**

Under Miranda v. Arizona, an interrogation must cease immediately when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." United States v. McCarthy, 382 F. App'x 789, 792 (10th Cir. 2010)(citation omitted). Statements elicited after a defendant invokes this right are inadmissible. See United States v. McCarthy, 382 F. App'x at 792 (citation omitted). To fall within the ambit of this rule, however, a defendant's invocation of his right to remain silent must be clear and unambiguous. See United States v. McCarthy, 382 F. App'x at 792 (citing United States v. Rambo, 365 F.3d 906, 910 (10th Cir. 2004)).

**3.      Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the United States Constitution provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. 477, 481 (1981). Once an individual subject to custodial interrogation expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85. The Supreme Court in Miranda v. Arizona stated:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.

The request for counsel must be clear and unequivocal. See Davis v. United States, 512 U.S. 452, 459 (1994). "Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an

attorney.'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her <u>Miranda</u> rights." <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250 (2010)(citations omitted).

The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to 'determine whether the accused actually invoked his right to counsel.'" <u>Davis v. United States</u>, 512 U.S. at 458 (citations omitted). A court's inquiry into whether the accused invoked the right to counsel is "objective." An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. <u>Davis v. United States</u>, 512 U.S. at 459 (emphasis in original).

In <u>United States v. Lux</u>, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked "how long it would take if she wanted a lawyer and if she would have to stay in jail while she waited for a lawyer." 905 F.2d at 1382. The Tenth Circuit, without elaborating on its reasoning, found that, based upon its "independent review" of the record, with deference to the trial court's findings of fact, the defendant did not make a request for an attorney. 905 F.2d at 1382.

<u>**SIXTH AMENDMENT RIGHT TO COUNSEL**</u>

The Supreme Court has stated that, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." <u>Montejo v. Louisiana</u>, 129 S. Ct. 2079, 2085 (2009)(citations omitted).

"The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecution' is limited by its terms: 'it does not attach until a prosecution is commenced.'" Rothgery v. Gillespie County, Tex., 554 U.S. 191, 198 (2008). The Sixth Amendment right to counsel "may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." Montejo v. Louisiana, 129 S. Ct. at 2085 (citations omitted).

> As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in [Miranda v. Arizona], has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.

Patterson v. Illinois, 487 U.S. 285, 296 (1988).

## RELEVANT LAW OF THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the police will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d

at 999.

### 1.    Judicial Rationale of the Exclusionary Rule.

The exclusionary rule introduces into the criminal justice system a tension between the court's need to find the truth by using all relevant evidence and the societal desire to deter illegal police conduct by excluding otherwise probative evidence.  An illegal search often results in reliable, probative, and otherwise-unobtainable evidence of an individual's guilt.  Sometimes the result of applying the exclusionary rule is that all evidence in a case is suppressed, even though the defendant's guilt is almost certain, because the unconstitutional search taints all of the evidence.  In such circumstances, the individual often cannot be convicted of the crime of which he is clearly guilty.  The Supreme Court has found, however, that limiting the powers of law enforcers and the concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth Amendment's protections.  As Justice Stevens noted in his concurring and dissenting opinion in United States v. Leon, 468 U.S. 897 (1984): "It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt.  But that price is one courts have often been required to pay to serve important social goals."  468 U.S. at 979 (Stevens, J., concurring and dissenting).  See Kolender v. Lawson, 461 U.S. 352, 355 (1983)("The price of [law-enforcement] effectiveness, however, is intrusion on individual interests protected by the Fourth Amendment.").

> [The exclusionary] rule is based upon very strict requirements designed to narrow the occasions upon which officers can make searches and seizures without judicial warrant.  Unquestionably its application will now and then permit a guilty person to escape conviction because of hasty or ill-advised action on the part of enforcement officers.   But the same may be said of the requirements of the Fourth Amendment . . . .  The framers of the Fourth Amendment must have concluded that reasonably strict search and seizure requirements were not too costly a price to pay for protection against the dangers incident to invasion of private premises and papers by officers, some of whom might be overzealous and oppressive.

United States v. Rabinowitz, 339 U.S. 56, 67-68 (1950)(Black, J., dissenting), overruled in part by

Chimel v. California, 395 U.S. 752 (1969).  The Constitution of the United States and the case law interpreting it reveal that the government's right to interfere in the lives of its citizens is highly circumscribed.  For the present time, the Supreme Court has determined that the purpose of the exclusionary rule "is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it."  Elkins v. United States, 364 U.S. 206 (1960).[8]

### 2.   Distinction between Finding of a Constitutional Violation and Applying of the Exclusionary Rule.

"Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  United States v. Leon, 468 U.S. at 906 (citing Illinois v. Gates, 462 U.S. 212, 223 (1983))(internal quotes omitted).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct. 695, 702 (2009).  Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error

---

[8] There are powerful arguments against the exclusionary rule.  Both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves.  See, e.g., Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L.Rev. 363, 369-70, 442-43 (1999); Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 795-800 ("[I]f deterrence is the key, the idea is to make the government pay, in some way, for its past misdeeds, in order to discourage future ones.  But why should that payment flow to the guilty? Under the exclusionary rule, the more guilty you are, the more you benefit."); Hon. Malcolm Richard Wilkey, A Call for Alternatives to the Exclusionary Rule, 62 Judicature 351 (1978-1979); Hon. Malcolm Richard Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 214 (1978-1979).

or reckless disregard of constitutional requirements," suppression is not automatic, and "any marginal deterrence" from suppression is often insufficient. Herring v. United States, 129 S. Ct. at 702, 704.

### 3. Exclusionary Rule Prohibits Indirect Uses of Tainted Evidence.

If officers acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an exception to the exclusionary rule applies. See United States v. Calandra, 414 U.S. at 347 ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule demands exclusion of evidence that was obtained as a but-for result of the illegal search unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no longer clings to it. Wong Sun v. United States, 371 U.S. 471, 484 (1963)("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920)). See United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006). The exclusionary rule is simply stated, but courts have been hashing out its scope for many years.

### 4. Relevant Exceptions to the Exclusionary Rule.

The exclusionary rule has exceptions. If illegally obtained evidence is somehow purged of the taint of the unconstitutional conduct, it can be admitted. "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence

would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." United States v. Olvares-Rangel, 458 F.3d at 1109.  See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.").

      **a.**    **Attenuation of the Taint.**

When determining whether evidence constitutes fruit of the poisonous tree subject to the exclusionary rule, a court must determine, based upon the unique facts of each case, "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Wong Sun v. United States, 371 U.S. at 448).  See United States v. Carson, 793 F.2d 1141, 1156-57 (10th Cir. 1986)("The issue is not whether the officers 'would not have requested consent but for the first illegal search,' but rather whether the officers exploited the fruits of their illegal activity in such a way that Carson's consent to the search was involuntary under the Fourth Amendment.").  In Brown v. Illinois, the Supreme Court listed three factors for courts to consider when analyzing fruits of the poisonous tree and determining whether the causal chain is sufficiently attenuated: (i) the time elapsed between the constitutional violation and the acquisition of evidence; (ii) the presence of intervening facts; and (iii) the purpose and flagrancy of the official misconduct. See 422 U.S. at 603-04.  See also United States v. Torres-Castro, 470 F.3d at 999 ("In considering whether evidence seized is so attenuated from the illegality as to dissipate any taint, we balance the 'temporal proximity of the Fourth Amendment violation,' any 'intervening circumstances,' and the

'purpose and flagrancy of the official misconduct.'")(quoting United States v. King, 990 F.2d at 1563-64).

The Tenth Circuit has stated that "[t]he implication of the Supreme Court's decision in Brown v. Illinois is that in order for incriminating statements to be purged of the taint of an underlying Fourth Amendment violation, [the] defendant's consent must meet the voluntariness standard of the Fourth Amendment."  United States v. Carson, 793 F.2d at 1151.

> If Government officials use the fruits of their illegal conduct to "cajole" the consent [to search] of [an] unwitting citizen, then the evidence [obtained in that search] is obtained by exploitation of the primary illegality and is not obtained by means sufficiently distinguishable from the illegality to be purged of the primary taint.

United States v. Carson, 793 F.2d at 1157.  At least in the context of the officers' motivation for requesting consent to search, "the inquiry turns on whether the evidence is obtained by means, although influenced by prior illegal police actions, which are different enough from the prior illegality to be 'sufficiently distinguishable.'"  United States v. Carson, 793 F.2d at 1149 (emphasis added).

### b.      The Good-Faith Exception.

Another exception to the exclusionary rule is the investigating officer's "good-faith."  In United States v. Leon, the Supreme Court faced the question whether to create an exception to the exclusionary rule when a police officer obtained evidence through the use of a warrant that he mistakenly thought probable cause supported.  See 468 U.S. at 905.  The Supreme Court noted that excluding evidence which was obtained pursuant to a warrant that the officer reasonably thought to be valid would not deter police misconduct, because the affected officer had taken all steps in his power to comply with the Fourth Amendment.  See 468 U.S. at 918-19.  It further noted that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter

is the issuing judge and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court thus concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant.  See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).

> [T]he suppression of evidence obtained pursuant to a warrant should be ordered only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.  Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter.

United States v. Tuter, 240 F.3d at 1298-99 (citations omitted).  Furthermore, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).

The Tenth Circuit has outlined four situations in which an officer's reliance upon a warrant would be improper.

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard for the truth."  Second, the exception does not apply when the "issuing magistrate wholly abandon[s his] judicial role."  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007(quoting United States v. Leon, 468 U.S. at 922-23)

-44-

(internal citations omitted).  See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).

If any of these situations is present, the good-faith exception should not be applied, and the evidence

should be excluded.

### (i)      Warrants based on illegally obtained information.

When a search is conducted pursuant to a warrant that is based on illegally obtained

information, a court is not to blindly apply the good-faith exception.  Instead, the court is to consider

the warrant with the illegally obtained information excluded and determine, based on the remaining

information, whether probable cause nevertheless existed.  If the remaining content of the warrant

affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the

evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we
> nonetheless uphold the warrant if there was probable cause absent that information.
> An affidavit containing erroneous or unconstitutionally obtained information
> invalidates a warrant if that information was critical to establishing probable cause.
> If, however, the affidavit contained sufficient accurate or untainted evidence, the
> warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83 F.3d

1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the

affidavit and ask whether sufficient facts remain to establish probable cause."); United States v.

Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or

unconstitutionally obtained information invalidates a warrant if that information was critical to

establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted

evidence, the warrant is nevertheless valid.").  The apparent rationale for this rule is that one officer

cannot execute a warrant "in good faith" if it contains information that he or a fellow officer

obtained illegally.  See United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)("Leon's

-45-

good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.").

**(ii)**     ***Herring v. United States*.**

Recently, the Supreme Court decided a case that may have changed the standard for the good-faith exception to the warrant requirement. In <u>Herring v. United States</u>, officers arrested Herring pursuant to an arrest warrant listed in the Dale County Alabama warrant database. <u>See</u> 129 S. Ct. at 698. In the search incident to that arrest, officers found drugs and a gun on Herring's person. <u>See</u> <u>id.</u> Herring was then indicted on federal gun and drug-possession charges. <u>See</u> 129 S. Ct. at 699. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. <u>See</u> 129 S. Ct. at 698. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. <u>See</u> 129 S. Ct. at 699. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. <u>See</u> 129 S. Ct. 699.

The Supreme Court In <u>United States v. Herring</u> also affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. <u>See</u> <u>Herring v. United States</u>, 129 S. Ct. at 700. The Supreme Court reiterated its holding in <u>United States v. Leon</u>: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." <u>Herring v. United States</u>, 129 S. Ct. at 701 (citing <u>United States v. Leon</u>, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To

-46-

trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 129 S. Ct. at 702.

The Supreme Court in Herring v. United States then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made in objectively reasonable reliance on a warrant that had been subsequently recalled. 129 S. Ct. at 703-04. Thus, it appears that, if the police make a negligent administrative error which results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

In United States v. McCane, 573 F.3d 1037 (10th Cir. 2009), the Tenth Circuit described Herring v. United States as extending the exception to "good faith reliance upon the negligent mistake of a fellow law enforcement employee." 573 F.3d at 1043. "In Herring[ v. United States], the [Supreme] Court applied the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee." 573 F.3d at 1043 "[T]he good-faith inquiry 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Id. at 1044 (quoting Herring v. United States, 129 S. Ct. at 703). As the Supreme Court stated: "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." United States v. Herring, 129 S. Ct. at 701. See United States v. McCane, 573 F.3d at 1044; United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009)("An

officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."); United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009).

## ANALYSIS

The Court will not strike Christy's motion to suppress, because it finds that the motion was timely. The Court finds that the deputies' entry into Christy's house without a warrant was not justified by exigent circumstances. The United States has not met its burden of proving that the exigency exception applies, because the deputies did not have an objectively reasonable basis to believe that there was an immediate need to protect K.Y.'s safety, because, as a sixteen-year old girl, she could consent to sexual contact under New Mexico law. The Court will suppress Christy's statements to Proctor as fruit of the illegal searches. The Court will also suppress the evidence that the deputies found when they executed their search warrants for Christy's residence, vehicle, and person, and the warrant for the cellular telephones, because, excluding the illegally obtained information, the remaining information in the warrants is not sufficient to establish probable cause.

## I.   THE COURT WILL NOT STRIKE CHRISTY'S MOTION TO SUPPRESS.

The United States argues that the Court set a pre-trial motions deadline which expired on June 23, 2010. Christy filed his motion on February 14, 2011. The United States argues that Christy's motion is thus untimely. It also argues that good cause does not exist to consider Christy's untimely motion. It asserts that Christy's motion to suppress concerns the circumstances surrounding the search of his home, and that the United States provided discovery regarding the search and Christy's statements to Christy's counsel on July 12, 2010. It asserts that, since the discovery of these relevant reports, Christy has had ample time to file a timely motion to suppress. It asserts that, while this relevant discovery was provided after the pre-trial motions deadline, it does

not justify an eight-month delay.  The United States asserts that, using the Court's June 3, 2010 standard discovery order as a guide, Christy can justify only a one-month delay in filing his motion to suppress -- not an approximately eight-month delay.  The United States also asserts that, should the Court consider the motion, it will likely affect and delay the trial date.

Christy argues that he has not waived his right to a motion invoking his constitutional rights. He argues that, at a hearing on March 1, 2011, the Court extended the time for filing pre-trial motions to April 1, 2011 and thus his motion was timely.  Christy argues that, even if the Court decides that his motion was untimely, it may grant relief from his waiver of his rights to file the motion to suppress upon a showing of good cause.  Christy argues that good cause exists to grant relief, because the United States has provided inadequate discovery in the matter, especially relating to events leading up to the warrantless arrest, search, and seizure of Christy and of his home. Christy notes that the last trial setting on March 14, 2011 was continued upon the United States' motion for a definite trial setting, and the United States continued making disclosures of previously undisclosed materials until March 17, 2011.

At the hearing on March 1, 2011, Christy's counsel asked the Court to set a date upon which he may not file any more pre-trial motions.  The Court set the deadline as April 1, 2011.  Because Christy filed his motion to suppress before the deadline for pre-trial motions that the Court set during the March 1, 2011, the Court finds that Christy's motion to suppress was timely and that Christy did not waive his right to file the motion to suppress.  The Court thus will not strike Christy's motion to suppress.

## II.   THE DEPUTIES' ENTRY INTO CHRISTY'S RESIDENCE VIOLATED CHRISTY'S FOURTH-AMENDMENT RIGHTS.

Christy contends that the deputies' act of walking around the corner of the house, past the

normal front entrance, and peering into a crack in the window shades constitutes an illegal warrantless search.  He further argues that the deputies' entry into the house was in violation of the Fourth Amendment and that the search which followed inside Christy's home was unreasonable. Christy also argues that, assuming there was an exigent circumstance, it passed before they entered, which meant they had an obligation to get a warrant.

The United States argues that exigent circumstances and officer safety provided reasonable grounds that necessitated the deputies walking to the corner of the house and looking in the window. The United States also argues that the deputies lawfully entered Christy's residence pursuant to the emergency aid/exigent circumstances exception to the Fourth Amendment.  The United States argues that the exigent circumstance did not pass by the time they entered the residence.  The United States further argues that the deputies' manner and scope of the search was reasonable.

The Court finds that the deputies' entry into Christy's residence without a warrant violated Christy's Fourth-Amendment rights, because exigent circumstances did not justify the entry. Exigent circumstances did not justify the warrantless entry, because the deputies could not have had an objectively reasonable basis to believe that there was an immediate need to protect K.Y.'s personal safety, because she was able to consent to sexual contact under New Mexico law.  The Court need not decide whether the deputies' actions in walking around the corner of the house and looking in the window were illegal searches, because, the United States conceded at the hearing that the deputies had exigent circumstances when they pulled up to Christy's house and that, if they did not have exigent circumstances before they got to the house, they could not have looked in the window. See Apr. 22, 2011 Tr. at 26:10-28:25 (Court, Rees)("THE COURT: Is what you're arguing is that they had exigent circumstances when they pull[ed] their police car up.  MS. REES: Absolutely.  THE COURT: So would you agree . . . that if they didn't have exigent circumstances

that he couldn't have been in the . . . window.  MS. REES:  I would agree . . . .").  It is thus not

appropriate for the Court to decide these constitutional issues, because the Court has found that the

deputies did not have exigent circumstances to enter Christy's residence when they first arrived and

the United States has conceded that, without exigent circumstances when they arrived, the deputies

did not have exigent circumstances to look in the window and to enter the house.  See United States

v. Gonzales, 150 F.3d 1246, 1254 (10th Cir. 1998)("[W]e avoid deciding constitutional issues where

narrower grounds for a decision exist . . . ."); McKenzie v. Renberg's Inc., 94 F.3d 1478, 1488 (10th

Cir. 1996)(stating that there is a "well-established rule that federal courts should avoid deciding

constitutional issues if narrower grounds for decision exist." (citation omitted)).  Because exigent

circumstances did not justify the deputies' warrantless entry into the residence, and thus that the

warrantless entry constituted an illegal search, the Court need not address whether the alleged

exigent circumstances dissipated before the deputies entered the residence or whether the manner

or scope of the deputies' search in the residence was reasonable.

 The deputies' entry into Christy's residence without a warrant violated Christy's Fourth-

Amendment.  Exigent circumstances did not justify the entry.  The deputies could not have had an

objectively reasonable basis to believe that there was an immediate need to protect K.Y.'s personal

safety, because, at sixteen, K.Y. could consent to sexual contact.

 In Galindo v. Town of Silver City, 127 F. App'x 459 (10th Cir. 2005), the Tenth Circuit

found that the material facts showed that exigent circumstances justified a law enforcement officer's

warrantless entry into the plaintiff's home.  See 127 F. App'x at 466.  The officer had information

from a minor's parent that the minor was in the home and that underage drinking was likely

occurring.  See id.  Law enforcement officers had observed minors in the home, "who could not be

aroused by repeated knocking on the patio door and yelling through the open door."  127 F. App'x

at 466.  "Fearing for the safety and welfare of these unresponsive minors . . . due to alcohol poisoning, the officers entered the home to check on the welfare of the minors."  127 F. App'x at 466.  "Under these circumstances, where there was an 'immediate threat of death or severe physical harm,' it was objectively reasonable for Officer Rodriguez to have entered the Galindo home. Officer Rodriguez therefore did not violate plaintiffs' Fourth Amendment rights."  127 F. App'x at 466.

In United States v. Taylor, 624 F.3d 626 (4th Cir. 2010), the United States Court of Appeals for the Fourth Circuit held that a law enforcement officer's actions in reuniting a four-year-old girl with her parents were objectively reasonable and justified by the exigent circumstances stemming from her abandonment.  See id. at 628.  The officer took custody of a four-year-old girl who was wandering along a busy street and took her home.  See id. at 627-8.  The officer saw, through the exterior door, that the interior door was open, and when he opened the exterior door and yelled hello, no one answered.  See id. at 628.  The girl walked inside, and the officer followed her inside; inside the home was a man who the officer arrested after learning that there were arrest warrants for the officer.  See 624 F.3d at 629.  The Fourth Circuit found that the circumstances surrounding the four-year-old's unsupervised odyssey constituted an emergency that made the officer's actions reasonable and stated that the absence of responsible adult supervision of children is an exigent circumstance justifying warrantless entry.  See id. at 632.

In Hunsberger v. Wood, 570 F.3d 546 (4th Cir. 2009), the Fourth Circuit stated that it believed that objective circumstances at the time of the law enforcement officer's entry "would cause a reasonable officer to believe that there was an emergency requiring prompt entry."  570 F.3d at 555.

First, the circumstances indicated the strong possibility of an unauthorized

intruder in the home. Klik, the Hunsbergers' neighbor, had said that she thought the Hunsbergers were out of town. There appeared to be someone inside the home who wished to avoid contact with the police; when the officers first arrived, someone in the house turned the lights off, and then later the open door in the garage suggested that someone had fled the home while the officers were at the front door. Three cars not belonging to the Hunsbergers were parked in front of the house. No one came to the front door when the officers rang the doorbell, and no one answered when Wood and Blessard knocked on the basement door repeatedly. Furthermore, a vacant home in the neighborhood had recently burned down as the apparent result of unauthorized use.

All of these facts gave rise to an objectively reasonable belief that vandalism might be taking place in the home. It is true that police officers need more than a slight suspicion that property is being harmed to justify a warrantless entry. For example, an open door alone does not create a reasonable belief that a burglary is taking place. But here there were numerous indications to justify the belief that someone was in the Hunsberger home who was not supposed to be there.

Second, there was evidence that a minor girl was in the home, given that her car was parked in front of the house. The girl's stepfather said that she was not supposed to be at the home and was exceedingly concerned for her welfare, especially given that it was the middle of the night. In his deposition testimony, Mark Hunsberger recalled telling his wife that night that Blessard was "worried sick" about his stepdaughter NW. The fact that the girl was not answering her cellphone suggested the possibility that she was hurt or otherwise in need of assistance. When a child goes missing, time is of the essence. It turned out that NW was not in immediate danger, but we cannot judge Wood's search based on what we know in hindsight. At the time of the search, there was reason to think she needed help.

Under these circumstances, a reasonable officer could conclude that prompt entry was necessary in order to protect the Hunsberger home from potential damage and to locate a missing girl who might be in harm's way.

570 F.3d at 555 (internal citation omitted).

In United States v. Johnson, 22 F.3d 674 (6th Cir. 1994), the United States Court of Appeals for the Sixth Circuit found that exigent circumstances justified police officer's warrantless entry into the defendant's apartment to free the minor victim. See 22 F.3d at 679-80. The police officers responded to a call that a "young girl was missing and being held against her will at the defendant's apartment." Id. at 676. The young girl, who was fourteen years old, "answered the door and told

-53-

officers that the defendant had locked her in the apartment and would not release her." Id. at 676. The young girl was alone, but she was locked in the apartment behind an armored gate. See id. at 676.  " The officers called their supervisor, Sergeant Aaron Carey for assistance.  When Sergeant Carey arrived at the defendant's apartment approximately twenty minutes later, he authorized a forced entry."  22 F.3d at 676.  The officers cut the padlock from the armored door and freed the young girl.  See id. at 676.  The Sixth Circuit found that, under these circumstances, "the police officers were clearly justified in the limited warrantless entry to free [the young girl]."  22 F.3d at 680.  "This warrantless entry was justified by the need to free a victim who had been held against her will and sexually assaulted."  22 F.3d at 680 (citing Minnesota v. Olson, 495 U.S. 91 (1990); Mincey v. Arizona, 437 U.S. 385 (1978)).

In United States v. Kenfield, 270 F. App'x 695 (9th Cir. 2008), the United States Court of Appeals for the Ninth Circuit found that the law enforcement officer's search did not violate the Fourth Amendment and affirmed the district court's denial of the defendant's suppression motion. See 270 F. App'x at 697.  The Ninth Circuit determined that the officer "had a reasonable basis for concluding that there was an immediate need to protect a minor female from serious harm."  270 F. App'x at 696.

> Cameron was searching for the girl at the request of her grandmother.  The sheriff's office had received an anonymous phone call saying the girl was out getting drunk with Kenfield.  He first established that the girl had lied to her grandmother about her whereabouts.  By the time he arrived in front of Kenfield's trailer, Cameron had good reason to believe the girl was there with two other older male friends of hers, one of whom owned the pickup truck parked in front of the trailer.  Cameron had seen the three of them driving together in the same pickup truck on prior occasions. He also knew that Kenfield had "proclivities to have young girls," and that Kenfield had a history of sexually deviant behavior.  As Cameron approached Kenfield's trailer, he smelled marijuana and, when he knocked on the door, heard the music inside stop playing, saw the lights go out, and heard running feet.

270 F. App'x at 969-97.  The Ninth Circuit found that, considering the totality of the circumstances,

the officer reasonably believed that he had to act quickly to retrieve the juvenile.  See id. at 697.

The Ninth Circuit also found that, once inside the trailer, the officer confined his search to locating

the juvenile and the other people inside.  See id. at 697.  The Ninth Circuit thus concluded that the

search did not violate the Fourth Amendment.  See 270 F. App'x at 697.

      The United States rests its case on the premise that Littlefield and the deputies had the right

to enter Christy's home without a warrant as soon as they received the CAD Report and pulled their

vehicle up, a few doors down from Christy's home.  See Apr. 22, 2011 Tr. at 26:25:27:4 (Court,

Rees)("THE COURT:  Is what you're arguing is that they had exigent circumstances when they pull

their police car up.  MS. REES:  Absolutely.  THE COURT:  Two blocks away or so radios.  MS.

REES:  Absolutely.").  The United States concedes that the Court need not decide whether the

deputies' action of walking around the corner of the house and peering in a crack in the window

shades was an illegal search or established exigent circumstances, because, according to the United

States, if Littlefield did not have exigent circumstances when he arrived at the house, he could not

lawfully develop exigent circumstances by walking to the back of the house and peering through a

crack in the window shades.  See id. at 27:5-12 (Court, Rees)(stating, in response to the Court's

questions whether Ms. Rees would agree "that if they didn't have exigent circumstances that he

couldn't have been in the . . . window," "I would agree," and in response to the Court's statement

"[s]o he needs exigent circumstances before he even looks in the window," "I would agree[,] . . .

because the window would be a search").  The United States also conceded that Littlefield did not

have probable cause that a crime was being committed by Christy in his house, and the United States

does not attempt to argue that the probable-cause requirement of the exigent circumstances doctrine

applies.  See United States v. Najar, 451 F.3d at 718 (" Neither did the Court require probable cause

in  this  type  of  exigent  circumstances[  --  in  the  emergency  aid  subset  of  exigent

circumstances].”); <u>United States v. Martinez</u>, 686 F. Supp. 2d 1161, 1184 (D.N.M. 2009)(stating that "generally, a warrantless entry under the exigent-circumstances exception requires probable cause and exigent circumstances," but that the "Tenth Circuit, however, appears to have recognized a subset of exigent-circumstances cases -- what the Court refers to as 'emergency-aid' cases -- that do not require probable cause," -- instead they require a reasonable belief that a person needs immediate assistance, and entry is necessary to protect or preserve life or avoid serious injury (citing <u>Kirk v. Louisiana</u>, 536 U.S. at 638; <u>Manzanares v. Higdon</u>, 575 F.3d at 1142-43; <u>United States v. Najar</u>, 2004 WL 3426123, at *6)). Thus, the United States concedes that the only issue is whether Littlefield and the BCSO deputies had exigent circumstances as soon as they saw the CAD Report. <u>See</u> Apr. 22, 2011 Tr. at 27:13-16 ("THE COURT: And so what I understand the Government to be arguing is that from this CAD report these -- this information is enough to constitute exigent circumstances. [MS. REES:] Absolutely.").

The CAD Report informed Littlefield and McKinney that K.Y., a sixteen-year old female from California, had gone missing from her residence in California; the CAD called K.Y. a run away. <u>See</u> CAD Report at 1 ("WESTMINSTER CNTY WANTS UNITS TO 10-10 REF A 10-28 . . . 10-28 IS FRM CALI SHES A 16 YR OLD FEMALE."). They knew that K.Y. had been sending electronic mail transmissions to a man who was substantially older than herself -- Christy -- and that Christy was sending her nude pictures of himself. <u>See</u> CAD Report at 1 (stating that the adult male was born 06/08/52 and that "AFTER A 27 CALI FOUND OUT THAT SHE HAD BEEN EMAILING A MALE . . . CHRISTY . . . AND THE MALE WAS ALSO SENDING HER NUDE PICS OF HIMSELF").[9] The deputies also knew that Christy's cellular telephone connected to a

_____

[9] Although the CAD Report would suggest that Christy is in his late fifties -- fifty-nine -- at the hearing, counsel for the United States referred to Christy as fifty-four years old. <u>See</u> Apr. 22,

cellular tower in Westminster on the day K.Y. went missing and that it currently was connecting to a cellular tower in Albuquerque.  See id. at 1 ("CALI PINGED THE 21 OF THE MALE ON SUNDAY AND IT HIT IN WESTMINSTER CALI AND TODAY ITS HITTING NEAR THE 20 IN ALBUQ.").

If K.Y. were a minor who could not consent to sexual contact, the Court would find that Littlefield and the BCSO deputies had reasonable suspicion that K.Y. was in danger of physical harm, because she was in danger of sexual contact to which she could not consent.  Littlefield testified that, based on the information in the CAD Report, he believed that it was likely K.Y. was in Christy's company, that she had an inappropriate relationship with Christy, and that it was an emergency situation because K.Y. was possibly in danger and was being abused or sexually exploited.  See Apr. 21, 2011 Tr. at 12:17-13:10 (Kastrin, Littlefield).  Because the officers knew that K.Y. and Christy were sending electronic mail transmissions to each other, and that Christy was sending K.Y. nude pictures of himself, the belief that there was a sexual relationship or sexual interest between the two was reasonable.  As in United States v. Kenfield, where exigent circumstances justified the officer's entry into the trailer when he had information that a minor female was with an older man and that the older man had proclivities towards young girls, the Court would find that there were exigent circumstances if K.Y. could not consent to sexual contact, because the deputies reasonably believed that K.Y. was with Christy, a much-older man, and that there was a sexual interest or relationship between the two.  "[T]he exigent circumstances exception applies where officers reasonably believe that a minor is at risk of being subjected to sexual contact."  United States v. King, 560 F. Supp. 2d 906, 916 (N.D. Cal. 2008).  "This exception

---

2011 Tr. at 29:5-17 (Court, Rees).  For purposes of consistency, the Court will also refer to Christy as fifty-four years old.

applies regardless of whether the minor's involvement is involuntary, see United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994), or voluntary, as in Kenfield," if the minor who voluntarily engages in sexual conduct is legally incapable of consenting.  United States v. King, 560 F. Supp. 2d at 916. The Court would thus find that, if K.Y. were legally incapable of consenting to sexual contact that, considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding there was an immediate need to protect K.Y., because, "while [K.Y.] may not have been at risk of immediate physical injury, the [deputies' actions] w[ere] justified by the likelihood that [K.Y.] would be subjected to repeated sexual contact if left unprotected" and she had been missing from her home for over twenty-four hours.  United States v. King, 560 F. Supp. 2d at 916. See Hunsberger v. Wood, 570 F.3d at 555 ("Under these circumstances, a reasonable officer could conclude that prompt entry was necessary in order to. . .  locate a missing girl who might be in harm's way.").

For exigent circumstances to justify the deputies' actions of entering the house without a warrant, the deputies must have had an objectively reasonable basis to believe that there was an immediate need to protect the lives or safety of themselves or others.  See United States v. Najar, 451 F.3d at 718.  The United States asserts that the deputies reasonably believed that they needed to protect K.Y. from sexual abuse.  See Apr. 22, 2011 Tr. at 29:5-17 (Court, Rees)(stating that a sixteen-year- old girl in the company of a fifty-four-year old man is in danger in the form of sexual abuse).  The key to the United States' argument is that there was an immediate need to protect K.Y., because she was at risk of being subjected to sexual contact; the United States did not assert that K.Y. was in danger of being murdered or tortured.  See United States v. King, 560 F. Supp. 2d at 916 ("[T]he exigent circumstances exception applies where officers reasonably believe that a minor is at risk of being subjected to sexual contact.").  The Court believes that the courts which have

found that the exigent circumstances exception applies where officers reasonably believe a minor

is at risk of being subjected to sexual contact have come to this conclusion because the minors did

not consent to the sexual contact or could not legally consent to the sexual contact.  In <u>United States</u>

<u>v. Johnson</u>, the facts showed that the minor female did not consent to the sexual contact; the Sixth

Circuit found that the officer's warrantless entry was justified by the need to free a minor female --

who was fourteen -- "who had been held against her will and sexually assaulted."  22 F.3d at 680.

In <u>United States v. Kenfield</u>, the Ninth Circuit found that there was an immediate need to protect

a minor female from serious harm when the officer received information that the minor was out

getting drunk with the defendant, and knew that the defendant had proclivities to have young girls

and had a history of sexually deviant behavior.  The Ninth Circuit did not state the age of the minor

female.  The Court notes, however, that the California Penal Code provides that "[u]nlawful sexual

intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the

perpetrator, if the person is a minor," and defines a "minor" as "a person under the age of 18 years"

and an "adult" as "a person who is at least 18 years of age."  California Penal Code § 261.5(a).

<u>See</u> California Penal Code § 261.5(b)("Any person who engages in an act of unlawful sexual

intercourse with a minor who is more than three years younger than the perpetrator is guilty of either

a misdemeanor or a felony . . . .").  It thus appears that, in California, the minor could not have

legally consented to the sexual contact.[10]  The Court believes that the minor's lack of ability to

legally consent to the sexual contact -- even if she voluntarily participated in the sexual contact --

---

[10] The Court recognizes that these factual circumstances may present an anomalous situation in which the deputies likely would have had exigent circumstances in California, but they did not in New Mexico.  Although this different application of the Fourth Amendment in California than in New Mexico under otherwise identical circumstances concerns the Court, this result does not change the fact that the deputies could not, in New Mexico, have had a reasonable belief that K.Y. was in immediate danger of physical harm, because she could consent to sexual contact.

and the officer's knowledge of the defendant's proclivities and deviant sexual history were important factors in the Ninth Circuit's decision that exigent circumstances justified the warrantless search.

New Mexico does not have a statute stating that a sixteen-year old can consent to sexual contact, but New Mexico's statute regarding criminal sexual penetration states that criminal sexual penetration in the fourth degree consists of criminal sexual penetration "perpetrated on a child thirteen to sixteen years of age when the perpetrator is at least eighteen years of age and is at least four years older than the child and not the spouse of that child."  NMSA 1978, § 30-9-11G.  New Mexico courts have interpreted this statute to mean that the victim must be at least thirteen but less than sixteen.  See State v. Hargrove, 108 N.M. 233, 238, 771 P.2d 166, 171 (1989)(stating that the criminal penetration statute penalizes sexual intercourse with a child "between the ages of thirteen and sixteen"); State v. Perea, 145 N.M. 123, 125, 194 P.3d 738, 740 (Ct. App. 2008)("Under the CSP IV statute, the law does not recognize the willingness of a child between the ages of thirteen and sixteen to engage in sexual intercourse with a twenty-nine-year-old man as vitiating his causing the intercourse to occur.  Such a child's consent is legally irrelevant."); State ex rel. Children, Youth and Families Dept. v. Paul P., Jr., 127 N.M. 492, 494, 983 P.2d 1011, 1013 (Ct. App. 1999)(stating that, "[a]lthough, on its face, the statutory language 'perpetrated on a child thirteen to sixteen years of age' could be construed to include a sixteen-year-old victim," New Mexico courts "have never given the language such an interpretation," and that, "[r]ather, our cases have long held that criminal sexual penetration of a sixteen-year-old does not fall under similar statutory provisions" and that the Uniform Jury Instruction for criminal sexual penetration further supports this view (citing State v. Richardson, 48 N.M. 544, 546, 154 P.2d 224, 225 (1944)(stating that statute defined crime as being perpetrated on a female "under the age of sixteen"); State v. Hargrove, 108 N.M. at 238, 771 P.2d

at 171 (describing criminal sexual penetration as certain intercourse with a child "between" ages of thirteen and sixteen)); UJI 14-941 NMRA (stating that the jury must find that the victim was at least thirteen but less than sixteen years old as one of the elements for criminal sexual penetration of a thirteen to sixteen year-old minor). A sixteen-year old can thus legally consent to sexual relations with an older person, and the sexual relations between the two is not prohibited under New Mexico law. Although it was reasonable for the deputies to infer that K.Y. and Christy were engaged in a sexual relationship or that there was a sexual interest between the two, because K.Y. was sixteen and could thus consent to a sexual relationship with Christy, the reasonable belief that the two were engaged in a sexual relationship is not sufficient to establish an objectively reasonable belief that K.Y. was at risk of being subjected to harmful sexual contact and thus was in physical danger. Unlike United States v. Johnson, where the facts showed that the minor did not consent in the sexual contact, there is no evidence that the officers has any basis to believe Christy forced or coerced K.Y. into having sexual contact with him; instead the deputies knew that K.Y. was a run away and that she was communicating with Christy through electronic mail transmissions. Unlike United States v. Kenfield, K.Y. could legally consent to sexual contact with Christy. Furthermore, unlike United States v. Kenfield, the deputies did not know that Christy had proclivities towards sexual contact with young girls or that Christy had a sexually deviant history. The deputies could not have reasonably believed that K.Y. was at risk of being subjected to nonconsensual or harmful sexual contact and thus in imminent danger of physical harm, because they knew that she was sixteen and thus could legally consent to sexual contact with Christy, and because there is no evidence that the officers reasonably believed Christy forced or coerced K.Y. into sexual contact with him. Because the deputies could not have reasonably believed that prompt entry was necessary to prevent K.Y. from physical harm in the form of subjection to sexual contact, the Court finds that the deputies did

not have exigent circumstances to enter the house without a warrant.[11]  Just as exigent circumstances would not justify a law enforcement officer's actions of entering a house because he or she knew that a nineteen year-old, missing from her home, was inside the residence with an older man and that the nineteen year-old and man had a sexual relationship, exigent circumstances do not justify the deputies' actions when K.Y. could legally consent to a sexual relationship, and there was no evidence that the officers believed Christy threatened or coerced K.Y. into participating in sexual contact.[12]

---

[11] The United States relied only on the CAD Report to create the exigent circumstances -- asserting that what Littlefield saw merely heightened the exigency.  When Littlefield looked into the window, he saw a young female who matched K.Y.'s description.  See Apr. 21, 2011 Tr. at 18:19-20 (Littlefield).  The young female was wearing only a brassiere and underwear, and was hanging on a rope which was tied to the ceiling while an adult male walked around in underwear and a T-shirt.  See id. at 18:19-24 (Littlefield).  When Littlefield again checked on the young female's status while he was waiting for his backup units to arrive, he saw that the young female was no longer wearing a brassiere, and, instead of just holding onto the rope, she appeared to be restrained by the rope.  See id. at 21:2-11 (Kastrin, Littlefield).  Moreover, as Littlefield was waiting for the backup units to arrive on the scene, he saw what looked like camera flashes that came from the window.  See id. at 22:2-13 (Kastrin, Littlefield).  The United States conceded that, without exigent circumstances, the deputies' actions of peering in the window shades was an illegal search; thus, Littlefield could not lawfully develop exigent circumstances by peering through the window shades.  Given the United States' concession, the Court need not decide whether, given that, at sixteen, K.Y. could legally consent to sexual relations with Christy, Littlefield's observations were sufficient to create an objectively reasonable belief that K.Y. was at risk of being subjected to imminent physical harm.  Although Littlefield testified that he saw what looked like camera flashes, the United States abandoned any argument that exigent circumstances were present because the deputies had probable cause that a crime was being committed.  See Apr. 22, 2011 Tr. at 25:5-13 ("THE COURT:  But you . . . are jet[isoning] the probable cause portion of the exigent circumstances, then aren't you forced to . . . establish that [K.Y.] was in immediate danger of harm.  MS. REES:  That is correct . . . .  THE COURT:  So the crime . . . aspect . .  goes out the window.  MS. REES:  That is correct.").  The Court thus finds that the deputies' illegally entered Christy's residence in violation of the Fourth Amendment, because exigent circumstances did not justify their action.  Because the deputies' actions did not fall within an exception to the search warrant requirement, the Court finds that their actions violated the Fourth Amendment.  See United States v. Sims, 428 F.3d at 952.

[12] The Court notes that the United States relied only on the emergency aid/exigent circumstances exception.  See Apr. 22, 2011 Tr. at 25:5-13 ("THE COURT:  But you . . . are jet[isoning] the probable cause portion of the exigent circumstances, then aren't you forced to . . .

While the situation about which Littlefield read in the CAD Report was creepy, it was not

scary.  Unless the Court is prepared to say that consensual sex by a woman who can give consent

places the woman in imminent danger of physical harm, the Court cannot say that there is an exigent

circumstances when the age gap is so great.  Because K.Y. was at an age where she could consent

to sexual contact, the police cannot treat her consensual sexual activity as creating an exigent

circumstance anymore than would the sexual activities of a twenty-seven or twenty-eight-year-old

female with a fifty-four-year-old man.

Because the deputies' actions do not fall within an exception to the search warrant

requirement, the Court finds that the deputies' actions violated the Fourth Amendment.[13]  See United

_____

establish that [K.Y.] was in immediate danger of harm.  MS. REES:  That is correct . . . .  THE
COURT:  So the crime . . . aspect . .  goes out the window.  MS. REES:  That is correct.").  The
United States stated that it was not relying on probable cause of any crime to justify the deputies'
actions, and that it was relying only on its argument that K.Y. was in immediate danger of harm.
See Apr. 22, 2011 Tr. at 25:25-26:3 ("THE COURT: So it's kind of irrelevant, then . . . what crime
could have been ch[arged], what crime could have been suspected . . . . The thing we're focusing
on is whether the . . . girl was in immediate danger of harm.  MS. REES: . . . [I]n that initial entry
you are absolutely correct.").  Because the United States has not asserted an argument that the
deputies' actions were justified because they had probable cause that a crime was being committed
-- and instead disavowed such an argument -- the Court will not address exigent circumstances
requiring probable cause.  See United States v. Martinez, 686 F. Supp. 2d 1161, 1184 (D.N.M.
2009)(stating that "generally, a warrantless entry under the exigent-circumstances exception requires
probable cause and exigent circumstances," but that the "Tenth Circuit, however, appears to have
recognized a subset of exigent-circumstances cases-what the Court refers to as 'emergency-aid'
cases-that do not require probable cause," -- instead they require a reasonable belief that a person
needs immediate assistance and entry is necessary to protect or preserve life or avoid serious injury
(citations omitted)).

[13] The United States cites United States v. Smith, 797 F.2d 836 (10th Cir. 1986), in support
of its contention that the deputies had exigent circumstances to look into the crack in the window
shades because of officer safety.  While the United States thoroughly addressed its argument that
the deputies had exigent circumstances, because they had an objectively reasonable belief they had
to act immediately to prevent harm to K.Y., the United States only briefly sets forth this argument.
In United States v. Smith, the Tenth Circuit found that exigent circumstances justified the law
enforcement officer's actions of climbing onto the airplane wings, and looking into the windows,
because, given the "darkness of night, an isolated airfield, lack of knowledge about the occupants,

States v. Sims, 428 F.3d at 952 ("A warrantless search is per se unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions . . . ." (citation omitted)); United States v. Blount, 98 F.3d 1489 (5th Cir. 1998)(finding that an officer's actions of peering through a rear window of a residence were not justified by exigent circumstances, because there was no indication contraband would be found in the house or that there was a risk of the removal or destruction of evidence, because the police were not aware of any particular danger to themselves or others, and because there was no basis for believing that resort to a magistrate would have created risks of a greater magnitude), opinion vacated by United States v. Blount, 104 F.3d 58 (5th Cir. 1997) and United States v. Blount, 123 F.3d 831 (5th Cir. 1997).

## III.    THE COURT WILL SUPPRESS CHRISTY'S STATEMENTS TO PROCTOR.

The Court has determined that the deputies' actions of entering the residence without a warrant violated Christy's Fourth-Amendment rights.  When the deputies entered Christy's residence, they handcuffed him and took him into custody.  But for the deputies' actions entering the residence without a warrant, the deputies would not have taken Christy into custody, and Proctor would not have questioned Christy.  The Court must determine whether Christy's statements were

---

owners or users of the Smith aircraft, knowledge that the airplane had probably traveled north from the Republic of Mexico under suspicious circumstances, and concern that the airplane may have been occupied by a person or persons armed and dangerous," 797 F.2d at 841, it was not unreasonable for the officer to climb onto the airplane's wings and look into the windows without a search warrant.  There is not evidence that the officers believed that Christy was armed and dangerous, and the United States has not so argued.  Thus, they could not have had a reasonable belief that their safety was in danger.

the fruit of the illegal searches.[14]  Because the statements would not have come to light but for the deputies' unconstitutional conduct, "the government must prove the 'evidence sought to be suppressed is not 'fruit of the poisonous tree,' . . . by demonstrating the evidence . . . was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.'"  United States v. Albert, 579 F.3d 1188, 1197 (10th Cir. 2009)(citation omitted).  "In considering whether evidence seized is so attenuated from the illegality as to dissipate any taint, [the Tenth Circuit] balance[s] the 'temporal proximity of the Fourth Amendment violation,' any 'intervening circumstances,' and the 'purpose and flagrancy of the official misconduct.'"  United States v. Torres-Castro, 470 F.3d at 999 (citing United States v. King, 990 F.2d at 1563-64; Brown v. Illinois, 422 U.S. at 603-04 (listing the three factors)).

---

[14] It is hard to glean what Christy's arguments regarding the Fifth and Sixth Amendments are.  In his First Brief, Christy states only:

> [The deputies] took Mr. Christy to the Bernalillo County Sheriff's Department for detention and interrogation without counsel . . . .

. . . .

> Instead, the actions of the Bernalillo County Sheriffs Department on November 9-11, 2009 at Mr. Christy's home show a conscious intention to subvert the judicial process by conducting warrantless  search . . . and arrest by affecting a violent and unjustified entry into . . . Christy's home, by arresting and interviewing . . . Christy without counsel, while the search has already been in progress for hours, . . . .

First Brief at 3-4.  Christy's Second Brief did not expand on these arguments.  At the hearing, Christy argued that he was denied his right to counsel and that he was coerced when Proctor interviewed him without counsel after he was detained for four hours without his pants, without a telephone call, without anything to drink, and while he was in handcuffs, and when Proctor told him that the FBI, if they had not already, were going to search his house and asked him what they were going to find.  The Court notes that Christy's argument appears to relate only to the interview with Proctor.  Because the Court will suppress Christy's statements to Proctor as fruit of the deputies' violation of Christy's Fourth-Amendment rights, the Court will not address Christy's arguments regarding his denial of counsel in violation of the Fifth and Sixth Amendments.

The facts of this case do not lead the Court to the conclusion that the taint of the illegal searches is attenuated.  Careful consideration of each factor, and the United States' argument that Christy made the statements of his own free will, indicate that the underlying search tainted Christy's subsequent statement.

The lapse of time between the illegal search and Christy's statements does not weigh in favor of finding attenuation.  The Court is without substantial guidance on what constitutes a significant amount of time, such that the taint of an illegality might become attenuated.  See, e.g., United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 951 (9th Cir. 2010)("[T]here is no 'bright-line' test for temporal proximity in an attenuation analysis.")(quoting United States v. Reed, 349 F.3d 457, 463 (7th Cir. 2003))(internal quotations omitted); United States v. Lopez-Garcia, 565 F.3d 1306, 1316 (11th Cir. 2009)("[T]here is no hard-and-fast rule for determining how much time must have passed before the link between an unlawful arrest and a confession can be considered sufficiently attenuated."); United States v. Najjar, 300 F.3d 466, 478 (4th Cir. 2002)("[T]he mere passage of time cannot serve to make tainted physical evidence admissible.  Rather, the temporal aspect can inform the attenuation analysis, for instance, by providing a context to the government's further investigations.").  Nevertheless, the Court finds that the approximately five hours between the illegal searches and Christy's confession do not weigh in favor of finding attenuation.  See Taylor v. Alabama, 457 U.S. 685, 691 (1982)(finding that a period of six hours between the illegal arrest and confession was six hours was not sufficient to attenuate the confession); United States v. Martinez, 696 F. Supp. 2d 1216, 1249 (D.N.M. 2010)("[T]he Court finds that the four or five hours between Lind's and Kmatz' illegal entry, and Martinez' confession, do not weigh in favor of finding attenuation.").

The two cases that provide something of a spectrum upon which to place the lapse-of-time

element are <u>Wong Sun v. United States</u> and <u>Brown v. Illinois</u>.  In <u>Wong Sun v. United States</u>, in which the Supreme Court found attenuation, Wong Sun was released on his own recognizance and, several days later, returned voluntarily to give a statement.  <u>See</u> 371 U.S. at 490.  By contrast, in <u>Brown v. Illinois</u>, only about one hour separated the police officers' unlawful arrest of Brown, at gunpoint, from his confession.  <u>See</u> 422 U.S. at 592, 594.  That amount of time was apparently insufficient. <u>See id.</u> at 605.  In <u>United States v. Ceccolini</u>, 435 U.S. 268 (1978), in which attenuation was found, the illegal search of Ceccolini's envelope occurred four months before the FBI agent went to speak with Ceccolini's employee.  <u>See</u> 435 U.S. at 272.  In <u>Taylor v. Alabama</u>, a case very similar to <u>Brown v. Illinois</u>, the Supreme Court found that a six-hour gap between an illegal arrest and a confession, when weighed with the other <u>Brown v. Illinois</u> factors, was not sufficient to attenuate the taint of the arrest.  <u>See</u> <u>Taylor v. Alabama</u>, 457 U.S. at 690-91.  In <u>United States v. Carson</u>, the Tenth Circuit found attenuation based on Carson's voluntary consent to the search that turned up the challenged evidence, <u>see</u> 793 F.2d at 1155, so temporal proximity was not considered. Other cases come to different conclusions based on the presence of other <u>Brown v. Illinois</u> factors. <u>See</u> <u>Mosby v. Senkowski</u>, 470 F.3d 515, 522 (2d Cir. 2006)(citing New York state law and finding that, when all other factors also weighed in favor of attenuation, five hours is sufficient to break the causal chain); <u>United States v. Pina-Aboite</u>, 109 F. App'x 227, 237 (10th Cir. 2004)(finding "a matter of minutes" to be an insufficient lapse of time to purge taint of illegality from a consent to search); <u>United States v. Reed</u>, 349 F.3d at 463 (appearing to find that five to six hours, in the absence of significant intervening circumstances, did not weigh in favor of attenuation); <u>United States v. McSwain</u>, 29 F.3d 558, 563 (10th Cir. 1994)(finding that, when "only a few minutes" separate the illegality and the grant of consent, the temporal proximity factor "weigh[s] heavily against finding the taint cleansed"); <u>United States v. George</u>, 883 F.2d 1407, 1416 (9th Cir.

1989)("As best we are aware, no court has weighed the first factor against a defendant when his inculpatory statement followed illegal police conduct by only a few hours."); United States v. Maez, 872 F.2d at 1447, 1455 (holding that, after forty-five minutes elapsed, "the proximity of the arrest and Mrs. Maez' consents clearly indicate that taint of the Payton[15] violation was not purged").

Attenuation is generally found where a period of multiple days elapses between the illegality and the challenged statement, such that it is clear that the statement is a product of free will.  See Wong Sun v. United States, 371 U.S. at 490 (finding attenuation when Wong Sun was released on his own recognizance and, several days later, returned voluntarily to give a statement); Taylor v. Alabama, 457 U.S. at 690-91 (finding, after weighing the Brown v. Illinois factors, that there was not sufficient time to attenuate the taint of the arrest when there was a six-hour gap between an illegal arrest and a confession); United States v. Martinez, 696 F. Supp. 2d at 1250 ("Attenuation generally is found where a period of multiple days elapses between the illegality and the challenged statement, such that it is clear that the statement is a product of free will.").  In this case, there is a gap of approximately five hours between the illegal entry and search and the interrogation.  This time period is more than elapsed in Brown v. Illinois, but substantially less than elapsed in Wong Sun v. United States or United States v. Ceccolini.  The time elapsed here is less time than elapsed in Taylor v. Alabama, wherein the Supreme Court did not find attenuation.  See 457 U.S. at 691 (holding that the taint had not become attenuated after six hours "where, as here, petitioner was in police custody, unrepresented by counsel and he was questioned on several occasions, fingerprinted, and subjected to a lineup").  The Court thus finds that the temporal proximity factor does not weigh

---

[15] A Payton violation, named after the Supreme Court case of Payton v. New York, 445 U.S. 573 (1980), refers to the Fourth-Amendment violation that occurs when police officers "effect[] a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." New York v. Harris, 495 U.S. 14, 16 (1990).

in favor of attenuation.

The Court finds that there were no intervening events of significance between the illegal entry and search of Christy's home, and his confession.  Although Proctor read Christy his rights under Miranda v. Arizona, and Christy signed statements asserting that he waived his rights, as the Supreme Court stated in  Oregon v. Elstad, 470 U.S. 298 (1985):

> Where a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

470 U.S. at 306 (internal citations omitted).  There are not significant intervening circumstances other than the administration of warnings under Miranda v. Arizona to render Christy's statements attenuated.  It was the illegal search, and resulting illegal detention, which led Christy to make incriminating statements, not the warnings under Miranda v. Arizona.  The illegal search figured prominently in Proctor's solicitation of Christy's statements.  Christy made statements to Proctor in response to Proctor telling him that FBI agents were sitting in his house, and that they were going through his house, or that they would soon go through his house if they had not yet, see Transcript of Interview at 39:18-25 (Proctor), and asking him what the FBI would find, see Transcript of Interview at 39:25-40:1 (Proctor).  He also made statements to Proctor in response to Proctor telling him that the deputies on the scene said that they saw Christy with video equipment and a camera, taking pictures of K.Y., see Transcript of Interview at 42:6-45:25, tying the illegality to the statements.  The Court thus finds that this factor -- intervening events -- weighs against finding attenuation.  See Oregon v. Elstad, 470 U.S. at 306; Taylor v. Alabama, 457 U.S. at 691-92 (finding that Alabama's reliance on the officer's giving of "Miranda warnings" as an intervening event was misplaced, because, "this Court firmly established that the fact that the confession may be

'voluntary' for purposes of the Fifth Amendment, in the sense that <u>Miranda</u> warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest"); <u>United States v. Martinez</u>, 696 F. Supp. 2d at 1252.

The third factor in <u>Brown v. Illinois</u> is "the flagrancy of the official misconduct." <u>Brown v. Illinois</u>, 422 U.S. at 604. Although the deputies should have known that their conduct was not in conformance with the Fourth Amendment, they may have acted with good intentions. Proctor also did not engage in flagrant misconduct in acquiring incriminating statements from Christy. When Proctor questioned Christy, he was not subjectively aware that the entry constituted a Fourth Amendment violation. Thus, the flagrancy-of-the-official-misconduct factor weighs in favor of attenuation. Because the temporal proximity factor and intervening events factor do not weigh in favor of attenuation, however, and because Proctor used information that the deputies learned as a result of the illegal search in interrogating Proctor, <u>see</u> Transcript of Interview at 42:11-46:16 (Proctor, Christy)(detailing Proctor's questions to Christy about video equipment or cameras, in which Proctor stated that the deputies said they saw Christy taking pictures of K.Y. in bondage and saw video equipment, and in response, Christy stated that he took a picture of K.Y. in her underwear when she was making dinner and that he had three pictures of her), the Court cannot find that the taint of the illegal entry was attenuated, <u>see</u> <u>United States v. Peters</u>, 10 F.3d 1517, 1523 (10th Cir. 1993)(stating that it " must determine whether the government has shown that the subsequent incriminating statements . . . were not fruit of the illegal stop," and considering each factor set forth in <u>Brown v. Illinois</u>, and whether the factors weigh against a finding of attenuation, in determining that the incriminating statements should be suppressed as "fruit of the poisonous tree"); <u>United States v. Martinez</u>, 696 F. Supp. 2d at 1253 (finding that "the flagrancy-of-the-official-misconduct factor weighs in favor of attenuation," but, "[b]ecause [the officer] used the fruits of the illegal

-70-

search in interrogating [the defendant], . . . the Court c[ould not] find that the taint of the illegal

entry was attenuated").

The United States argues that Christy's statements were the product of free will.  Christy

would not have been in custody but for the deputies illegally entering his house.  While he was in

custody, Christy was in handcuffs for approximately five hours before Proctor interviewed him.

During this time, and during the interview, Christy was without pants throughout the interview.

During the interview, Proctor told Christy that the FBI was sitting in his house and, if they had not

yet, they were soon going to go through his house and that the deputies saw a camera during their

search and said that Christy was taking bondage pictures of K.Y.  In response to these statements,

Christy told Proctor that he had three pictures of K.Y.  When Proctor told Christy that the deputies

saw a camera during the search and said he was taking pictures of K.Y., he used information that

he received from the illegal search to pressure Christy to make inculpatory statements.  See Wong

Sun v. United States, 371 U.S. at 487-88 (stating that an important question in determining whether

evidence is tainted is if police have exploited the illegal search to obtain evidence); United States

v. Melendez-Garcia, 28 F.3d 1046, 1055 (10th Cir. 1994)(stating that there is an exclusionary

purpose -- excluding evidence that is tainted, because police exploited the illegal search to obtain

the evidence -- "as well as a fairness purpose in depriving police of the fruit of an illegal arrest or

search"); United States v. Martinez, 696 F. Supp. 2d at 1253-54.  Given these circumstances, the

Court finds that Christy's statements were not freely made so as to purge the taint of the Fourth-

Amendment violation.  See United States v. Carson, 793 F.2d at 1150 ("The implication of the

Supreme Court's decision in Brown v. Illinois is that in order for incriminating statements to be

purged of the taint of an underlying Fourth Amendment violation, [the] defendant's consent must

meet the voluntariness standard of the Fourth Amendment."); United States v. Martinez, 696 F.

Supp. 1253-54 (finding that Martinez' statements were not freely made so as to purge the taint of the Fourth-Amendment violation and that the statements were a fruit of illegal entry, because Martinez was seized when he was brought to the station, left in a windowless room, read his rights under Miranda v. Arizona, and was told BCSO was investigating him for drug trafficking, and when the deputy used information from the illegal search to pressure Martinez to confess details). Because the factors that the Supreme Court set forth in Brown v. Illinois weigh against the Court finding attenuation, and because Christy's statements were not so freely made as to purge the taint of the Fourth-Amendment violation, the Court will suppress Christy's statements to Proctor. See Taylor v. Alabama, 457 U.S. at 690-64 (finding that the defendant's confession was the fruit of his illegal arrest when the defendant confessed six hours after the illegal arrest and after being given Miranda warnings, because intervening events did not break the causal connection between the arrest and the confession, the passage of six hours between the illegal arrest and confession was not sufficient to attenuate the taint when the defendant "was in police custody, unrepresented by counsel"); United States v. King, 990 F.2d at 1564-65 (affirming the district court's finding that the drugs were the fruit of the unlawful detention, because the time between the officer's retrieval of the drugs and the illegal detention were close, because there were not intervening circumstances, and because the officer came close to approaching an arrest for which there was no probable cause and thus the flagrancy of official misconduct weighed in favor of finding the drugs were the fruit of the unlawful seizure); United States v. Santos, 340 F. Supp. 2d 527, 539 (D.N.J. 2004)(finding that the defendant's statements following the illegal search were fruit of the poisonous tree, because, although eighteen hours separated the statement from the initial arrest, there was no "clean break" between the time of arrest and the statement when the defendant was not released or provided with a bed, and when there was a lack of intervening circumstances sufficient to purge the taint, and

where the circumstances demonstrated a connection between the officer's illegal actions and the subsequent statements); United States v. Osorio, 66 M.J. 632, 640 (A.F. Ct. Crim. App. 2008)(finding that the defendant's admission was the fruit of a poisonous tree, because the taint of the illegal search remained when he confessed, when only several hours had elapsed between the illegal search and the confession, when there were no intervening circumstances sufficient to remove the taint of the illegal search and when, although the government agents did not have an improper motive, the court found that their actions were unnecessary and unwise).

## IV.    THE COURT WILL SUPPRESS THE EVIDENCE THAT THE DEPUTIES FOUND WHEN EXECUTING THE SEARCH WARRANTS.

The Court will suppress the evidence seized pursuant to the search warrants.  The United States argues that, if the Court finds that the search warrants were defective for some reason, the Court should not suppress the evidence because of the good-faith exception to the exclusionary rule.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Romero, 743 F. Supp. 2d 1281, 1316 (D.N.M. 2010)(Browning, J.).  "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d at 1460.  See United States v. Karo, 468 U.S. 705, 721 (1984)(finding that a search warrant affidavit, after striking facts obtained illegally, "contained sufficient untainted information to furnish probable cause for the issuance of the search warrant").

> "In determining whether probable cause supported the issuance of a search warrant, we give 'great deference' to the decision of the issuing magistrate or judge." Cusumano, 83 F.3d at 1250 ( quoting United States v. Williams, 45 F.3d 1481, 1485 (10th Cir. 1995)).  We review only whether the issuing magistrate or judge had a

"substantial basis" for finding probable cause, requiring "a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. (quotation omitted).

United States v. Sims, 428 F.3d at 954.

The Court must exclude the information illegally obtained from the warrants and determine whether, based on the remaining information, probable cause nevertheless existed. As the Court has previously discussed, it need not decide this issue whether Littlefield's actions of walking around the house and peering into a crack in the window shades was an illegal search, because the United States has conceded that Littlefield's actions were an illegal search if there were no exigent circumstances. See Apr. 22, 2011 Tr. at 27:5-12 ("THE COURT: So he needs exigent circumstances before he even looks in the window . . . . MS. REES: I would agree with that because the window would be a search."). Given the United States' concessions, and the maxim that the Court should not decide constitutional issues unless necessary, the Court will thus assume, without deciding, for purposes of this Memorandum Opinion and Order, that Littlefield's actions of walking around the corner of the house and peering through a crack in the window shades was an illegal search. Because the Court will assume that Littlefield's actions of walking around the corner of the house and peering through a crack in the window shades was an illegal search, the Court will exclude the information that Littlefield learned through peering through the crack in the window shades. The Court will also exclude Christy's statements to Proctor, as those statements are fruit of the illegal searches. See discussion supra Part III. Similarly, K.Y.'s statements in her interview with an FBI agent following the illegal searches are also fruit of the illegal searches, because the exclusionary rule applies to witness' statements discovered only as a result of a Fourth

Amendment violation, see United States v. Ceccolini, 435 U.S. at 274-75 (rejecting the government's suggestion that the Supreme Court adopt a rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and the Fourth-Amendment violation, and stating that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion"), and K.Y.'s statements were made within hours of the illegal searches, her interview was a result of the deputies' illegal entry into Christy's residence, and the United States has not sufficiently demonstrated that her statements in the interview were so attenuated from the illegality as to dissipate the taint of the unlawful conduct.[16] See United States v. Pettigrew, 468 F.3d 626, 634 (10th Cir. 2006)("Accordingly, the exclusionary rule as it applies to the Fourth Amendment is broad and witnesses and evidence (including confessions), no matter how probative, discovered only as a result of a Fourth Amendment violation, must be excluded from evidence." (citing Wong Sun v. United States, 371 U.S. at 485-86)); United States v. Albert, 579 F.3d at 1197 (stating that, because the statements would not have come to light but for the deputies' unconstitutional conduct, "the government must prove the 'evidence sought to be suppressed is not 'fruit of the poisonous tree,' . . . by demonstrating the evidence . . . was so attenuated from the illegality as to dissipate the taint of the unlawful conduct'" (citation omitted)); United States v. Maez, 872 F.2d at 1454 (stating that

---

[16] The Court has not found cases which suggest that a defendant does not have standing to raise the issue of taint as to a witness' statements, allegedly obtained in violation of his Fourth-Amendment rights. Instead, cases suggest that defendants do have standing to raise the issue of taint. See United States v. Maez, 872 F.2d 1444, 1454 (10th Cir. 1989)(stating that "the defendant could raise the taint issue as to the statements made by his employee," which resulted from "an unlawful search of [the defendant's] business premises")(citing United States v. Ceccolini, 435 U.S. at 274-75)).

the question is whether the witness' statements are so attenuated as to dissipate the taint).  The Court must thus exclude Christy's statements and K.Y.'s statements from the warrants.  With this information excluded, the information remaining is that: (i) the Westminster Police Department in California asked the BCSO to perform a welfare check at 2265 Kelly SW in reference to a missing sixteen year-old female -- K.Y.; (ii) the Westminster Police Department told BCSO that K.Y. possibly left California with Christy and gave BCSO K.Y.'s description and Christy's address; and (iii) the Westminster Police Department sent BCSO an electronic mail transmission that Christy sent K.Y. on November 6, 2009, which indicated that he knew she was sixteen years old.  See Vehicle Search Warrant at 3-4; Residence Search Warrant at 5-6; Cellular Telephones Search Warrant at 5-6. The Search Warrant for Christy's Body also states that K.Y. possibly left California because of electronic mail transmissions recovered from K.Y.'s account, and that the electronic mail transmissions helped identify Christy and contained two naked photographs Christy sent of himself. See Search Warrant for Christy's Body at 3-4.

In United States v. Sims, the Tenth Circuit affirmed the district court's ruling that the warrants were based on probable cause without regard to the prior warrantless searches, stating:

> Here, in addition to the information coming from the warrantless office search, the affidavit contained detailed information about Sims's contacts with Mike Walker and the FBI's confirmation, after assuming the "sweetthingforyou16" identity, that Sims was planning to travel to meet Sue and Kate.  The magistrate had information about the images sent to Walker, messages and images sent to the FBI, Sims's detailed plans to go to Missouri to meet Sue and Kate, and that Sims used both his home and office computers to send these messages.
>
> In this case, the depth of the affidavit's specific information regarding Sims's suspected activity was more than sufficient to warrant suspicion and give the magistrate judge a reasonable ground to believe relevant evidence would be found.

428 F.3d at 954.  In United States v. Cusumano, the Tenth Circuit found that the officer's affidavit set forth "numerous facts in such detail that, in aggregate, lead us to conclude that a fair probability

existed that Defendants were growing marijuana in the basement of their residence" and thus that "the search warrant was based on probable cause even without the information supplied by the thermal imager."  83 F.3d at 1250.  The officer had based his conclusion that the defendants were growing marijuana in the basement of their residence on the following verified facts: (i) the defendants stated to the landlord that a grow light in their furnace room was used to grow fresh vegetables; (ii) the landlord detected a strong musty odor in the residence's basement; (iii) power company reports indicated that the residence was consuming twice the amount of electricity as similar structures in the area; (iv) an electrician whom the defendants had hired to approve electrical work in the residence's basement reported that the existing wiring could support a grow operation; (v) the defendants "received delivery of five hundred gallons of diesel fuel at the residence to operate the generator"; (vi) the defendants paid their rent in three-month installments of $2,100.00 in cash; (vi)  the defendants had no visible means of support; (vii) "Resident Thomas J. Sanatello (a defendant in the district court) refused to allow the landlord's homeowners insurance agent to inspect the residence for a two week period"; (viii) "the insurance agent observed two wheel barrows, a shovel, and sacks of soil near a door of the residence leading to the basement"; and (ix) the "insurance agent feared for his safety while speaking with Sanatello."  83 F.3d at 1248-49.  The Tenth Circuit found that the "totality of the evidence substantially supports the conclusion that there was 'a fair probability that contraband or evidence of a crime' would be found in Defendants' home."  83 F.3d at 1247 (citation omitted).

Excluding the information illegally obtained, the warrants do not establish a fair probability that evidence of a crime would be found in Christy's home, vehicle, person, or cellular telephones. The remaining factual details in the warrants are bare.  Given that the age of consent in New Mexico is sixteen, the Court does not believe that the remaining factual allegations support the conclusion

that there was a fair probability that evidence of a crime would be found in Christy's home.  See United States v. Sims, 428 F.3d at 954; United States v. Cusumano, 83 F.3d at 1247 (citation omitted).  Because the remaining content of the warrant affidavits do not establish probable cause, the searches pursuant to the warrants were not appropriate, and the Court will exclude the evidence found pursuant to the search warrants.  See United States v. Snow, 919 F.2d at 1460.

The United States argues that, assuming the information in the warrants was unconstitutionally obtained, the good-faith exception should apply in light of Herring v. United States.  The Tenth Circuit has interpreted Herring v. United States as extending "the good-faith exception to police reliance upon the negligent mistake of a fellow law enforcement employee, as opposed to a neutral third party."  United States v. McCane, 573 F.3d at 1043.  The Tenth Circuit has drawn two principles from Herring v. United States and other Supreme Court cases: (i) the exclusionary rule seeks to deter objectively unreasonable police conduct -- conduct which an officer knows or should know violates the Fourth Amendment; and (ii) the exclusionary rule seeks to deter misconduct by law enforcement officers, and not by other entities.  See United States v. McCane, 573 F.3d at 1043 (citing Herring v. United States, 129 S. Ct. at 701-04)(other citations omitted).

The Court does not believe that Herring v. United States changes its analysis whether a warrant containing illegally obtained information contains sufficient other information to establish probable cause.  Herring v. United States dealt with negligent bookkeeping and not with negligent performance of the police officers' duties.  The Supreme Court in Herring v. United States was focused on whether exclusion under the circumstances of that case would have a substantial deterrent effect on the complained-of unconstitutional conduct.  See 129 S. Ct. at 702.  The Supreme Court found that excluding evidence obtained in an unauthorized arrest based on incorrect data in a database would not substantially deter police administrative workers from incorrectly and

-78-

negligently entering such arrest warrant information.  See 129 S. Ct. at 703.  By contrast, if the Court excludes evidence obtained by officers when they fail to make a proper analysis whether exigent circumstances exist, officers might be deterred from making hasty exigent-circumstances assessments and/or applying ad hoc rules without performing the necessary analysis.  The Court is not convinced that Herring v. United States stands for the proposition that, any time an officer in the field mistakenly violates someone's constitutional rights, exclusion of the evidence is not justified. See 129 S. Ct. at 704.  Rather, Chief Justice Roberts specified that " nonrecurring and attenuated negligence is far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place," and that such negligence does not justify exclusion.  Id. at 702 (emphasis added).  The negligent data entry of an administrative employee that causes an unconstitutional seizure is more attenuated from the seizure itself than the negligence or mistake of an officer in the field who executes an unconstitutional search based on his own misapplication of the standard for determining whether exigent circumstances exist.  In short, the Court does not believe that Herring v. United States expands the good-faith exception to the point that exclusion of evidence would be inappropriate in this case.

IT IS ORDERED that the Defendant's Motion to Suppress Evidence and Statements, filed February 14, 2011 (Doc. 41) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J.  Gonzales
  United States Attorney
Charlyn E. Rees
Holland S. Kastrin
  Assistant United States Attorneys
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Lee P. McMillian
Law Offices of Lee McMillian, P.C.
South Houston, Texas

*Attorney for the Defendant*