IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. CR 10-1534 JB

EDWARD CHRISTY,

   Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Motion to Reconsider Suppression Order *(Doc. 127)* and Reopen the Suppression Hearing, filed June 9, 2011 (Doc. 133)("Motion to Reconsider").  The Court held a hearing on July 8, 2011, an evidentiary hearing on August 3, 2011, and a hearing on August 4, 2011.  The primary issues are: (i) whether the Court should reopen the suppression hearing; (ii) whether the Court should reconsider its Amended Memorandum Opinion and Order, filed May 25, 2011 (Doc. 127), because, at the suppression hearing, the United States mistakenly conceded that, when Deputy David Littlefield looked through a crack in the blinds covering Christy's residential window, it was clearly a search that required an exception to the warrant requirement; (iii) whether the Court should reconsider its Amended Memorandum Opinion and Order in light of the collective-knowledge doctrine; (iv) whether the Court should reconsider its Amended Memorandum Opinion and Order, because the Bernalillo County Sheriff's Office ("BCSO") deputies would have inevitably discovered the same evidence through lawful means, because they would have entered Christy's residence pursuant to exigent circumstances upon learning that the minor girl -- K.Y. -- was suicidal, depressed, and off her medication; and (v) whether the Court should reconsider its Amended Memorandum Opinion and

Order, because law enforcement officers would have obtained search warrants and discovered the evidence.  The Court will grant in part and deny in part the United States' motion.  The Court reopened the suppression hearing and took more evidence from the parties.  The Court finds that the United States did not mistakenly concede that, when Littlefield looked through a crack in the blinds, it was a search, and finds that Littlefield conducted an unconstitutional search by looking in the crack in the blinds.  That there has been an unconstitutional search does not end the inquiry; there is a distinction between the Fourth Amendment of the United States Constitution analysis of search and seizure and the suppression rule.  They are distinct concepts.  The Court will apply the collective-knowledge doctrine to its analysis of exigent circumstances and probable cause.  The Court finds that exigent circumstances would not have justified the deputies' entry into Christy's residence.  The Court thus continues to conclude that the warrantless entry into and search of Christy's residence was unconstitutional.  Nevertheless, the Court will apply the inevitable discovery doctrine, an exception to the suppression rule, and even though the entry and search were unconstitutional, not suppress the evidence, because, after a consideration of the relevant factors, the Court finds that Orange County Investigator Paul Carvo would inevitably have obtained search warrants and discovered the evidence the Court suppressed, despite the unconstitutional entry and search.

**FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these

findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269-70 (10th Cir. 1982), <u>cert. denied</u>, 461 U.S. 916 (1983). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  <u>See</u> Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  <u>See</u>  <u>United States v. Garcia</u>, 324 F. App'x 705 (10th Cir.)("We need not resolve whether <u>Crawford's</u>[1] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"), <u>cert. denied</u>, 130 S. Ct. 223 (2009); <u>United States v. Merritt</u>, 695 F.2d at 1269.  The Court incorporates its factual findings set forth in the Court's Amended Memorandum Opinion and Order, filed May 25, 2011 (Doc. 127).

     1.    **<u>Claudia McCarthy</u>.**

     1.    McCarthy, formerly Claudia Fletes, is a police officer for the City of Westminster. <u>See</u> Transcript of Hearing at 42:14-24 (taken August 3, 2011)(Kastrin, McCarthy)("Aug. 3, 2011 Tr.").

     2.    McCarthy is assigned to a detective bureau that works crimes against children and domestic violence.  <u>See</u> Aug. 3, 2011 Tr. at 43:2-5 (Kastrin, McCarthy).

     3.    McCarthy is a member of the safe team task force, in which local agencies work with the Federal Bureau of Investigation ("FBI") on cases where children are victims of crimes that are

---

[1] <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

sexual in nature.  <u>See</u> Aug. 3, 2011 Tr. at 43:9-12 (Kastrin, McCarthy).

4.      On November 8, 2009, the father of a missing juvenile (hereinafter "K.Y.") reported K.Y. missing to a Westminster Police desk officer.  <u>See</u> Aug. 3, 2011 Tr. at 45:5-9 (McCarthy).

5.      Initially, the investigators had no information suggesting that K.Y. traveled with an adult male to another state.  <u>See</u> Aug. 3, 2011 Tr. at 45:10-13 (Kastrin, McCarthy).

6.      On November 9, 2009, however, K.Y.'s father went to the Westminster police station and provided the desk officer with two photographs of an adult male, which he had found in K.Y.'s Yahoo! account.  <u>See</u> Aug. 3, 2011 Tr. at 45:21-24 (McCarthy).

7.      The adult male was completely nude in both photographs.  <u>See</u> Aug. 3, 2011 Tr. at 45:25-46:5 (Kastrin, McCarthy).

8.      K.Y.'s mother emailed the Westminster desk officer a user name for the website agematch.com,[2] which she believed was associated with the person who sent the photographs to K.Y.  <u>See</u> Aug. 3, 2011 Tr. at 46:7-11 (McCarthy).

9.      McCarthy ran a Google search on the user name and came across another profile associated with consensual.com.  <u>See</u> Aug. 3, 2011 Tr. at 46:17-19 (McCarthy).

10.      To view the profile on consensual.com, McCarthy had to create a fictitious account; once McCarthy created a fictitious account and logged on, she was able to view a few photographs of the person's profile.  <u>See</u> Aug. 3, 2011 Tr. at 46:20-25 (Kastrin, McCarthy).

11.      The photographs were of an adult male whose appearance matched the male in the nude photographs K.Y.'s father brought to the police station.  <u>See</u> Aug. 3, 2011 Tr. at 46:25-47:3

---

[2] www.agematch.com is a dating website that specializes in matching up people in different age groups.  The website requires people to give an age of eighteen or older when they sign up. <u>See</u> Transcript of Hearing at 106:4-7 (taken April 21, 2011)(McMillian, Carvo).

(McCarthy).

12.     The photographs of the adult male did not show any simulated sexual activity. See Aug. 3, 2011 Tr. at 58:21-25 (McMillian, McCarthy).

13.     Based on McCarthy's experience and training, McCarthy thought that the adult male was looking for a sexual relationship with K.Y., because K.Y. was missing and had nude photographs of an adult male man who used agematch.com and consensual.com. See Aug. 3, 2011 Tr. at 47:13-48:2 (Kastrin, McCarthy).

14.     K.Y.'s father informed the investigators that he noticed two incoming calls from an unknown number on his daughter's cellular telephone records. See Aug. 3, 2011 Tr. at 47:18-21 (McCarthy).

15.     K.Y.'s father also showed the investigators photographs that K.Y. had sent to the person with whom she was communicating, one of which depicted K.Y. from her chest up with her breasts exposed. See Aug. 3, 2011 Tr. at 48:6-10 (McCarthy).

16.     K.Y. was not simulating sexual activity in the photographs. See Aug. 3, 2011 Tr. at 58:12-19 (McMillian, McCarthy).

17.     McCarthy does not know whether the electronic mail transmission exchange between K.Y. and Christy predated the photographs, or whether Christy solicited the photographs. See Aug. 3, 2011 Tr. at 58:18-19 (McMillian, McCarthy).

18.     Based on McCarthy's experience and training in crimes against children, she believed that the adult male "was seeking for [K.Y.] to send those photos for his sexual pleasure and to continue a sexual romantic relationship." Aug. 3, 2011 Tr. at 63:22-64:7 (Kastrin, McCarthy).

19.     McCarthy contacted Carvo, an investigator for the Orange County District Attorney's Office, to let him know that she was investigating a missing juvenile whom she believed left the

state with an adult male; McCarthy gave -- to Carvo -- K.Y.'s electronic mail address, her telephone number, and the electronic mail address that was used to send nude photographs of the adult male and to create an account on agematch.com.  See Aug. 3, 2011 Tr. at 48:18-49:10 (Kastrin, McCarthy).

20.    McCarthy gave Carvo this information because, at the time, he was working at the FBI office, and could obtain information regarding the internet protocol ("IP") addresses associated with the electronic mail transmissions and regarding K.Y.'s cellular telephone records.  See Aug. 3, 2011 Tr. at 49:11-15 (Kastrin, McCarthy).

21.    On November 9, 2009, McCarthy and Detective McCormick conducted an interview with K.Y.'s parents; during the interview, K.Y.'s mother told the detectives that K.Y. was diagnosed with depression; that K.Y. had attempted suicide on several occasions, the last occasion being in March 2009; that K.Y. liked to cut her wrists; and that K.Y. had mental health issues for which she was on medication.  See Aug. 3, 2011 Tr. at 49:16-50:5 (Kastrin, McCarthy); id. at 60:1-8 (McMillian, McCarthy).

22.    K.Y.'s parents told McCarthy and McCormick that K.Y. was not on medication when she left, and that they were very concerned about her well-being and her safety.  See Aug. 3, 2011 Tr. at 50:6-9 (Kastrin, McCarthy).

23.    Her parents also told McCarthy and McCormick that they believed K.Y. posed a risk of suicide or harm to herself.  See Aug. 3, 2011 Tr. at 50:10-12 (Kastrin, McCarthy).

24.    McCarthy and McCormick searched K.Y.'s bedroom, where they located numerous journals, writing, and drawings.  See Aug. 3, 2011 Tr. at 50:13-17 (McCarthy).

25.    In the journals, K.Y. wrote that she enjoys cutting herself to relieve stress; she also wrote about her research regarding how a human body can lose one-eighth of its blood before dying

-6-

and how she "likes to lose one-eighth of her blood."  Aug. 3, 2011 Tr. at 50:17-21 (McCarthy).

26.     K.Y. wrote the last journal entry either the same week or the week before she went missing.  See Aug. 3, 2011 Tr. at 50:24-60:1 (Kastrin, McCarthy).

27.     The journal entries spanned a lengthy period of time; there was some consistency in the entries regarding "thoughts of suicide, cutting, blood loss, bondage, rape, [and] things of that nature," and, as far as McCarthy understood, the journal entries were made while K.Y. was medicated.  Aug. 3, 2011 Tr. at 64:13-20 (Kastrin, McCarthy).

28.     The information that K.Y.'s parents relayed to McCarthy and McCormick about K.Y.'s mental health, in combination with K.Y.'s journals, led McCarthy to believe that K.Y. posed a suicide threat:

> [W]e now had reason to believe that she was in the presence of an adult male that she had met online for sexual purposes, she's 16, she's not allowed to give consent, she can't give consent for sexual -- to have a sexual relationship, we believed that she was in danger of herself and of the male that she was with.

Aug. 3, 2011 Tr. at 51:7-12 (McCarthy).

29.     McCarthy was also concerned that K.Y. was no longer on her medication.  See id. at 51:13-15 (Kastrin, McCarthy).

30.     After McCarthy and McCormick finished their interview with K.Y.'s parents, Carvo called McCarthy; he told her that the two telephone calls from an unknown number were from a 505 area code, which is a New Mexico area code, that K.Y. received the two telephone calls on November 7, 2009 and on November 8, 2009, and that the IP addresses associated with the electronic mail transmissions that K.Y. received matched an address associated with the 505 telephone number.  See Aug. 3, 2011 Tr. at 51:19-52:5 (Kastrin, McCarthy).

31.     Carvo provided McCarthy with the address -- 2265 Kelly Road Southwest,

Albuquerque, New Mexico.  See Aug. 3, 2011 Tr. at 52:6-7 (Kastrin, McCarthy).

32.     The timing of the two telephone calls to K.Y.'s telephone number on November 7, 2009 and 8, 2009 were significant, because the calls were close to the time the investigators believed K.Y. ran away.  See Aug. 3, 2011 Tr. at 52:12-16 (McCarthy).

33.     Based on this information, McCarthy believed that K.Y. was at 2265 Kelly Road SW. See Aug. 3, 2011 Tr. at 52:17-21 (Kastrin, McCarthy).

34.     McCarthy knew all this information before making her first telephone call to the Bernalillo County Sheriff's Office ("BCSO").  Aug. 3, 2011 Tr. at 52:22-25(Kastrin, McCarthy).

35.     McCarthy believed that the circumstances presented an emergency situation, because there was evidence that K.Y. posed an active suicide risk, because K.Y. was off her medications and was possibly with an adult male in another state.  See Aug. 3, 2011 Tr. at 53:1-7 (Kastrin, McCarthy).

36.     McCarthy believed that K.Y. posed a risk of harm to herself and that the adult male posed a risk of harm to K.Y., because K.Y. could not consent to sexual activity with the adult male given that the age of consent in California is eighteen.  See Aug. 3, 2011 Tr. at 53:8-12, 55:7-14 (Kastrin, McCarthy).

37.     Although K.Y. wrote a runaway note, in which she stated that she was safe and that she would call later, these statements did not allay McCarthy's worries that the situation presented an emergency.  See Aug. 3, 2011 Tr. at 65:14-23 (Kastrin, McCarthy).

38.     McCarthy contacted the BCSO and asked BCSO to do a welfare check.  See Aug. 3, 2011 Tr. at 53:14-25 (Kastrin, McCarthy).

39.     The BCSO dispatcher relayed the following information to BCSO deputies:

WESTMINSTER CNTY WANTS UNITS TO 10-10 REF A 10-28 . . . 10-28 FRM

> CALI SHES A 16 YR OLD FEMALE IS [K.Y.] DOB/09/29/93 LS ON SUNDAY
> . . . AFTER A 27 CALI FOUND OUT THAT SHE HAD BEEN EMAILING A
> MALE EDWARD S CHRISTY DOB/6/08/52 AND THE MALE WAS ALSO
> SENDING HER NUDE PICS OF HIMSELF . . . CALL PINGED THE 21 OF THE
> MALE ON SUNDAY AND IT HIT IN WESTMINSTER CALI AND TODAY ITS
> HITTING NEAR THE 20 IN ALBUQ FEMALE IS 16 YRS OLD 5'5 100 LBS
> BLUE/BLONDE

Bernalillo County Sheriff's Department Computer Aided Dispatch Report at 1 (dated November 9, 2009)(Government's Exhibit H)("CAD Report").[3]

40.     In McCarthy's initial call to the BCSO, she did not mention anything about K.Y.'s mental health.  See Aug. 3, 2011 Tr. at 54:1-5 (Kastrin, McCarthy).

41.     She called the BCSO back approximately an hour later and told them about K.Y.'s mental health issues -- that she was depressed, had attempted suicide in the past, and was off her medications.  See Aug. 3, 2011 Tr. at 54:14-21 (Kastrin, McCarthy).  See also CAD Report at 2 (stating that, at "19[:]49 THE DET FROM CALI CALLED ADV THE SUBJ IS SUICIDAL, OFF MEDS & DEPRESSED").

**2.     Littlefield.**

42.     On November 9, 2009, following McCarthy's first call to the BCSO, BCSO Deputy Littlefield was dispatched to Christy's residence at 2265 Kelly Road, S.W. to perform a welfare check in reference to a run away from California.  See Aug. 3, 2011 Tr. at 69:21-70:3 (Kastrin, Littlefield).

43.     Littlefield had information that the run away was a sixteen-year-old female who left

---

[3] A 10-10 is a welfare check, and a 10-28 is a run away.  See Transcript of Hearing at 11:17 (taken April 21, 2011)(Littlefield).  A 20 is a residence.  See Transcript of Hearing at 28:6 (taken April 22, 2011)(Rees).  Although the Court is not aware of any testimony at the hearing relating to the definition of a 21 or 27, it appears in context that 21 means cellular telephone and 27 relates to law enforcement.

California, possibly in Christy's company.  See Aug. 3, 2011 Tr. at 70:4-11 (Kastrin, Littlefield).

44.    Littlefield believed that, before he "ever stepped foot on" Christy's property, he had probable cause to believe that Christy committed the New Mexico state crimes of kidnaping, custodial interference, contributing to the delinquency of a minor, and sexual exploitation of a minor.  Aug. 3, 2011 Tr. at 70:12-72:10 (Kastrin, Littlefield).

45.    Littlefield believed he had probable cause[4] for the New Mexico crime of kidnaping, because K.Y. left her home, because, as far as Littlefield knew, there was no note saying where she had gone, because, although K.Y. had been in contact with Christy, there was nothing indicating whether she left of her own free will, and because Christy brought K.Y. across state lines and K.Y. had been missing for two days.  See Aug. 3, 2011 Tr. at 70:18-71:9 (Kastrin, Littlefield).

46.    Littlefield believed that he had probable cause for the New Mexico crime of custodial interference, because Christy took K.Y. across state lines, because Littlefield did not have any reason to believe that K.Y.'s parents had consented to her leaving, and because there was nothing in the dispatch that said K.Y.'s parents consented to her leaving the state.  See Aug. 3, 2011 Tr. at 71:13-19 (Kastrin, Littlefield).

47.    Littlefield believed that he had probable cause for the New Mexico crime of contributing to the delinquency of a minor, because Christy had, either with K.Y.'s consent or through enticement, brought K.Y. across state lines apparently against the wishes of her parents.

_____

[4] At times during the hearing, the United States' questions and the witnesses' answers were inconsistent regarding whether they, in November, 2009, had probable cause for a specific crime and knew at that time they had probable cause for that specific crime; or whether they presently believed they had probable cause for a specific crime in November, 2009, but were not thinking about probable cause for that crime at the time.  The Court, in making its findings of fact, tried to be as consistent as possible with the witnesses' testimony.  Thus, the Court will make its findings as precise as possible for each crime, depending upon the witness' testimony.

See Aug. 3, 2011 Tr. at 71:20-72:3 (Kastrin, Littlefield).

48.     Littlefield believed that he had probable cause for the New Mexico crime of sexual exploitation of a minor, because he believed, based on his training and experience, that there was a possibility child pornography could be involved, given the electronic mail transmission communications between K.Y. and Christy, and the nude pictures that Christy sent K.Y.  See Aug. 3, 2011 Tr. at 72:9-16 (Kastrin, Littlefield).

49.     Littlefield knew that Christy and K.Y. had communicated through electronic mail transmissions and that Christy had sent K.Y. nude photographs, but, as far as he knew, there was not any simulated sexual act in the nude pictures or any actual sexual act.  See Aug. 3, 2011 Tr. at 78:1-6 (McMillian, Littlefield).

50.     Littlefield shared the information that Christy possibly transported a run-away sixteen-year-old female -- K.Y. -- from California to New Mexico with Detective Weylin Proctor from the BCSO so that Proctor could get a search warrant.  See Aug. 3, 2011 Tr. at 72:21-24 (Kastrin, Littlefield)

51.     Littlefield wanted to search Christy's vehicle, Christy's residence, Christy's and K.Y.'s cellular telephones, Christy's computers, and any memory or data storage devices, cameras, or similar items.  See Aug. 3, 2011 Tr. at 72:25-73:7 (Kastrin, Littlefield).

52.     When Littlefield arrived at Christy's residence, he walked down the driveway, because it appeared to him that the residence's rear entrance was the main entrance or the entrance that was used most, because the leaves were disturbed going down the driveway, and the front porch was dark and did not look used.  See Transcript of Hearing at 18:4-12 (taken April 21, 2011)(Kastrin, Littlefield).

53.     The rear entrance is not visible from the front of the residence; the disturbance of the

leaves in the driveway is consistent with disturbance from the tires of a car -- there are two tracks where the leaves are disturbed.  See Government's Exhibit J.

54.     From the Court's independent review of the photographs, the Court does not agree that the front door did not look like the door people used.  Littlefield could not see the back porch, so he could not have reasonably made a comparison before he went to the back porch.  The back porch is messy and looks like a back porch; the front porch looks neat and inviting. See Government's Exhibit I; Government's Exhibit M; Government's Exhibit N.

55.     After Littlefield looked in Christy's window, he believed that he had probable cause that Christy had committed production of child pornography, because he saw a flash that was consistent with a camera flash, because he saw K.Y. in various states of undress, and because it looked like K.Y. was staged.  See Aug. 3, 2011 Tr. at 73:12-74:4 (Kastrin, Littlefield).

56.     When Littlefield looked in the window, he did not see a camera and could not, physically, have seen the computer on Christy's desk.[5]  See Aug. 3, 2011 Tr. at 78:7-12 (McMillian, Littlefield).[6]

57.     Littlefield later shared what he saw when he looked into the window with Proctor to

_____

[5] Had the Court found that Littlefield's act of peering through the crack in the blinds was not a search, whether Littlefield saw the computer would have been important in the Court's analysis of whether Adkins or Carvo had probable cause for child pornography.  Because the Court finds, however, that Littlefield's act was a search, this finding of fact, and whether Littlefield could physically see the computer, is not significant.

[6] Although Littlefield testified that, when he looked in the crack in the blinds, he saw a computer that was pointed in the direction of the juvenile, see Aug. 3, 2011 Tr. at 78:10-14 (McMillian, Littlefield), the Court does not credit this testimony.  The United States produced pictures of the window, and the pictures showed the crack in the blinds and the computer as it was when Littlefield looked through the crack.  The crack in the blinds was small, appearing no more than an inch in height, and the computer was on the wall near the window.  It is not a reasonable conclusion or finding that Littlefield was able to position himself in a manner which would have allowed him to see the computer.

-12-

make sure that, when Proctor obtained search warrants, he would include all devices, such as cameras, computers, flash drives, media storage devices, and cellular telephone cameras, which could be used for the production and distribution of child pornography.  See Aug. 3, 2011 Tr. at 74:9-17 (Kastrin, Littlefield).

58.    Littlefield has concluded that, had he not forced entry into Christy's residence when he did, he would have entered the residence at a later time, because BCSO was later given information that K.Y. was considered suicidal, off her medication, and a danger to herself.  See Aug. 3, 2011 Tr. at 74:21-75:3 (Kastrin, Littlefield).

59.    BCSO deputies learned this information approximately an hour after they forced entry into Christy's residence.  See Aug. 3, 2011 Tr. at 76:13-18 (Kastrin, Littlefield).

**3.    Mary Adkins.**

60.    Adkins, a Special Agent with the FBI, is currently assigned to work cases involving online exploitation of children.  See Aug. 3, 2011 Tr. at 5:14-22 (Rees, Adkins).

61.    Adkins is affiliated with a statewide task force relating to internet crimes against children.  See Aug. 3, 2011 Tr. at 7:19-8:5 (Rees, Adkins).

62.    In the course of her duties as an FBI agent who is assigned to investigate child exploitation cases, Adkins writes search warrants for premises that may contain evidence of a child exploitation crime.  See Aug. 3, 2011 Tr. at 6:10-14 (Rees, Adkins).

63.    When the FBI works jointly with a state agency, investigative decisions are made jointly through communications with both agencies and, at times, attorneys.  See Aug. 3, 2011 Tr. at 11:1-4 (Rees, Adkins).

64.    On the evening of November 9, 2009, sometime between six and seven, a task force member called Adkins to Christy's residence to assist the BCSO.  See Aug. 3, 2011 Tr. at 7:17-23

-13-

(Rees, Adkins).

65.     The task force member contacted Adkins, because there was a possibility a federal crime occurred, given that Christy and K.Y. had crossed over state lines; Adkins arrived on the scene to work with Proctor to determine what kind of crimes had occurred, whether the search warrant should be state or federal, and how best to proceed.  See Aug. 3, 2011 Tr. at 8:1-9 (Rees, Adkins).

66.     Before Adkins got to Christy's residence, she knew that an individual had traveled to California, picked up a minor, and brought her back to New Mexico.  See Aug. 3, 2011 Tr. at 22:16-20 (McMillian, Adkins).

67.     Adkins "knew that there was not parental permission when [she] was on [her] way over there, or there wouldn't have been a call to [BCSO] to begin with."  Aug. 3, 2011 Tr. at 26:24-27:1 (Adkins).

68.     Adkins did not know the circumstances of the transportation when she arrived on the scene.  See Aug. 3, 2011 Tr. at 25:13-18 (McMillian, Adkins).

69.     After she arrived on scene at Christy's residence, Adkins learned, mostly through Proctor and other BCSO deputies, that Christy had traveled to California and picked up K.Y., then brought her back to his residence in New Mexico.  See Aug. 3, 2011 Tr. at 9:3-7 (Adkins).

70.     BCSO deputies informed Adkins that K.Y. was removed from her place of residence without her parents' consent; Carvo also later told Adkins this information.  See Aug. 3, 2011 Tr. at 9:22-25 (McMillian, Adkins).

71.     On the scene, and later during her interview with K.Y., Adkins learned that Christy and K.Y. had communicated over the internet and that the communications were sexual in nature.  See Aug. 3, 2011 Tr. at 10:1-9(McMillian, Adkins).

-14-

72.     Adkins found out about the photographs that Christy and K.Y. sent each other during her interview of K.Y., when K.Y. described some of the photographs she sent to Christy; Adkins did not see the pictures that night.  See Aug. 3, 2011 Tr. at 27:20-29:1 (McMillian, Adkins).

73.     Adkins knew that Littlefield had looked through a window in Christy's residence, and that he had seen what appeared to be camera flashes and K.Y. in various stages of undress. See Aug. 3, 2011 Tr. at 9:1-11 (Rees, Adkins).

74.     That evening, Proctor and Adkins had a discussion about obtaining a search warrant; Adkins made a telephone call to the FBI's evidence response team to determine whether they were available to execute a search warrant.  See Aug. 3, 2011 Tr. at 11:7-11 (Adkins).

75.     The FBI's evidence response team was not immediately available.  See Aug. 3, 2011 Tr. at 12:6-16 (Rees, Adkins)

76.     In Adkins' experience, if both the FBI and a state agency have probable cause for crimes, both agencies do not obtain a search warrant.  See Aug. 3, 2011 Tr. at 11:12-19 (Rees, Adkins).

77.     Adkins was prepared to acquire a federal search warrant that evening.  See Aug. 3, 2011 Tr. at 12:3-5 (Rees, Adkins).

78.     Because the FBI's evidence response team was not available until the following day, a decision was made that Proctor would obtain the search warrant, because it was believed a state agency could get the warrants quicker.  See Aug. 3, 2011 Tr. at 12:22-13:10 (Rees, Adkins).

79.     If Adkins had written the federal search warrant, she would have contacted Carvo or Fletes to obtain information about their investigation, and she would have contacted the BCSO deputies to obtain information about what occurred on the scene.  See Aug. 3, 2011 Tr. at 13:11-20 (Rees, Adkins).

-15-

80.     Adkins would have incorporated this information into her affidavit for a search warrant.  See Aug. 3, 2011 Tr. at 13:21-24 (Rees, Adkins).

81.     Adkins did not do an "independent investigation of the circumstances, other than what [she] got from BCSO and Westminster PD."  Aug. 3, 2011 Tr. at 34:14-17 (McMillian, Adkins).

82.     All the "information [Adkins] had that evening, that [she] [would] ha[ve] []used to get a search warrant came from either the task force member, BCSO, Westminster PD, [the investigations that Westminster PD did,] or [her] interview with [K.Y.]" Aug. 3, 2011 Tr. at 36:11-17 (McMillian, Adkins).

83.     Adkins did not ever write a warrant application.  See Aug. 3, 2011 Tr. at 31:11-13 (McMillian, Adkins).

84.     Adkins believes that an Assistant United States Attorney would have approved a federal search warrant.  See Aug. 3, 2011 Tr. at 13:25-14:3 (Rees, Adkins).

85.     Adkins has obtained other federal search warrants in this district, and she has never had an issue with a federal judge not issuing a search warrant in similar cases.  See Aug. 3, 2011 Tr. at 14:4-11 (Rees, Adkins).  See also Transcript of Hearing at 56:23-57:2 (taken July 8, 2011)(Court, Rees)("THE COURT: . . . [S]o the only thing we'd be talking about here for purpose of a Rule 41 search warrant would be one of the United States magistrate judges here?  MS. REES: Right.  I never had an issue with not being able to [obtain a warrant.]").

86.     If the BCSO had not acquired a search warrant that night, Adkins would have acquired a search warrant.  See Aug. 3, 2011 Tr. at 14:12-15 (Rees, Adkins).

87.     Adkins believed that she had probable cause, "based upon the evidence [she] learned that particular evening," for "a search warrant for [the federal crimes of] production of child

pornography, possession of child pornography, kidnapping, and . . . traveler or the enticement statute." Aug. 3, 2011 Tr. at 14:18-24 (Rees, Adkins).

88.     A person under the age of eighteen cannot consent to the production or possession of child pornography.  See Aug. 3, 2011 Tr. at 39:6-13 (Rees, Adkins).

89.     That the minor may have consented does not negate Adkins' probable cause for child pornography crimes or enticement or coercion crimes.  See Aug. 3, 2011 Tr. at 40:4-8 (Rees, Adkins).

90.     Adkins believes that she would have had probable cause for the federal crimes of production and possession of child pornography, based on Littlefield's "approach and view through the window," and the later "statements made by the victim," from whom Adkins learned that she sent explicit pictures of herself.  Aug. 3, 2011 Tr. at 15:1-11 (Rees, Adkins).

91.     Littlefield told Adkins that he looked through the window of Christy's residence and saw a young girl in what appeared to be some type of bondage apparatus, that the young girl was nude, and that he had seen flashes which could have come from a camera.  See Aug. 3, 2011 Tr. at 31:19-32:3 (McMillian, Littlefield).

92.     Adkins believes that, based on her experience, there is a possibility that a person who may be producing child pornography may also collect it.  See Aug. 3, 2011 Tr. at 32:9-12 (Adkins).

93.     Adkins believes that, "in theory," if she spoke to the Westminster Police Department, she would have acquired information that the victim sent explicit images of herself that were consistent with child pornography.  Aug. 3, 2011 Tr. at 15:8-19 (Rees, Adkins).

94.     Based upon her training and experience with the crimes of production and possession of child pornography, Adkins would have searched Christy's residence and Christy's vehicle; her search warrant for the residence and vehicle would have encompassed any computers, cellular

-17-

telephones, and devices that could be used to hold digital media.  See Aug. 3, 2011 Tr. at 15:20-16:7 (Rees, Adkins).

95.     Adkins believes that she would have had probable cause for the federal crime of kidnaping, because she was aware of evidence that Christy took K.Y. from her residence in California without her parents' permission.  See Aug. 3, 2011 Tr. at 16:13-20 (Rees, Adkins).

96.     Adkins received information that K.Y. was removed from her residence without her parents' permission on the scene from Proctor, from the task force member who initially contacted her, and from K.Y. during K.Y.'s interview.  See Aug. 3, 2011 Tr. at 33:12-22 (McMillian, Adkins).

97.     With a search warrant based on probable cause for kidnaping, Adkins would have been looking for K.Y.'s belongings, receipts related to travel, and other related items in Christy's vehicle and Christy's residence.  See Tr. at 16:18-17:6 (Rees, Adkins).

98.     Adkins believed that she had probable cause to write a search warrant for the federal crime of enticement or coercion, because she was aware of evidence that K.Y. and Christy used the internet and cellular telephones to communicate, and that Christy traveled across state lines to meet K.Y. and to transport her to Albuquerque.  See Aug. 3, 2011 Tr. at 17:7-16 (Rees, Adkins).

99.     Proctor told Adkins that K.Y. and Christy had communicated over the internet, and she also gained the same information later from Westminster investigators and from K.Y.  See Aug. 3, 2011 Tr. at 33:1-8 (McMillian, Adkins).

100.    A search warrant based upon probable cause for enticement or coercion would have encompassed Christy's residence, Christy's vehicle, Christy's cellular telephone, and Christy's computers.  See Aug. 3, 2011 Tr. at 17:17-3 (Rees, Adkins).

101.    Presuming Adkins "g[o]t a search warrant and [went] inside [Christy's] residence and [found] things like used condoms," Adkins "would have -- If [she] had not done it previously, [she]

-18-

would have stopped and requested a supplemental [search warrant].  But [she] would have requested in the search warrant items of a sexual nature, items that can be used: Sheets, bed sheets, condoms, et cetera. . . . Anything that could obtain DNA evidence," because the items would have been evidence of the crime.  Aug. 3, 2011 Tr. at 18:17 (Rees, Adkins).

102.    The DNA evidence would have included DNA evidence from Christy.  <u>See</u> Aug. 3, 2011 Tr. at 18:16-17 (Rees, Adkins).

103.    The BCSO's search warrant "sufficiently cover[ed] the evidence [she] would have sought to obtain in a federal search warrant."  Aug. 3, 2011 Tr. at 18:20-24 (Rees, Adkins).

104.    Adkins believed that there was no need for her to obtain a supplemental federal search warrant.  <u>See</u> Aug. 3, 2011 Tr. at 18:25-19:2 (Rees, Adkins).

105.    Adkins believes that, if the BCSO deputies had not looked through the window and seen the circumstances involving the missing juvenile, she still would have had probable cause for federal crimes so as to obtain a federal search warrant.  <u>See</u> Aug. 3, 2011 Tr. at 19:3-8 (Rees, Adkins).

106.    Adkins believes that these crimes would be the "traveler enticement [and] kidnapping."  Aug. 3, 2011 Tr. at 19:9-11 (Rees, Adkins).

107.    Adkins believes she would have had probable cause for these crimes based upon evidence that Christy had traveled to California, picked up K.Y., and brought her across state lines without her parents' permission, and based upon evidence that K.Y. and Christy were communicating through the internet and cellular telephones.  <u>See</u> Aug. 3, 2011 Tr. at 20:17-21:24 (Rees, Adkins).

108.    With search warrants based on these crimes, Adkins would have sought to search Christy's vehicle and residence; she would have sought to seize computer-related material, any

devices that could hold or store computer-related material and digital images, cellular telephones, and receipts for travel and communications.  See Aug. 3, 2011 Tr. at 19:12- 22 (Rees, Adkins).

109.    If Adkins had found evidence of sexual activity in the residence, she would have obtained a supplemental search warrant for items of a sexual nature that could contain DNA evidence, including from Christy's person.  See Aug. 3, 2011 Tr. at 19:23-20:6 (Rees, Adkins).

110.    If BCSO had not looked through the window, and had not obtained a search warrant, Adkins is "absolutely certain" she would have applied for a search warrant the next day.  Aug. 3, 2011 Tr. at 20:7-14 (Rees, Adkins).

**4.    Carvo.**

111.    Carvo is a member of a FBI task force that is comprised of state and local investigators who investigate internet crimes against children.  See Aug. 3, 2011 Tr. at 87:5-88:1 (Rees, Carvo).

112.    In this assignment, Carvo is cross designated to acquire both state and federal search warrants.  See Aug. 3, 2011 Tr. at 88:2-4 (Rees, Carvo).

113.    If a federal crime occurs in California, but the evidence exists elsewhere, Carvo can write a federal search warrant to acquire that evidence.  See Aug. 3, 2011 Tr. at 88:9-12 (Rees, Carvo).

114.    Based upon his investigation, training, and experience, Carvo believed that he had probable cause to acquire search warrants for Christy's vehicle, cellular telephones, residence, and other matters.  See Aug. 3, 2011 Tr. at 88:13-18 (Rees, Carvo).

**a.    California Crimes.**

115.    Carvo believed he had probable cause for the California crimes of: (i) child abduction -- California Penal Code §§ 278 and 278.5; (ii) illegal contact with a minor -- California Penal Code

§ 278.3; (iii) showing or sending harmful matter to a minor -- California Penal Code § 288.2; (iv) arranging a meeting with a minor for sexual purposes -- California Penal Code § 288.4; (v) attending a meeting with a minor for sexual purposes or for a lewd act -- California Penal Code § 288.4B; (vi) annoying or molesting a child -- California Penal Code § 647.6; (vii) unlawful sexual intercourse -- California Penal Code § 261.5; (viii) possession of child pornography -- California Penal Code § 311.11; (ix) production of child pornography -- California Penal Code § 311.4; and (x) unlawful oral copulation with a minor -- California Penal Code § 288A.  See Aug. 3, 2011 Tr. at 88:21-89:21 (Rees, Carvo).

116.   The age of consent in California is eighteen years.  See Aug. 3, 2011 Tr. at 88:19-20 (Rees, Carvo).  See also People v. Soto, 245 P.3d 410, 422 n.11 (Cal. 2011)("The Legislature later raised the age of consent from 14 to 18 . . . ." (citing Stats. 1897, ch. 139, § 1, p. 201; Stats.1913, ch. 122, § 1, p. 212)).

117.   Carvo believes he had probable cause for these California crimes as soon as he started the investigation and learned of the contact over electronic mail transmissions between Christy and K.Y., the pictures that the two exchanged, the age difference, and that Christy had met K.Y. in California and taken her to New Mexico.  See Aug. 3, 2011 Tr. at 88:23-90:7 (Rees, Carvo).

**I.   Child abduction.**

118.   The California crime of child abduction encompasses a defendant who maliciously takes or entices away a child under the age of eighteen when the defendant did not have rights to custody of that child, and when the defendant intended to detain or conceal the child from the child's lawful custodian; the defendant may be guilty of this crime even if the child consented to the taking. See Aug. 3, 2011 Tr. at 90:10-19 (Rees, Carvo).  See also Cal. Penal Code § 277 ("'Child' means a person under the age of 18 years."); Cal. Penal Code § 278 ("Every person, not having a right to

custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent

to detain or conceal that child from a lawful custodian shall be punished . . . .").

119.    Carvo believed that he had probable cause for this crime, because Christy had been

in contact with K.Y. through electronic mail transmissions, because K.Y. was under the age of

eighteen, because the cellular telephone evidence and the evidence from the cellular telephone

towers showed that Christy traveled from New Mexico to Westminster at the time that K.Y.

disappeared and then traveled back to New Mexico, and because K.Y.'s parents did not consent to

her leaving the state with Christy.  See Aug. 3, 2011 Tr. at 90:22-91:6 (Rees, Carvo).

120.    The California crime of child abduction by depriving a lawful custodian of a right

to custody or visitation encompasses a defendant who takes or entices away a child who is under the

age of eighteen when the defendant acted maliciously to deprive the right to custody of a lawful

custodian.  See Aug. 3, 2011 Tr. at 91:11-22 (Rees, Carvo).  See also Cal. Penal Code § 277; Cal.

Penal Code § 278.5 ("Every person who takes, entices away, keeps, withholds, or conceals a child

and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation,

shall be punished . . . .").

121.    Maliciously is defined as when the defendant intentionally does a wrongful act or

when he or she acts with the unlawful intent to distribute defraud, annoy, or injure someone else.

See Aug. 3, 2011 Tr. at 91:21-92:1 (Carvo).  See also People v. Neidinger, 146 P.3d 502, 509-10

(Cal. 2006)("The current section 278.5 requires that the person act 'maliciously.' Section 7,

subdivision 4, states that this word 'import[s] a wish to vex, annoy, or injure another person, or an

intent to do a wrongful act . . . .'").

122.    It is not a defense to the charge of the California crime of child abduction that the

minor consented to go with the defendant.  See Aug. 3, 2011 Tr. at 92:2-5 (Rees, Carvo).  See also

People v. Grever, 259 Cal. Rptr. 469, 472 (Super. 1989)("Just as with child stealing, the crime is committed against the parent, not the child; thus, the child's consent is irrelevant.").

123.    Carvo believed that he had probable cause for the California crime of child abduction, because Christy and K.Y. had contact through electronic mail transmissions, because K.Y. was under eighteen, and because the cellular telephone evidence showed Christy traveling to Westminster, picking up K.Y., and driving her back to California.  See Aug. 3, 2011 Tr. at 92:6-12 (Rees, Carvo).

### ii.    Sending harmful material.

124.    The crime of sending harmful material to seduce a minor encompasses a defendant who shows or sends harmful material to a minor through electronic mail transmissions or the internet, when the defendant either knew that the person was a minor or failed to use reasonable care to determine the age of the minor, and when the defendant acted to sexually arouse, appeal to, or gratify the lust, passions, or sexual desires of himself or the minor, and with the intent or for the purpose of seducing the minor.  See Aug. 3, 2011 Tr. at 92:13-25 (Rees, Carvo).  See also Cal. Penal Code § 288.2 (stating that "[e]very person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means," harmful matter, if the person had "the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor," is guilty of a "public offense").

125.    Material is considered harmful under this statute if it shows or describes sexual conduct in an obviously offensive way, an average person would conclude it lacks serious literary artistic, political, or scientific value for minors, and an average adult person applying contemporary

state standards would find that the material appeals to prurient interests.  See Aug. 3, 2011 Tr. at 93:1-8 (Carvo).  See also Cal. Penal Code § 313 (defining "[h]armful matter" as "matter . . . which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors").

126.    Carvo believes that the naked photographs that Christy sent to K.Y. constitute harmful material and that Christy intended to use the material to seduce K.Y., given Christy's and K.Y.'s communications over electronic mail transmissions and that they met on a dating website. See Aug. 3, 2011 Tr. at 93:9-24 (Rees, Carvo).

127.    Carvo testified that, in the pictures Christy sent the minor, there is not a sexual act depicted or suggested, but that his genitals are visible.  See Aug. 3, 2011 Tr. at 111:2-12 (McMillian, Carvo).

128.    K.Y. was not simulating or performing a sexual act in the any of the pictures she sent Christy.  See Aug. 3, 2011 Tr. at 112:4-8 (McMillian, Carvo).

129.    Carvo does not know the dates that either Christy or the juvenile sent the pictures, or when Christy first acquired knowledge of the juvenile's age.  See Aug. 3, 2011 Tr. at 112:9-113:1 (McMillian, Carvo).

130.    To register on agematch.com and consensual.com, a person must be eighteen years old.  See Aug. 3, 2011 Tr. at 113:2-7 (McMillian, Carvo).

131.    During his investigation, Carvo was aware that K.Y. was sending photographs of herself to Christy, and, based on his review of the photographs, K.Y. appears to be fourteen or fifteen years of age; Carvo believes that it would be reasonable to deduce that a person who looked

at the image would believe that the image is of a minor.  See Aug. 3, 2011 Tr. at 93:25-94:13(Rees, Carvo).

132.    Carvo believed that he had probable cause to believe that Christy had committed the California crime of showing or sending harmful material to seduce a minor, because Christy and K.Y. met on a dating website, because K.Y. was under the age of eighteen, and because Christy sent her naked pictures of himself.  See Aug. 3, 2011 Tr. at 94:14-20 (Rees, Carvo).

### iii.    Contacting a minor with intent to commit certain felonies.

133.    The California crime of contacting a minor with intent to commit certain felonies encompasses a defendant who contacts or attempts to contact a minor with the intent to commit a certain felony, which in this case, would be unlawful sex with a minor and unlawful oral copulation with a minor, when the defendant knew or reasonably should have known that the person was a minor.  See Aug. 3, 2011 Tr. at 94:21-95:6 (Rees, Carvo).  See also Cal. Penal Code § 288.3(a) (stating that "[e]very person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense" specified in the statute "involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense").

134.    Carvo believes that the pictures K.Y. sent suggest she was a minor.  See Aug. 3, 2011 Tr. at 95:8-10 (Rees, Carvo).

135.    Under this statute, contact or communication includes direct or indirect contact or communication, personally, through electronic mail, through the internet, or through the telephone. See Aug. 3, 2011 Tr. at 95:11-15 (Rees, Carvo).  See also Cal. Penal Code § 288.3 (b) (defining "contacts or communicates with" as including "direct and indirect contact or communication that

may be achieved personally or by use of an agent or agency, any print medium, any postal service,

a common carrier or communication common carrier, any electronic communications system, or any

telecommunications, wire, computer, or radio communications device or system").

136.    Based on his investigation, Carvo was aware that K.Y. and Christy communicated

through the internet, through electronic mail transmissions, and through the telephone.  See Aug.

3, 2011 Tr. at 95:16-21 (Rees, Carvo).

137.    Carvo believed that he had probable cause for the felonies of unlawful sexual

intercourse and oral copulation, because, based on his training and experience investigating similar

crimes,  when two people exchange naked pictures through electronic mail transmissions and then

arrange in-person meeting, the purpose of that meeting is for sexual contact.  See Aug. 3, 2011 Tr.

at 95:22-96:13 (Rees, Carvo).

### iv.    Arranging/attending meeting with a minor for lewd purposes.

138.    The California crime of arranging a meeting with a minor for a lewd purpose

encompasses a defendant who is motivated by an unnatural or abnormal sexual interest in children,

arranging a meeting with a minor or a person that he or she believes to be a minor, when, at the

meeting, the defendant intended to either expose his genitals or pubic area or to have the minor

expose her genitals or pubic area or engage in lewd or lascivious behavior.  See Aug. 3, 2011 Tr.

at 96:17-97:2 (Rees, Carvo).  See also Cal. Penal Code § 288.4(a) (stating that "[e]very person who,

motivated by an unnatural or abnormal sexual interest in children, arranges a meeting with a minor

or a person he or she believes to be a minor," for purposes of "exposing his or her genitals or pubic

or rectal area, having the child expose his or her genitals or pubic or rectal area, or engaging in lewd

or lascivious behavior, shall be punished").

139.    Lewd or lascivious behavior covers any touching of a person with the intent to

sexually arouse the person or the other person.  See Aug. 3, 2011 Tr. at 97:3-12 (Rees, Carvo). See People v. Carpenter, 291 P.2d 189, 190 (Cal. App. 1955)("[H]e evolved the theory that . . . there was a distinction between the 'private parts' of the little girl and the 'sexual parts' . . . .  The argument is specious since section 288 relates to acts committed upon any part of the body of the child.").

140.    Carvo believed that he had probable cause for this crime, because, based on his training and experience in investigating similar crimes, when an adult and minor exchange nude photographs with each other and then arrange a meeting in real life, it is likely that the meeting is to enable sexual contact between the two.  See Aug. 3, 2011 Tr. at 97:13-20 (Rees, Carvo).

141.    The California crime of attending a meeting with a minor for lewd purposes encompasses a situation where a person arranges a meeting with a minor or a person that they believe to be a minor, when the person was motivated to arrange the meeting by unnatural or abnormal sexual interest in children, when the person had a specific intent to expose his or her genitals or pubic or rectal area or have the child expose his or her genitals or pubic or rectal area, and when the person went to the arranged meeting place at or about the arranged time.  See Aug. 3, 2011 Tr. at 98:10-21 (Rees, Carvo).  See also Cal. Penal Code § 288.4(b) ("Every person described in paragraph (1) of subdivision (a) [ -- arranging a meeting with a minor for lewd purposes --] who goes to the arranged meeting place at or about the arranged time, shall be punished . . . .").

142.    Carvo believed he had probable cause for this particular crime, because the information from the cellular telephone towers showed that Christy used his cell phone in the Westminster area on the morning K.Y. disappeared, and because, based on his training and experience in investigating similar crimes, when an adult and minor exchange nude photographs with each other and then arrange a meeting in real life, it is likely that the meeting is to enable sexual

contact between the two.  See Aug. 3, 2011 Tr. at 98:22-99:17 (Rees, Carvo).

### v.   Annoying/molesting a child.

143.   The California crime of annoying or molesting a child encompasses a case in which a defendant annoyed or molested a child under eighteen years of age and a defendant who, motivated by unnatural or abnormal sexual interest in child under eighteen years of age, engages in conduct which, if directed at a child, would violate this statute. See Aug. 3, 2011 Tr. at 99:18-100:2 (Rees, Carvo).  See also Cal. Penal Code § 647.6(a) ("Every person who annoys or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."), Cal. Penal Code § 647.6(b) ("Every person who, motivated by an unnatural or abnormal sexual interest in children, engages in conduct with an adult whom he or she believes to be a child under 18 years . . . , which conduct, if directed toward a child . . .  would be a violation of this section, shall be punished . . . .").

144.   A child does not need to be touched for a violation of this statute to occur.  See Aug. 3, 2011 Tr. at 1003-5 (Rees, Carvo).  See also United States v. Pallares-Galan, 359 F.3d 1088, 1101 (9th Cir. 2004)("[N]o actual contact need be shown in order to establish the crime of annoying or molesting a person under the age of 18." (citations omitted)).

145.   Carvo believed that he had probable cause for this crime, because Christy sent naked pictures to K.Y.  See Aug. 3, 2011 Tr. at 100:9-12 (Rees, Carvo).

### vi.   Unlawful sexual intercourse with a minor.

146.   The California crime of unlawful sexual intercourse with a minor more than three years younger than the defendant encompasses defendants who have sexual intercourse with another person, when the defendant and the other person were not married to each other, and when, at the

time of intercourse, the other person was under the age of eighteen and more than three years younger than the defendant.  <u>See</u> Aug. 3, 2011 Tr. at 100:13-21 (Rees, Carvo).  <u>See also</u> Cal. Penal Code § 261.5 (stating that "[u]nlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor," that a minor "is a person under the age of 18 years," and stating that "[a]ny person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony, and shall be punished").

147.    It is not a defense that the minor may have consented to sexual intercourse; the age of consent in California is eighteen.  <u>See</u> Aug. 3, 2011 Tr. at 100:22-101:1 (Rees, Carvo).  <u>See also</u> Cal. Penal Code § 261.5;  <u>People v. Soto</u>, 245 P.3d at 422 n.11.

148.    Carvo believed that he had probable cause for this crime, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.  <u>See</u> Aug. 3, 2011 Tr. at 101:2-9 (Rees, Carvo).

### vii.    <u>Oral copulation.</u>

149.    The California crime of oral copulation with a person under the age of eighteen encompasses a defendant who participates in an act of oral copulation with another person who was under the age of eighteen when the act was committed.  <u>See</u> Aug. 3, 2011 Tr. at 101:10-16 (Rees, Carvo).  <u>See also</u> Cal. Penal Code § 288a (stating that "any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year").

150.    It is not a defense that the minor may have consented to the act.  <u>See</u> Aug. 3, 2011 Tr. at 101:17-19 (Rees, Carvo).  <u>See also</u> <u>People v. Hillhouse</u>, 1 Cal. Rptr. 3d 261, 267 (App. Dist.

2003)(stating that the concept of consent is irrelevant to the determination whether the statute criminalizing oral copulation with a minor has been violated).

151.    Carvo believed that he had probable cause for this crime, because, based on his interviews with child victims and subjects arrested for similar conduct, oral copulation occurs in almost every case between a child and an adult.  See Aug. 3, 2011 Tr. at 101:20-102:4 (Rees, Carvo).

### viii.    Child pornography.

152.    The California crime of using a minor in creating pornography encompasses a person who, with knowledge that a person is a minor under eighteen years of age or while in possession of facts on the basis of which he or she should reasonably know that the person is a minor under eighteen years of age, knowingly promotes, employs, uses, persuades, induces, or coerces the minor to engage in or assist others to engage in, posing, or modeling for the purpose of preparing any picture, involving sexual conduct by the minor.  See Aug. 3, 2011 Tr. at 102:10-23 (Rees, Carvo). See also Cal. Penal Code § 311.4(c) (stating that "[e]very person who, with knowledge that a person is a minor under the age of 18 years, or who, while in possession of any facts on the basis of which he or she should reasonably know that the person is a minor under the age of 18 years," who "knowingly promotes, employs, uses, persuades, induces, or coerces a minor under the age of 18 years . . . to engage in or assist others to engage in either posing or modeling alone or with others for purposes of preparing any representation of information, data, or image, . . . or a live performance," which involves "sexual conduct by a minor under the age of 18 years alone or with other persons or animals, is guilty of a felony").

153.    Carvo believed that he had probable cause for this crime, because, based on his training and experience, it is more likely than not Christy attempted to get K.Y. to take pictures of

-30-

herself completely naked and it is more likely than not that Christy has engaged in this conduct with other minors and has asked other minors to take pictures of themselves naked.  See Aug. 3, 2011 Tr. at 102:24-103:11 (Rees, Carvo).

154.    The California crime of possession of child pornography encompasses possession of any image, whether it is a picture or a video, of a minor under the age of eighteen engaged in sexual conduct.  See Aug. 3, 2011 Tr. at 103:21-104:4 (Rees, Carvo).  See also Cal. Penal Code § 311.11 ("Every person who knowingly possesses or controls any matter . . . the production of which involves . . . use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct . . . is guilty of a felony . . . .").

155.    Carvo believed that he had probable cause for this crime, because, based on his training and experience, when a defendant sends naked pictures of himself to a minor and then solicits similar pictures from the minor, it is more likely than not the defendant will possess child pornography in his home in his computer.  See Aug. 3, 2011 Tr. at 104:5-15 (Rees, Carvo).

156.    Based on his belief that he had probable cause for these crimes, Carvo would have sought to search Christy's vehicle, his cellular telephone, his residence, his computers, any digital media that could store pictures, evidence of contact between Christy and K.Y., evidence that K.Y. was in Christy's residence, and DNA evidence from Christy and K.Y.  See Aug. 3, 2011 Tr. at 104:21-105:10 (Rees, Carvo).

b.    **Federal Crimes.**

157.    Carvo also believed that he had probable cause for the federal crimes of production of child pornography, 18 U.S.C. § 2251, possession of child pornography, 18 U.S.C. § 2252; coercion or enticement of a minor 18 U.S.C. § 2422 and transportation of a minor for sexual

purposes 18 U.S.C. § 2423.  <u>See</u> Aug. 3, 2011 Tr. at 106:4-11 (Rees, Carvo).

158.    Carvo believed that he had probable cause for the federal crime of production and/or possession of child pornography, because K.Y. sent Christy an image of her bare breasts, which, although by itself is not child pornography, based on Carvo's training and experience, when an adult man sends naked pictures of himself and solicits naked pictures of a minor, and then arranges a meeting in the middle of the night with the minor, it is more likely than not that he has asked for additional pictures of her, that he will take pictures of her, and that he has solicited pictures from minors in previous incidents.  <u>See</u> Aug. 3, 2011 Tr. at 106:12-25 (Rees, Carvo).

159.    Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.  <u>See</u> Aug. 3, 2011 Tr. at 107:12-21(Rees, Carvo).

160.    Carvo believed that he had probable cause for the crime of transportation of a minor for sexual purposes, because, based on his training and experience in similar cases, given the pictures Christy and K.Y. exchanged, and given the cellular telephone evidence showing that Christy traveled to bring K.Y. to New Mexico, it is more likely than not that they engaged in sexual activity that would have been a violation of several felonies in the state of California.  <u>See</u> Aug. 3, 2011 Tr. at 107:21-108:8 (Rees, Carvo).

        **c.    Obtaining Search Warrants.**

161.    Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell

phones, things of that nature." Aug. 3, 2011 Tr. at 109:6-13 (Rees, Carvo).

162.    If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  See Aug. 3, 2011 Tr. at 109:14-19 (Rees, Carvo).

163.    Carvo would have sought a search warrant for Christy's cellular telephone, Christy's vehicle, Christy's residence, Christy's computer, any digital media that had the capability of storing pictures, any evidence of contact between Christy and K.Y., any evidence that K.Y. had been in Christy's residence, and DNA evidence.  See Aug. 3, 2011 Tr. at 107:14-108:3 (Rees, Carvo).

164.    To acquire a search warrant for California crimes with evidence in New Mexico, Carvo could have written a search warrant affidavit, sent it to a detective in New Mexico, and had the New Mexico detective seek a search warrant incorporating the affidavit.  See Aug. 3, 2011 Tr. at 105:11-18 (Rees, Carvo).

165.    Carvo believed that he had probable cause based on his investigation, and not on any information he learned from the BCSO or the Albuquerque FBI.  See Aug. 3, 2011 Tr. at 110:11-18 (Rees, Carvo).

    **5.    Proctor.**

166.    Proctor wrote a supplemental report, finishing the report in December, 2009, or January, 2010, which stated that, after he gained confessions from Christy, Adkins contacted him and informed him that she was under the impression from the United States Attorney's Office that there were insufficient criteria to pursue federal charges against Christy, and that it was decided that the BCSO would take custody of the investigation and that he would be the case agent.  See Aug. 3, 2011 Tr. at 124:25-126:15 (McMillian, Proctor).

-33-

167.   Adkins assisted with the investigation, however, and the BCSO had subsequent meetings with the FBI and the United States Attorney's Office.  See Aug. 3, 2011 Tr. at 127:14-22 (Rees, Proctor).

## PROCEDURAL BACKGROUND

On February 14, 2011, Christy filed his Motion to Suppress Evidence and Statements.  See Doc. 41.  Christy asked the Court to suppress evidence allegedly illegally obtained from his residence during a warrantless search, followed by a search pursuant to a warrant, as well as his statements obtained as a result of the search.  On February 15, 2011, Christy filed his Brief in Support of Motion to Suppress Evidence and Statements.  See Doc. 46 ("First Brief").  Christy argued that there were not exigent circumstances to justify the invasion of his home.  He argued that, had the deputies not forced entry into his home and searched his home, arrested him, and interviewed him, "none of the material used in the search warrant and affidavit would have been available to establish probable cause for the issuance of the warrant."  First Brief at 3.  He further argued that, even if the deputies' entry into his home was justified, the search that followed was unreasonable.

On February 28, 2011, the United States filed the United States' Response to Defendant's Motion to Suppress *(Docs. 41, 46 and 47)*.  See Doc. 54 ("Response").  The United States asked the Court to deny the Defendant's Motion to Suppress.  The United States contended that the officers had a right to lawfully enter Christy's residence under the emergency aid/exigent circumstances exception to the search requirement of the Fourth Amendment to the United States Constitution. The United States further contended that, once inside the residence, the officers did not exceed the Fourth Amendment's limitations.  The United States asserted that Christy's subsequent interviews

-34-

and his recorded incriminating admissions were in accordance with Miranda[7] and a product of his free will.  The United States contended that there is not any fruit of a poisonous tree evidence that merits suppression.  The United States further asserted that, if the Court finds that the basis of the search warrants defective, it should find application of the good-faith exception to the exclusionary rule.  The only mention of inevitable discovery in the United States' brief was two sentences in a footnote on page eleven, where the United States asserted:

> Should the Court conclude that the officers should have sought consent to enter or should have waited to obtain a warrant prior to making entry, [it] nonetheless should decline to suppress the evidence pursuant to the inevitable discovery exception to the exclusionary rule.  The deputies would have had sufficient probable cause to acquire a search warrant for the Defendant's residence and thus would have inevitably located the evidence in this case.

Response at 11 n.4 (internal citation omitted)(emphasis added).

On April 1, 2011, Christy filed the Defendant's Amended Brief in Support of Motion to Suppress Evidence and Statements.  See Doc. 66 ("Second Brief").  In his amended brief, Christy argued that the deputies' act of walking around the corner of the house past the normal front entrance and peering into a crack in the window shades constituted an illegal warrantless search.

On April 6, 2011, the United States filed the United States' Response to Defendant's Amended Brief in Support of Motion to Suppress *(Doc. 66)*.  See Doc. 80.  The United States contended that the only new information and/or argument in the Second Brief was that the deputies

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966)(holding that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized," and stating that "[p]rocedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored," law enforcement officers must warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him).

were wearing tactical gear, a reference to the BCSO exigent circumstance policy, and that the deputies' act of peering into the crack in the window shades was an illegal search. The United States reiterated its argument that the officers had a right to enter the resident under the emergency aid/exigent circumstances exception and its request that the Court deny Christy's motion to suppress. The United States mentioned inevitable discovery three times in its brief. In an introductory paragraph, the United States asserted: "If by chance the Court disagrees and finds the basis of the search warrants defective in any way, the Court should find application of the good-faith or inevitable discovery exceptions to the exclusionary rule." Response to Amended Brief at 9. The United States included the same footnote, with two sentences that mentioned the inevitable-discovery exception, that it had placed in its Response. <u>See</u> Response to Amended Brief at 15 n.7. At the conclusion of its brief, the United States also included the statement that, "if the Court finds the search warrants were defective for some reason, the evidence need not be suppressed because of the good-faith and inevitable discovery exceptions to the exclusionary rule as articulated in the United States [sic] Response to the Defendant's Motion to Suppress." Response to Amended Brief at 23. The United States' Response, however, mentions the inevitable discovery exception only one once, in a footnote. The section of the Response devoted to why the exclusionary rule does not apply discusses only the good-faith exception to the exclusionary rule.

During the hearings on April 21, 2011, the United States mentioned inevitable discovery once, stating that it "would submit to the Court that if this Court finds, for lack of argument, everything that Mr. McMillian has proposed to this Court to be true, the evidence still would have been discovered under inevitable discovery." Apr. 21, 2011 Tr. at 6:13-17 (Rees).

The United States also solicited testimony regarding probable cause. The United States asked Carvo what he would have done if the BCSO had conducted a welfare check, but had not

found K.Y.  <u>See</u> Apr. 21, 2011 Tr. at 91:24-92:3 (Rees, Carvo).

A. I would have asked for a search warrant to be done on the residence and Mr. Christy's vehicle and computers and cell phone, both in an attempt to locate the missing juvenile and also for evidence of crimes that we had, through our investigation, determined that he had likely committed.

Q. What crimes did you determine he had likely committed?

A. Enticement of a minor through the Internet, child pornography, receiving and distribution of child pornography, distribution of harmful matter to a child, custodial interference, and transportation of a minor across state lines.

Q. And these are all California crimes?

A. California and federal, both.

Q. California and federal, both.

Okay. So let's break this down a little bit. You would have asked for a search warrant of the residence for these crimes. What evidence would you have sought based upon your training and experience?

A. We would have sought evidence of the child having been there through clothes, writings, photographs, as well as searching for his computer and then searching the computer specifically itself for communications between him and the minor; e-mails, chats, photographs. We would have searched for any digital media, as is typical in a child pornography-type case.

. . . .

Q. You also indicated that you would have requested that they get a search warrant for his vehicle. What, specifically, would you have wanted to look for?

A. We would have looked for evidence of him having gone to California to pick up the minor in violation of custodial interference laws and transporting a child across state lines. We would have looked for any evidence of sexual assault, whether it be bodily fluids, condoms, that kind of thing. We also would have looked in the car for digital media for the same reasons as in the house.

Q. So is it fair to say that, based upon the -- based upon the pinging of the cell phone towers, at a minimum you had reason to believe that he used his vehicle to go pick up the minor and bring her across state lines?

A. Yes.

> Q. Would you have assisted Bernalillo County Sheriff's Office in drafting those search warrants?
>
> A. Yes.

Apr. 21, 2011 Tr. at 92:1-94:18.  The United States asked Proctor whether he believes he had probable cause to search for all the items he listed in the search warrants he obtained.  See Apr. 21, 2011 Tr. at 200:9-16 (Rees, Proctor).  Proctor replied that he believes he had probable cause to search for all the items.  See Apr. 21, 2011 Tr. at 200:16 (Proctor).  Proctor testified that he reviewed the information that law enforcement officers in California provided to the BCSO, and that, based on that information, he believes he "would have had probable cause to write a search warrant for [Christy]'s house [and Christy's vehicle] if the deputies had not located [Christy] or [K.Y.] that night."  Apr. 21, 2011 Tr. at 212:11-19, 213:2-5 (Rees, Proctor).  He testified he would have had probable cause, because law enforcement officers "were able to confirm [Christy's] address and his identity and his path of travel. . . . They also had reason to believe that [K.Y.] was having sexual contact of some manner with [Christy], as well."  Apr. 21, 2011 212:22-213:1 (Proctor).

On April 22, 2011, the United States mentioned inevitable discovery during a discussion with the Court regarding whether the deputies needed probable cause to enter Christy's residence under the exigent circumstances doctrine.

> For purposes of exigency, I do not believe we needed to have probable cause.  We would have only needed to have probable cause if we would have acquired a search warrant which molds into the inevitable discovery argument, when Detective Carvo indicated in his testimony that he believed he had probable cause for crimes.

April 21, 2011 Tr. at 258:16-21 (Rees).  The United States argued:

> Furthermore, Your Honor, I guess this is where I was having a difficult time initially when we were having a discussion of probable cause, that any items seen inside the residence would have been inevitably discovered. Presuming that the officers did not find the minor at the residence, as Investigator Carvo testified to and Detective Proctor also testified to, they would have acquired search warrants for the

residence.

So if they had shown up and did not find the minor and did not further the exigency, they would have had probable cause, and that's where I get into the discussion of probable cause for crimes to seize his computers, look for evidence in his house, look for evidence in his vehicle, and you would have had a circumstance of inevitable discovery.

April 22, 2011 Tr. at 267:24-268:12 (Rees).

At the hearing on April 22, 2011, the United States argued that the deputies had exigent

circumstances based on the information they received from California in the CAD report.  The

United States argued that the deputies had exigent circumstances when they pulled their police car

up and conceded that, if they did not have exigent circumstances when Littlefield read the CAD

Report, Littlefield could not have had exigent circumstances looking in the window.

MS. REES: . . . It's the United States' position that Deputy Littlefield lawfully approached that window and looked through the window and he had sufficient information based upon the CAD report to believe that this missing child was in danger.

It is a 16-year-old female who went missing from Westminster, California, with a 57-year-old male.  The fact that she's missing suggests some degree of danger. It's been reported that she is missing, and then they found -- Deputy Littlefield also was aware that she had been e-mailing naked photographs between herself and this adult male.

And as Deputy Littlefield suggest that fact in and of itself indicated some type of sexual interest.  So just based on the age difference you would have a danger to the child because we know it is unlawful to have any type of sexual relations with a minor.

From there --

THE COURT:  Is what you're arguing is that they had exigent circumstances when they pull their police car up --

MS. REES:  Absolutely.

THE COURT:  -- two blocks away or so?

MS. REES:  Absolutely.

THE COURT:  So would you agree with me that if they didn't have exigent circumstances, that he couldn't have been in the window?

MS. REES:  I would agree with that.

THE COURT:  So he needs exigent circumstances before he even looks in the window . . . .

MS. REES:  I would agree with that, because the window would be a search.

THE COURT:  And so what I understand the Government to be arguing is that from this CAD report these -- this information is enough to constitute exigent circumstances?

MS. REES:  Absolutely. But let me throw in the additional prong, the fact that California had pinged the cellular telephone of this male and found it hit in Westminster, California, the same location that in the missing juvenile was from and now today it is pinging in Albuquerque, that suggests recent travel.

So now they have reason to believe that the missing juvenile is in the company of this adult, who is substantially older than who her, who has been engaged in sending and receiving naked pictures.  So that further raises the bar.

. . . .

MS. REES: I believe that the exigent circumstance -- The United States believes that the exigent circumstances arose when this juvenile went missing, and the facts and circumstances which were available to Deputy Littlefield certainly suggested she was in company of this substantially older male, whom she had been exchanging naked pictures with.  And that naked pictures is key.

Apr. 22, 2011 Tr. at 260:3-262:24 (Court, Rees)(emphasis added).  It argued that, once Littlefield looked in the window, he saw circumstances that heightened the exigency suggesting child abuse. At the hearing, the United States asserted that exigent circumstances arose from the CAD report itself, and did not rely on the collective-knowledge doctrine.

THE COURT: If we just take what's in the CAD report here, is there -- is there a crime -- let's start -- let's start with the higher standard of probable cause -- would these allegations constitute probability for any crime?

MS. REES: Absolutely, Your Honor. And I don't think you can look at just Deputy Littlefield when assessing probable cause, because you would have to assess also what Investigator Carvo knew.

. . . .

THE COURT: Well, let me stop you there, because that's the reason I was asking whose mind we're looking in, rather than Mr. Carvo. But why would we -- Why would we, in determining exigent circumstances and to the extent that it's necessary to determine probable cause, why would we go back to Mr. Carvo?

. . . .

MS. REES: . . . When we're looking at [Littlefield's] testimony and assessing his objective reasonable belief whether exigency existed, you look at whether he reasonably believed an emergency existed that endangered the safety of another.

THE COURT: Okay. And I agree with that. I need to think it through, but I think I agree with you, that doesn't require any probable cause.

MS. REES: Absolutely.

THE COURT: So it's kind of irrelevant, then -- It's kind of irrelevant what crime could have been committed, what crime could have been suspected, what he was ultimately charged with. All that's sort of irrelevant. The thing we're focusing on is whether the young girl was in immediate danger of harm.

MS. REES: For purposes of Deputy Littlefield in that initial entry, you are absolutely correct.

Apr. 22, 2011 Tr. at 256:11-257:1, 259:5-20 (Court, Rees).  See Apr. 22, 2011 Tr. ("MR. McMILLIAN: If I understand the Government's position, they're attributing all knowledge of -- THE COURT: No, I don't think so.  I don't think they're doing any sort of collective officer theory . . . .  They're saying right here, this CAD report gives . . . Littlefield all the exigent circumstances he needs.").

On May 18, 2011, the Court entered a Memorandum Opinion and Order, which granted the Defendant's Motion to Suppress Evidence and Statements, filed February 14, 2011 (Doc. 41).  See Doc. 120.  The Court found that the BCSO deputies did not have exigent circumstances to enter

Christy's residence, because they could not have had an objectively reasonable basis to believe that there was an immediate need to protect K.Y.'s personal safety, because she was, under New Mexico law, able to consent to sexual contact. The Court suppressed Christy's statements to Proctor as fruit of the illegal searches. It also suppressed the evidence that the deputies found when they executed search warrants for Christy's residence, vehicle, person, and Christy's and K.Y.'s cellular telephones, because it found that, excluding the illegally obtained information, the remaining information in the warrants was not sufficient to establish probable cause. The Court did not address inevitable discovery, because the United States' argument was only briefly mentioned and not fully developed. Unlike the United States' other arguments, the United States did not brief an inevitable discovery theory -- it solely made mention of inevitable discovery, without argument, in its brief. The United States did not provide the Court with citations to statutes for which officers may have had probable cause.

On May 25, 2011, the Court filed an Amended Memorandum Opinion and Order to correct an omission in the order section of its Memorandum Opinion in Order, in which it failed to state that the United States' Motion to Strike Defendant Edward Christy's Motion to Suppress Evidence and Statements (Doc. 41), filed February 14, 2011 (Doc. 45), was denied. See Doc. 127.

On June 9, 2011, the United States filed its Motion to Reconsider. See Doc. 133. The United States argues that the evidence found in Christy's residence, in his vehicle, and on his person, as well as his subsequent statements, inevitably would have been discovered. It also argues that, at the suppression hearing, it mistakenly stated that, when the deputies looked through Christy's residential window, it was clearly a search that required an exception to the warrant requirement. The United States also argues that the Court can and should employ the collective knowledge doctrine for purposes of establishing exigent circumstances in the case.

On July 8, 2011, Christy filed the Defendant's Motion for Leave to File Out of Time Response to United States' Motion to Reconsider Suppression Order and Reopen the Suppression Hearing.  See Doc. 148.  Christy asserted that his counsel, as of the date of filing, despite diligent effort, did not have time to complete his response.

At the hearing on July 8, 2011, the United States asked the Court to reopen the suppression hearing for further testimony.  Counsel for the United States, Charlyn Rees, discussed her involvement in the case:

> THE COURT:  Do you think as part of your inevitability you would have -- you would have been involved, or the U.S. Attorney's Office would have been involved, in the issuance [of] the search warrant?  Is that part of the steps in your -- in your inevitability scenario?  Either from the state  court or from the federal court?
>
> MS. REES:  Well, I was involved, Your Honor, so I guess I would say I would have been involved, since I was involved.
>
> . . . .
>
> THE COURT:  In securing the search warrants?
>
> MS. REES:  Yes.  I was involved, therefore, I feel comfortable telling Your Honor I was involved.

July 8, 2011 Tr. at 46:24-47:7 (Court, Rees).  At the hearing, the United States discussed the inevitability scenario it believes would have occurred.

> MS. REES:  I would say it is inevitable that [Adkins] would have come and gotten a federal search warrant considering --
>
>  Again I would ask the Court reopen the suppression hearing, because with the cases that we work jointly in this jurisdiction with state and federal components, again, federal agencies go out there, there's consultation between the United States Attorney's Office and the D.A.'s Office, and had she have been out there and we received this information from Westminster, but we only had probable cause for a federal crime, we absolutely would have had a discussion to get a federal search warrant for the evidence.
>
> THE COURT:  So that's the scenario, is that inevitably this Agent Adkins would

have put together an affidavit and then come to federal court and got a federal search for the violation of --

MS. REES:  Absolutely.

THE COURT:  All right.  Is it also inevitable that the police would have gone and gotten a state search warrant for the violations of California and New Mexico law?

MS. REES:  They could have, absolutely. . . . .

THE COURT:  I think the standard for inevitable is a lot higher than could have.

MS. REES:   Let me rephrase.   The testimony Detective Proctor testified to, according to my recollection, is he would have applied for a search warrant.

THE COURT: So you would have had an FBI agent going to the -- You say it's inevitable that you would have had an FBI agent come into federal court to get a search warrant and inevitable that a state police officer would have gone and gotten a state search warrant for the same house?

MS. REES: We would have gone one of two avenues.

THE COURT: That's now different, isn't it?

MS. REES: Well, obviously -- Obviously -- If I may?

THE COURT: Wait.  You need to tell me what the Government's theory is on inevitability.

MS. REES:  Let's me explain . . . .  Obviously if you have two investigators jointly working this case one is [BCSO] and one is the FBI, they're not going to both go write search warrants for the exact same evidence.

THE COURT:  So didn't the Government need to decide what the inevitability is? I mean, it can't just throw a bunch of theories at the Court.  It has to decide.  What was inevitable?  And if you look at the standards for inevitability, I think you would agree that you just can't throw some scenarios at the Court and said, well, they could have done this, they could have done that, but they wouldn't have done both.

MS. REES:  Your Honor, if I may --

THE COURT:  Do you think you can do that?

MS. REES:  No, Your Honor.  If I may address your question, it would have been inevitable discovery because, simplistically, under the violation of federal law, a

federal agent in New Mexico would have -- would have -- who was jointly working this case would have applied for a federal search warrant for the crimes of -- the federal crimes of enticement as well as attempted possession of child pornography.

Obviously, that is your best case scenario, because you have the across state lines.

So inevitable discovery was the federal jurisdiction was already looking at taking this case because of the across state lines.

THE COURT:  So -- so can I now ignore the New Mexico statute and just focus on the federal statute, because we're now deciding that the state law officers wouldn't have gone to state court?

MS. REES:  I don't think you can disregard this. I apologize that I'm having a difficult time articulating this, but the agents are going to look at what they have probable cause for, and they had probable cause for the state crimes as well as the federal crimes, so at that juncture there is inevitably going to be a discussion, because this case is being jointly investigated, with Westminster, FBI in Albuquerque, and [BCSO], and you have probable cause for state crimes and federal crimes.

And inevitably an agent, like the FBI, is going to get a search warrant for federal crimes.  However, if the discussion were to be we also have probable cause for state crimes, or we only have probable cause for state crimes, then you would have had [BCSO] relying upon the same evidence inevitably get a search warrant for the state crimes.

So what I'm trying to suggest to Your Honor is that there would have been a search warrant acquired in this case because we had probable cause for not only federal crimes, but state crimes.

And either the FBI would have gotten the search warrant for the federal crimes or the [BCSO] would have gotten a search warrant for the state crimes. Regardless, an agency would have gotten a search warrant.  Period.  And with that search warrant, it would have led to the discovery of all of the same evidence.

THE COURT:  Well, I guess I'm still confused.  Is what you're -- Are you now back to suggesting that I can propose two scenarios, one in which the State Police are going to the state judge to get a search warrant and then also the FBI agent going to get an FBI --

MS. REES:  They could -- They absolutely both had the right to get a search warrant, but, obviously from a probability standpoint and an efficiency standpoint, we know

that both agencies are not going to go get a search warrant, but someone is inevitably going to get a search warrant. And knowing the dynamics out on scene, I suspect the [BCSO] would have said, FBI, you're the lead, because that's what Detective Proctor testified to; you go get the warrants, because you have the better jurisdiction for the federal crimes. They're the more serious crimes.

So I feel comfortable standing before the Court indicating an agent would have inevitably gotten a search warrant, and it was -- it inevitably would have been the FBI.

July 8, 2011 Tr. at 23:15-28:5 (Court, Rees). The United States represented that it did not object to the Court granting Christy's motion for leave to file an out of time response. The United States also represented that it did not have any disagreements with the Court's findings of fact in its Amended Memorandum Opinion and Order. See July 8, 2011 Tr. at 59:14-21 (Court, Rees)("THE COURT: . . . Did you have any disagreements with the findings of fact? MS. REES: . . . [T]here was nothing I recall that [Holland Kastrin or I] saw that was inconsistent with the record."). The United States further represented that it adhered to, and was not asking the Court to reconsider in the motion, the Court's statement in its Amended Memorandum Opinion and Order that, because K.Y. was sixteen and could consent to a sexual relationship with Christy, the reasonable belief that the two were engaged in a sexual relationship was not sufficient to establish an objectively reasonable belief that K.Y. was at risk of being subjected to harmful sexual contact and was thus in physical danger. See July 8, 2011 Tr. at 60:15-19 (Court, Rees)("THE COURT: . . . Is that -- Is that a concession you don't disagree with the statement there on page 61 of my opinion? MS. REES: I mean, that is -- That I don't disagree with it? Obviously, that is your opinion, and we adhere to that."). The Court scheduled a hearing on August 3, 2011 and August 4, 2011 for the United States and Christy to present additional evidence.

On July 12, 2011, the Court entered a Memorandum Opinion and Order, granting Christy's motion for leave to file out of time response no later than July 14, 2011. See Doc. 151.

On August 2, 2011, Christy filed his Supplemental Brief in Support of Motion to Suppress Evidence.  See Doc. 157.  In his brief, Christy argues that the United States cannot meet the burden of showing that the evidence would have been inevitably discovered.  Christy also argues that the United States was correct when it stated that the deputies' actions of looking into the window constituted a search.  Christy thus argues that the Court should not reconsider its Amended Memorandum Opinion and Order.

At the hearing on August 3, 2011, the United States called four witnesses: (i) Adkins; (ii) McCarthy; (iii) Littlefield; and (iv) Carvo.  Christy called Proctor.  The United States asked the Court to strike Christy's response, because Christy did not show good cause for failing to comply with the Court's deadline, or, if the Court was not inclined to strike the response, to allow the United States until September 16, 2011 to reply.

At the hearing on August 4, 2011, Christy stated that he elected not to file a response.  He stated that he filed a supplemental brief, which did not bring any new issues to the Court's attention. He thus argued that he did not disobey any order of the Court.

## RELEVANT LAW REGARDING MOTIONS TO RECONSIDER

In its motion to reconsider, the United States did not articulate under what authority the Court might entertain its motion.  It also did not articulate the standard under which the Court should entertain its motion.

The Federal Rules of Criminal Procedure do not expressly recognize a motion to reconsider. See United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010)("None of the Rules of Criminal Procedure authorizes a generic motion to reconsider; the criminal rules lack a counterpart to the motions authorized by Fed.R.Civ.P. 50(b), 52(b), or 59, though they do authorize some post-trial motions . . . that have features in common with motions under the civil rules.").  In the criminal

context, however, courts ordinarily apply the same standards as those used in civil cases.  See United States v. Rollins, 607 F.3d at 502 (stating that the Supreme Court of the United States has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits")(citing United States v. Healy, 376 U.S. 75 (1964); United States v. Dieter, 429 U.S. 6 (1976); United States v. Ibarra, 502 U.S. 1 (1991)); United States v. Wilson, No. 08-cr-263-KHV, 2011 WL 1706890, at *1 (D. Colo. May 5, 2011)(stating that, in the context of criminal cases, courts ordinarily apply the same standard for a motion to reconsider as the standard they use in civil cases); United States v. Matlack, No. 09-cr-531-WYD, 2010 WL 2682110, at *1 (D. Colo. July 1, 2010)(stating that other district courts in the Tenth Circuit have relied on the standards for evaluating a motion to reconsider in the civil context when address motions to reconsider in the criminal context); United States v. West, No. 01-40122-01-SAC, 2002 WL 1334870, at * 1 (D. Kan. May 9, 2002)("Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions. This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."); United States v. D'Armond, 80 F. Supp.2d 1157, 1170 (D. Kan. 1999)("This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case.").

It is within the court's discretion to grant or to deny a motion to reconsider.  See United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999).  "A motion under Rule 59(e) is warranted when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was previously unavailable; or (3) it is necessary to correct clear error or prevent manifest injustice."  Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts,

a party's position, or the controlling law." Servants of Paraclete v. Does, 204 F.3d at 1012 (citation

omitted). A district court has considerable discretion in ruling on a motion to reconsider. See

Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997). A motion to reconsider is not an

opportunity to rehash arguments previously addressed or to advance new arguments that could have

been raised in prior briefing. See Servants of the Paraclete v. Does, 204 F.3d at 1012 ("It is not

appropriate to revisit issues already addressed or advance arguments that could have been raised in

prior briefing." (citation omitted)).

### RELEVANT LAW REGARDING THE INEVITABLE DISCOVERY DOCTRINE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the

government will generally be prohibited from using that evidence in a criminal prosecution of that

person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has

been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g.,

unconstitutional searches and seizures, and confessions exacted in violation of the right against

compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra,

414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment

cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The

exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a

constitutional violation and a causal nexus between the violation and the evidence sought to be

excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the

defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the

burden shifts to the government to prove that an exception to the exclusionary rule applies. See

United States v. Torres-Castro, 470 F.3d at 999.

The exclusionary rule has exceptions. If illegally obtained evidence is somehow purged of

the taint of the unconstitutional conduct, it can be admitted.  "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006).  See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.").

One exception to the exclusionary rule is the inevitable-discovery doctrine.  The doctrine permits courts to admit unconstitutionally obtained evidence "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  See United States v. Torres-Castro, 470 F.3d at 999. "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct"; "it is possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997).  See United States v. Cunningham, 413 F.3d at 1204 n.1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham).  "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will

be admissible." United States v. Griffin, 48 F.3d at 1151 (internal citations and quotations omitted).

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53. The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. Rejecting the government's position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153. "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.), aff'd, 643 F.3d 1292 (10th Cir. 2011).

## ANALYSIS

The Court will grant in part and deny in part the United States' motion. The Court reopened

the suppression hearing and took more evidence from the parties.  The Court finds that the United

States did not mistakenly concede that, when Littlefield looked through a crack in the blinds, it was

a search, because the conduct constituted a search and an unreasonable one.  That there has been an

unconstitutional search does not end the inquiry; there is a distinction between the Fourth

Amendment analysis of search and seizure and the suppression rule.  They are distinct concepts.

Cf. United States v. Torres-Castro, 470 F.3d at 999 (stating that, for the exclusionary rule to apply,

the defendant must show by a preponderance of the evidence not only a constitutional violation but

also a causal nexus between the violation and the evidence sought to be excluded).  The Court will

apply the collective-knowledge doctrine to its analysis of exigent circumstances and probable cause.

The Court finds that exigent circumstances would not have justified the deputies' warrantless entry

into Christy's residence.  Accordingly, the Court continues to believe that the deputies violated

Christy's Fourth Amendment right to be free from warrantless searches and seizures.  Nevertheless,

the Court will not suppress the evidence, because, the Court will apply the inevitable discovery

doctrine, an exception to the suppression rule. After a consideration of the relevant factors, the Court

finds that Carvo would have obtained search warrants and discovered the evidence the Court

suppressed.

I.    **LITTLEFIELD'S ACT OF PEERING THROUGH A CRACK IN THE BLINDS
      COVERING CHRISTY'S RESIDENCE WINDOW WAS A SEARCH.**

The United States argues that, at the original suppression hearing, it mistakenly conceded

that, when Littlefield looked through Christy's residence window, it was clearly a search that

required an exception to the warrant requirement.  The United States argues that it recently

discovered United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006), which it asserts indicates that

Littlefield was in a lawful area when he looked through the crack in the blinds.  Christy argues that

the act of looking through a crack in the blinds covering his window was a search. He argues that the facts of United States v. Cousins is distinguishable.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." United States v. Dunn, 480 U.S. 294, 300 (1987). In Oliver v. United States, 466 U.S. 170 (1984), the Supreme Court of the United States recognized that the Fourth Amendment protects the curtilage of a house and stated that whether an area is curtilage is determined by factors that bear upon "whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." 466 U.S. at 180. In United States v. Dunn, the Supreme Court stated that it believed

> that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301. These factors are not a "finely tuned formula," but "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." 480 U.S. at 301.

In United States v. Cousins, the Tenth Circuit found that the district court did not err in finding that a sideyard was not within the curtilage of the defendants' home. See 455 F.3d at 1122.

> On June 12, 2003, Robert Bryant, an employee with Public Service of New Mexico ("PNM"), visited the home of Kurt Donald Cousins ("Kurt") and Bukola Tolase-Cousins ("Bukola") (collectively "Defendants"), a married couple. Bryant was attempting to collect on a delinquent bill for electricity and gas services. When he knocked on the door, there was no answer. After leaving a note stating that the home's power would be cut off, Bryant then went to the electricity meter and cut the power to the house using two plastic "boots." The meter was located on the east side

-53-

of a small "sideyard," directly adjacent to the Cousinses' home.

   The sideyard was approximately eight feet wide and was bordered to the north by a gate leading to the Cousinses' backyard, to the west by a fence separating the Cousinses' property from their neighbor's, and to the east by the Cousinses' residence. There was no barrier to the south. One could enter the sideyard from the south by walking north along the Cousinses' driveway and following a paved walkway that led west (away from the front door) and turned north at the edge of the Cousinses' garage where it ended in front of the gate. The distance from the electric meter to the gate was approximately thirteen feet. Defendants had planted a small melon garden in the sideyard to the left of the paved walkway.

455 F.3d at 1118-19. Bryant later returned to the residence, because payments had not been made and someone had tampered with the boots cutting off the electric meter, and as he was leaning against the west wall of the sideyard -- where he was able to see into the backyard of the house through an open gate -- Bryant saw marijuana plants. See 455 F.3d at 1119. He promptly informed police officers of his observation, and the officers went to the residence, "walked up Defendants' driveway, turned west (away from the front door), and walked north into the sideyard where the electric meter was located." 455 F.3d at 1119. The officers looked through heart-shaped cutouts in the gate and saw the marijuana plants. See id. at 1119. The Tenth Circuit used the factors the Supreme Court articulated in United States v. Dunn to determine whether the area was within the curtilage. See United States v. Cousins, 455 F.3d at 1122 (citing United States v. Dunn, 80 U.S. at 301). Regarding the first factor -- the proximity factor -- the Tenth Circuit stated: "The sideyard was immediately adjacent to the house. Thus, the proximity factor suggests this area is curtilage." 455 F.3d at 1122. Regarding the second factor -- the enclosure factor -- the Tenth Circuit stated:

   The sideyard was enclosed on three sides: (1) on the east by an exterior wall of the house; (2) on the north by the gate door; and (3) on the west by a fence. As such, the sideyard is partially, though not completely, enclosed.

   Courts have found an area to be curtilage where the area in question is only partially enclosed. See, e. g., Swepston, 987 F.2d [1510,] 1515 [(10th Cir. 1993)]("Here . . . although the barbed wire fence around [Defendant's] property was

incomplete, the same fence encircled both [Defendant's] house and his chicken shed, and no fence separated the two."). In United States v. Jenkins, 124 F.3d 768 (6th Cir.1997), the Sixth Circuit found an area to be curtilage where the yard was

> enclosed on three sides by a wire fence, making it impossible for someone to enter the yard from the fields without using the gate or climbing over the fence. Entry from the remaining side, although not completely barred, [was] partially obstructed by the house.

Id. at 773. What makes the instant case different from Jenkins is that the unenclosed side is the expected path one would take to get to the sideyard, and it is a paved sidewalk. Given this, it is substantially different from the areas in question in either Jenkins or Swepston. Thus, this factor weighs against a finding of curtilage.

455 F.3d at 1122. Regarding the third factor -- the nature-of-use factor -- the Tenth Circuit stated:

> There is some evidence in the record that a portion of the sideyard area was used as a garden for melons. Gardening is an activity often associated with the curtilage of a home. See United States v. Breza, 308 F.3d 430, 436 (4th Cir.2002). This is not to say that simply because an area has a garden, it will always be within the curtilage. As Dunn makes clear, the area in question must be used for the "intimate activities of the home." 480 U.S. at 302 . . . . Whatever intimate character a few melon plants might add to the sideyard, we cannot conclude that gardening was a primary or even significant use of this area. Indeed, the presence of the electric meter and paved walkway belie any claim that the sideyard was intended as a private space for gardening. Thus, this factor also weighs against a finding of curtilage.

455 F.3d at 1122-23. Regarding the fourth factor -- shielding from public view -- the Tenth Circuit

stated:

> As for the fourth Dunn factor, the district court concluded that "no steps were taken by Defendants to limit access to this walkway even when they were clearly aware utility employees frequented this area." Defendants' main counter-argument is that a number of trees and bushes restricted the view of the sideyard from the street. Even if this is true, it is still clear that the utility meter and gate were visible from the street and that the sideyard was connected to the driveway by a paved walkway that was accessible to any and all persons wishing to enter upon it. See LaFave, supra, at 599-603 ("In the course of urban life, we have come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends. Any one of them may be reasonably expected to report observations of criminal activity to the police.") (quoting State v. Corbett, 15 Or.App. 470, 516 P.2d 487, 490 (1973)).

-55-

Furthermore, since the electric meter was located in this area, the Cousinses knew that utility employees would be in the area at least once a month to read the meter. The Cousinses claim that these employees were not "uninvited visitors," but that they were "invited as the result of an easement to which the Cousins voluntarily agreed." The Cousinses, however, could have had no reasonable expectation that such visitors would protect the Cousinses' privacy; the utility employees could potentially report any illegal conduct observed while on the property (as happened in this case). Inviting such persons onto their property further shows that the Cousinses did not take steps to protect the area from observation. See United States v. Domitrovich, 1995 WL 358624, at *1 (9th Cir.1995) (unpublished) (affirming the district court's conclusion that an area was not curtilage, in part because the defendant "had regularly allowed meter readers access to the area around the home"), aff'g 852 F.Supp. 1460, 1467-71 (E.D.Wash.1994) ("Meter readers were afforded unrestricted access to the area around the residence while going to and from the meter . . . . [Thus,] the defendant's actions were not entirely consistent with his professed zeal for privacy."). Cf. United States v. Depew, 8 F.3d 1424, 1428 (9th Cir.1993) (finding that the fourth Dunn factor weighed in the defendant's favor, in part because he "had a post office box in town and read his own meter so that no postal worker or meter reader came to his premises"), overruled on other grounds by Johnson, 256 F.3d at 913 n. 4; State v. Poulos, 149 Or.App. 351, 942 P.2d 901, 904 n. 2 (1997) (concluding that the defendant had shown an intent to exclude the public, in part because "by agreement with the electric company, defendant read his own meter and reported it to the company").

Allowing meter readers on the premises is not necessarily dispositive, but here the fact that the area was accessed by a walkway and was not enclosed, coupled with the fact that the Defendants knew the area was frequented by a meter reader who might be expected to report observed illegal activity, leads to a conclusion that this fourth factor also weighs against a finding of curtilage.

455 F.3d at 1123-24. The Tenth Circuit thus concluded that the sideyard did not fall within the curtilage of the defendants' home and that the law enforcement presence in the area did not violate the Fourth Amendment. See 455 F.3d at 1124.

At the first suppression hearing on April 21, 2011, Littlefield testified that, when he arrived at Christy's residence, he walked down the driveway, because it appeared to him that the residence's rear entrance was the main entrance or the entrance that was used most, because the leaves were disturbed going down the driveway and the front porch was dark and did not look used. See Apr.

21, 2011 Tr. at 18:4-12 (Kastrin, Littlefield).[8]  The rear entrance is not visible from the front of the residence; the disturbance of the leaves in the driveway are consistent with disturbance from the tires of a car -- there are two tracks where the leaves are disturbed.  See Government's Exhibit J.  While Littlefield was walking down the driving path, he noticed that the blinds covering one of the windows were askew, and he looked in the gap in the blinds in the window to determine the circumstances within the residence.  See id. at 18:24-19:2 (Kastrin, Littlefield).

The proximity factor weighs in favor of a finding of curtilage.  As in United States v. Cousins, where the Tenth Circuit found that this factor suggested the area was curtilage, because the sideyard was immediately adjacent to the house, the area from where Deputy Littlefield looked into the window was adjacent to Christy's residence.  The proximity factor thus suggests this area is curtilage.  See United States v. Cousins, 455 F.3d at 1122 ("The sideyard was immediately adjacent to the house. Thus, the proximity factor suggests this area is curtilage.").

The enclosure factor weighs against a finding of curtilage.  In United States v. Cousins, the Tenth Circuit found that the enclosure factor weighed against a finding of curtilage when, although the sideyard was enclosed on three sides, the unenclosed side was the expected path one would take to get to the sideyard and the path was a paved sidewalk.  The area from which Littlefield looked into the window was enclosed on two sides; Christy's residence bordered one side of the area, and a fence bordered the opposite side.  There are no boundaries between the area from which Littlefield looked into the window and the driveway.  There are also no boundaries between the area from which Littlefield looked into the window and the area leading into Christy's backyard.  There are

---

[8] As the Court found in its Finding of Facts Nos. 52 through 54, the Court does not find Littlefield's conclusions reasonable.  Littlefield, however, was properly walking past the window, because the driveway was not part of the residence's curtilage.  Accordingly, Littlefield's belief, and the Court's different opinion, do not affect the Court's analysis or conclusion.

no boundaries because the area is a driveway.  Because the area was "only partially enclosed," and because the area is a driveway, the Court finds that this "factor weighs against a finding of curtilage."  United States v. Cousins, 455 F.3d at 1122.

The third factor -- nature of the use of the area -- weighs against a finding of curtilage.  The area from which Littlefield looked into the window was a driveway, which was clearly visible from the public street.  As the Tenth Circuit has stated, "a driveway abutting and clearly visible from a public [street] is not a suitable setting for intimate activities associated with a home."  Rieck v. Jensen, Nos. 10–4110, 10–4119, 2011 WL 2573363, at *5 (10th Cir. June 30, 2011).  The nature and use of this area thus weighs against a finding of curtilage.  See United States v. Cousins, 455 F.3d at 1123.

The fourth factor -- shielding from public view -- weighs against a finding of curtilage.  Christy did not take steps to limit access to this area.  This area was visible from the street and accessible to all persons wishing to enter it.  There is no boundary between the area from which Littlefield looked in the window and the public street.  Furthermore, the area is a driveway, fully visible from the public street.  This fact thus also weighs against a finding of curtilage.  See United States v. Cousins, 455 F.3d at 1123; United States v. Hatfield, 333 F.3d 1189, 1194-95 (10th Cir. 2003)("Hatfield's driveway was open to the public . . . .  The openness and accessibility of a driveway to the public has been an important factor that courts have used to conclude that an owner does not have a reasonable expectation of privacy . . . ." (citations omitted)).

After weighing these factors, the Court finds that the area from which Littlefield looked into the window "did not fall within the curtilage" of Christy's residence.  United States v. Cousins, 455 F.3d at 1124.  The Court thus concludes that the deputies' "presence in this area did not violate the Fourth Amendment."  United States v. Cousins, 455 F.3d at 1124.

Although the deputies' presence in the area from which Littlefield looked into Christy's residence window did not violate the Fourth Amendment, Littlefield's act of peering into a small crack in the blinds constituted a search.  The crack in the blinds was a little longer than half the length of the blinds, and the height of the crack was approximately an inch or less.  "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'"  California v. Ciraolo, 476 U.S. 207, 211 (1986)(quoting Katz v. United States, 389 U.S. 347, 360 (1967)(Harlan, J., concurring)).  Courts generally "determine whether a person has a constitutionally protected expectation of privacy by making two inquiries: first has the person exhibited a subjective expectation of privacy in the place or thing searched?  Second, is the person's expectation of privacy one that society is prepared to recognize as reasonable?"  United States v. Hatfield, 333 F.3d at 1195.  The "prototypical . . . area of protected privacy" is the interior of a residence.  Kyllo v. United States, 533 U.S. 57, 35 (2001).

In California v. Ciraolo, the Supreme Court determined whether "aerial observation without a warrant from an altitude of 1,000 feet of a fenced-in backyard within the curtilage of a home" violated the Fourth Amendment.  476 U.S. at 209.  The Supreme Court stated: "That the area is within the curtilage does not itself bar all police observation."  476 U.S. at 213.  "Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."  476 U.S. at 213 (citing United States v. Knotts, 460 U.S. 276, 282 (1983)).  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  California v. Ciraolo, 476 U.S. at 213.  The Supreme Court noted that the officers' observations "took place within public navigable airspace . . . in a physically nonintrusive manner; from this point they were able to observe plants readily discernible

to the naked eye as marijuana." 476 U.S. at 213.  "Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed. On this record, we . . . conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor." 476 U.S. at 213-14.

In Reeves v. Churchich, 484 F.3d 1244 (10th Cir. 2007), the Tenth Circuit addressed whether an officers insertion of his rifle into the bedroom window of a residence was an unlawful search. See 484 F.3d at 1253.  The Tenth Circuit found that the Reeves did not have a constitutionally protected reasonable expectation of privacy in the duplex's front yard where the officer was standing.  See 484 F.3d at 1254.  The Tenth Circuit thus found that the officer's entry into the yard did not violate the Fourth Amendment.   See 484 F.3d at 1255.   The Tenth Circuit stated: "Consequently, Churchich's mere visual observation of objects or people inside the Reeves' apartment through Alicia's bedroom window from the front yard was not a search under the Fourth Amendment." 484 F.3d at 1255.  The Tenth Circuit noted: "The fact Alicia's window contained bars covered in foliage does not detract from this conclusion."  484 F.3d at 1255 n.20 ("[T]he mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." (quoting California v. Ciraolo, 476 U.S. at 213)).

Professor Emeritus Wayne R. LaFave has discussed whether a law enforcement officer's actions of looking into or of listening for sounds in a residence constitute a search. See 1 Search & Seizure § 2.3 (4th ed. 2004).

> Although it is generally true that a person has a justified expectation of privacy with respect to the interior of his place of residence, it does not follow that it is inevitably a search for a law enforcement officer to see or hear what is occurring therein. At least when the officer only employs his natural senses, the prevailing rule is that such uses of the senses "made from a place where a police officer has a right

to be do not amount to a search in the constitutional sense."

. . . .

[I]t certainly is not a search for an officer to see or hear what is occurring inside a dwelling while he is in an area adjacent to that dwelling's curtilage which is open to the public.  By like reasoning, it may be concluded that no justified reliance [in the privacy of one's residence]  is present when a person's in-premises activities may be readily observed or heard by neighbors, so that it is not a search for an officer to see or hear those activities from a neighbor's property.

. . . .

This is not to suggest, however, that in every conceivable instance in which surveillance by the natural senses is conducted without entering the curtilage, it may be concluded that no Fourth Amendment search has occurred. [People v. Wright, 242 N.E.2d 180 (1986)] merely says that the lack of trespass is a "highly relevant consideration," not that it is controlling, and certainly there are circumstances in which it must be concluded that the occupant's justified expectation of privacy was breached notwithstanding the absence of a trespass. For example, what if policemen were to climb up a telephone pole and peer beneath a second-story window shade, thereby observing what could not be seen either from ground level or from nearby buildings? In such a case, "[a]lthough they use no electronic gadgetry, the interests on which their activities intrude appear to be indistinguishable from the interest protected in Katz."  It will not do in such a case to say that the occupant of the premises could have closed off that window more completely.  It is one thing to assert that an occupant cannot claim a justified expectation of privacy as to activities within his dwelling when that conduct is carried out in such a manner as to be readily seen or heard by neighbors or by the passing public. It is quite another to declare that citizens cannot "feel safe in leaving their windows uncurtained to the skies" or in otherwise failing to seal off each and every aperture in their dwellings. And thus when police surveillance takes place at a position which cannot be called a "public vantage point," i.e., when the police -- though not trespassing upon the defendant's curtilage -- resort to the extraordinary step of positioning themselves where neither neighbors nor the general public would ordinarily be expected to be, the observation or overhearing of what is occurring within a dwelling constitutes a Fourth Amendment search. This is really what Katz is all about.

W. LaFave, supra § 2.3 (footnotes omitted).

Christy had a reasonable expectation of privacy in his residence.  In cases where courts have

found that officers' observations into curtilage or a residence were not searches, the courts have

stated that the activities or materials were clearly visible from a public vantage point where the

officers had a right to be.  See California v. Ciraolo, 476 U.S. at 213-14 (stating that the officers' observations of marijuana in the defendant's curtilage were made in a physically nonintrusive manner from public airspace that, from the public airspace, the marijuana was "readily discernible to the naked eye," and that, because any member of the public flying in the airspace could have glanced down and seen everything the officers observed, the defendant's expectation that his garden was protected from such observation was unreasonable and was not an expectation society was prepared to honor); Reeves v. Churchich, 484 F.3d at 1254-55 (finding that the officer's observations from the duplex's front yard, where the officer lawfully stood, of people and objects in the apartment through the bedroom window was not a search, and noting that the window was open, that the officer did not move the blinds to obtain a better view of the home's interior, and that the fact that the window contained bars covered in foliage did not detract from its conclusion that the officer's observations were not a search); United States v. Hammett, 236 F.3d 1054, 1060-61 (9th Cir. 2001)(finding that the officers' observation of marijuana plants through a crack in the wall when circling the house looking for another door after no one answered the front door did not violate the Fourth Amendment, because the officers were lawfully present at the side of Hammett's residence when they observed the plants, and "the officers were able to view the marijuana plants through the crack from a distance of approximately five to six feet without making any contortions"); United States v. Garcia, 997 F.2d 1273, 1279 (9th Cir. 1993)("We have held that officers walking up to the front door of a house can look inside through a partially draped open window without conducting a Fourth Amendment search." (citations omitted)).  Unlike these cases, Christy took measures to shield the activities inside his residence from all observation -- the blinds of his windows were completely closed.  To view activities inside the residence, Littlefield had to bend down and peer through a small crack in the window's blinds.  Because Christy took measures

to shield the activities inside his residence from all observation, and because Christy's activities inside his residence were not clearly visible -- instead, Littlefield had to crouch down and peer through the small crack -- the Court finds that Christy had a reasonable expectation of privacy. The Court thus finds that Littlefield's actions of peering through a crack in the blinds of Christy's window was a search. See California v. Ciraolo, 476 U.S. at 211. Because Littlefield did not have a warrant to conduct a search of Christy's residence, the search was constitutionally unreasonable, and his actions violated the Fourth Amendment. See United States v. Franco, 981 F.2d 470, 472 (10th Cir. 1992)("The Fourth Amendment prohibits 'unreasonable searches and seizures.' . . . A search is usually per se unreasonable unless it is conducted pursuant to a warrant." (citations omitted)).

## II.    THE COURT WILL APPLY THE COLLECTIVE-KNOWLEDGE DOCTRINE FOR PURPOSES OF DETERMINING WHETHER EXIGENT CIRCUMSTANCES EXISTED AND WHETHER THERE WAS SUFFICIENT PROBABLE CAUSE TO OBTAIN A WARRANT.

The United States argues that, although it was not previously clear whether collective knowledge applied, it now wishes to make clear that collective knowledge is relevant to establishing exigency in this matter. The United States argues that the Court should employ the collective-knowledge doctrine "for purposes of establishing exigent circumstances in this case." Motion to Reconsider at 29. At the hearing on July 8, 2011, the United States argued that the collective-knowledge doctrine  played into the probable cause theory of inevitable discovery. The United States asserted that it is relying on information the Westminister investigators knew and shared with the BCSO deputies to argue that the evidence would have been inevitably discovered, because, excluding the information the deputies learned after they looked into and subsequently entered Christy's residence, the deputies still had sufficient probable cause to get a warrant.

-63-

In his brief, Christy argues that there were no exigent circumstances and, thus, the collective-knowledge theory is irrelevant. At the hearing on July 8, 2011, Christy asserted that the collective-knowledge doctrine does not deal with "a kind of ESP where every officer knows what every other officer knows. It deals rather in a very limited fashion, with the situation where there's been a [BOLO -- Be On the Lookout] issued." Transcript of Hearing at 73:18-22 (taken July 8, 2011)(McMillian).

Under the collective-knowledge doctrine -- also called the "fellow officer rule" -- the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer. See United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2008). The collective-knowledge doctrine stems from the holding of the Supreme Court in United States v. Hensley. In United States v. Hensley, officers from a Kentucky police department stopped a defendant in reliance on a flyer issued by an Ohio police department indicating that the defendant was wanted for investigation of an aggravated battery. See 469 U.S. at 224-25. The trial court denied the defendant's motion to suppress evidence seized from his car after the stop. See 469 U.S. at 225. The appellate court reversed, finding that, "[b]ecause the Covington police were familiar only with the St. Bernard flyer, and not with the specific information which led the St. Bernard police to issue the flyer, . . . they lacked a reasonable suspicion sufficient to justify an investigative stop." 469 U.S. at 225. The Supreme Court reversed the court of appeals, concluding that, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification." 469 U.S. at 232.

Assuming the police make a Terry stop in objective reliance on a flyer or bulletin,

we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop, United States v. Robinson, [536 F.3d 1298 (1976)], and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

469 U.S. at 233.

The collective knowledge doctrine "can be conceptualized using two categories: 'horizontal' collective knowledge and 'vertical' collective knowledge." United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008). "The first category subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." United States v. Chavez, 534 F.3d at 1345 (citing United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996)). In these situations, a court "must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." United States v. Chavez, 534 F.3d at 1345 (citations omitted). See United States v. Shareef, 100 F.3d at 1503 ("The cases in which we have applied the 'collective knowledge' rule all have involved actual communication to the arresting officer of either facts or a conclusion constituting probable cause, or an arrest order." (citing United States v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993) (stating that, where roving agents communicated facts to a fixed checkpoint, information collected by all agents could be pooled "to establish the requisite quantum of suspicion")); United States v. Matthews, 615 F.2d 1279, 1284 n.5 (10th Cir. 1980)(stating that information collected by several officers considered in determining probable cause, because officers "shared the various pieces of information with each other"); United States v. Goeltz, 513 F.2d 193, 197 (10th Cir.)(finding probable cause based on collective knowledge of officers on the scene where each officer "communicated his observations to his associates"), cert. denied, 423 U.S. 830 (1975); Wood v.

-65-

Crouse, 436 F.2d 1077 (10th Cir.)(stating that arresting officer may rely on sheriff's arrest order where sheriff has probable cause), cert. denied, 402 U.S. 1010 (1971)).

The second category subsumes situations "where one officer has probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action." United States v. Chavez, 534 F.3d at 1345. In these situations, the relevant inquiry is whether the officer who requested that other law enforcement officer to conduct a search or make a seizure had a sufficient legal basis to make the request. See United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008)("When law enforcement officials rely on a bulletin or alert to conduct a stop or make an arrest, the relevant inquiry is whether the officer who issued the alert -- rather than the officer who conducted the challenged action -- had the requisite level of suspicion."). The first and second categories are not mutually exclusive; for example, "the officer who has probable cause may possess that information as a result of communication from other officers." United States v. Chavez, 534 F.3d at 1345 n.12.

While the collective-knowledge doctrine is most commonly applied to impute reasonable suspicion or probable cause to other officers, see, e.g., United States v. Chavez, 534 F.3d at 1345-46, several courts and judges however stated or suggested that it also can be used to impute knowledge of exigent circumstances, see, e.g., United States v. Russell, 436 F.3d 1086, 1094-95 (9th Cir. 2006)(Thomas, J., concurring in part and dissenting in part)("We analyze the 'reasonable grounds to believe that there is an emergency at hand,' on an objective basis, taking into consideration the collective knowledge of the officers at the time." (citing United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986))); Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003)(stating that, because "the record before us shows that [the officers] knew the substance of the 911 call when they responded to Wright's apartment, this case does not raise any issues regarding the scope of the

'collective knowledge' doctrine," it "need not consider whether the warrantless entry would have been justified by exigent circumstances if the information provided to the 911 operator was never transmitted either to the police dispatcher or to the officers on the scene"); United States v. Pelletier, 2005 WL 1800084, at *12 n.17 (D. Me. July 27, 2005)("That the entry was made for purposes of arrest did not, as Pelletier seems to suggest, preclude the entry team from taking into consideration its collective knowledge of exigent circumstances, including those related more to the state drug investigation than to the federal arrest." (internal citation omitted)). One court has assumed without deciding that the "collective knowledge doctrine [can be used] in establishing the existence of exigent circumstances." Zitterkopf v. Hanks, No. 7:08CV3190, 2010 WL 1287076, at *6 (D. Neb. Mar. 30, 2010).

The Court will apply the collective-knowledge doctrine in its determination whether exigent circumstances existed and whether there was sufficient probable cause to obtain a warrant. The United States sets forth both arguments in support of its contention that the evidence found in Christy's residence, vehicle, on his person, and his subsequent statements would inevitably have been discovered. The parties have not directed the Court's attention to, and the Court has not found, cases in which courts have applied the collective-knowledge doctrine in their inevitable-discovery analysis. Although the Court is not aware of authority applying the collective-knowledge doctrine in inevitable discovery analysis, courts apply the collective-knowledge doctrine to impute reasonable suspicion or probable cause to other officers, see United States v. Chavez, 534 F.3d at 1345-46, and, in its inevitable-discovery analysis, the Court must determine whether, excluding the information the deputies learned after they looked into and subsequently entered Christy's residence, the deputies had sufficient probable cause to get warrants for Christy's residence, vehicle, and person. Because the Court must make a probable cause determination, it will apply the collective knowledge doctrine.

It seems that the more sound approach is to employ the collective-knowledge doctrine in its determination of probable cause as it would in any other determination of probable cause, and perhaps consider the fact of collective knowledge as a factor in determining the inevitability of discovery; the number of people who knew only bits and pieces of information may, depending on the circumstances, counsel for or against inevitability.

Although the parties have not directed the Court's attention to, and the Court has not found, cases which discuss, in depth, whether the collective-knowledge doctrine can be used to impute knowledge of exigent circumstances, the only authority which the Court has found has suggested that the collective knowledge doctrine can be used.  See United States v. Russell, 436 F.3d at 1094-95; Anthony v. City of New York, 339 F.3d at 137; United States v. Pelletier, 2005 WL 1800084, at *12 n.17.  Application of the collective knowledge doctrine to impute knowledge of exigent circumstances is consistent with the Supreme Court's holding in United States v. Hensley.  In United States v. Hensley, the Supreme Court held: "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification . . . ."  469 U.S. at 232. The Supreme Court recognized that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."  469 U.S. at 231 (citation omitted).  It stated that "[t]he law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulletins or flyers are considerable, while the intrusion on personal security is minimal."  469 U.S. at 232.  Although the intrusion on personal security may be more than minimal in cases involving alleged exigent circumstances -- for example, in this case, the

deputies entered Christy's residence -- police must act swiftly, especially in cases involving exigent circumstances, and effective law enforcement may require police officers to act on information transmitted from other officers.  The Court thus finds that the collective-knowledge doctrine can be used to impute knowledge of exigent circumstances.  See United States v. Russell, 436 F.3d at 1094-95; Anthony v. City of New York, 339 F.3d at 137; United States v. Pelletier, 2005 WL 1800084, at *12 n.17.  Although the Court is not aware of authority applying the collective-knowledge doctrine in inevitable-discovery analysis, because the Court has determined that the collective knowledge doctrine can be used to impute knowledge of exigent circumstances, and because it must address whether exigent circumstances existed in its inevitable-discovery analysis, the Court will apply the collective-knowledge doctrine.

## III.   THE COURT FINDS THAT THE EVIDENCE WOULD HAVE BEEN INEVITABLY DISCOVERED.

The United States argues that the evidence found in Christy's home, in his vehicle, in his and K.Y.'s cellular telephones, and on Christy's person, and that Christy's statements, inevitably would have been discovered.  Christy argues that the United States cannot meet its burden of showing that the evidence in question would have been inevitably discovered.

"The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Cunningham, 413 F.3d at 1203 (quoting United States v. Owens, 782 F.2d at 152; citing Nix v. Williams, 467 U.S. at 444, 448; United States v. Romero, 692 F.2d at 704).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d at 1203 (citation omitted).

A.    THE COURT FINDS THAT EXIGENT CIRCUMSTANCES WOULD NOT
      HAVE JUSTIFIED ENTRY INTO CHRISTY'S RESIDENCE.

The United States argues that an entry in the CAD Report at 20:06 -- over an hour after the deputies made forced entry -- which reads that a California detective informed BCSO that K.Y. was suicidal, off medication and depressed -- would have given the deputies exigent circumstances to enter Christy's residence and inevitably would have led to the discovery of the same evidentiary items that were later seized pursuant to the search warrants.  Christy argues that there were no exigent circumstances justifying warrantless entry and search of his residence.  He argues that there is nothing in the record to suggest the reliability of the information that K.Y.'s parents relayed to McCarthy and McCormick regarding her psychological condition.  He argues that K.Y.'s runaway note indicates that she did not have suicidal ideation.  Christy thus argues that there was no immediate threat of bodily harm.

In general, law enforcement officers must obtain a warrant to enter a person's home without the person's consent.  See Bringham City v. Stuart, 547 U.S. 398, 403 (2006). Nonetheless, the Tenth Circuit has applied the inevitable discovery doctrine in cases involving violations of the Fourth Amendment where "legal doctrines providing exceptions to the warrant requirement would have inevitably led to the discovery of the evidence."  United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000).  One exception to the warrant requirement is the emergency aid doctrine, which allows law enforcement officers to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.  See United States v. Najar, 451 F.3d 710, 718 (10th Cir, 2006)(emphasis added).  In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively

reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." United States v. Najar, 451 F.3d at 717-18.  A court is "guided by the realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers." United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard." United States v. Porter, 594 F.3d at 1258 (citation omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." United States v. Porter, 594 F.3d at 1258 (citation omitted).  A court must also, however, remember that officers cannot create their own exigent circumstances to justify a warrantless entry.  See United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003).  In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause.  See United States v. Najar, 451 F.3d at 718.

In United States v. Shively, 9 F. App'x 884 (10th Cir. 2001), the Tenth Circuit affirmed the district court's denial of the defendant's motion to suppress.  See 9 F. App'x at 886.  The defendant had telephoned his son and told him, in slurred speech, that he had ingested a large quantity of drugs in an attempt to kill himself.  See 9 F. App'x at 885.  The son reported the telephone call to his mother, who called the police.  See 9 F. App'x at 885.  Police officers were dispatched to the defendant's resident to check on his welfare.  See 9 F. App'x at 885.  When the officers arrived at the defendant's residence, they knocked on the door and yelled "in an attempt to contact anyone inside."  Id. at 885.  The officers "checked all of the doors and windows and found them all to be locked."  Id. at 885.  The officers could not see inside the home through any of the residence's windows.  See id. at 885.  Two cars were parked outside the residence, both of which were

registered to the defendant.  <u>See</u> 9 F. App'x at 885.  The officers also called the defendant's home

and cellular telephone, but did not reach the defendant.  <u>See</u> 9 F. App'x at 885.  "The officers then

contacted [d]efendant's uncle who indicated that if [d]efendant's cars were at the residence, he was

probably inside."  9 F. App'x at 885.  "Concerned about the safety of anyone inside the home, the

officers decided to make their first entry into the home."  <u>Id.</u> at 885.

> Officer Butler knocked a small pane of glass out of a door at the rear of the home while Officer Jerrell announced "police" several times. Defendant finally responded and told the officers to leave. One of them asked him if he was all right and if he would come to the door. Defendant said something to the effect of, "fuck you, you come in here, I'll kill you." One of the officers then asked Defendant if he was armed, and he stated, "fuck yes, come inside and find out." He went on to threaten the officers by saying, "if you come into my door, you're violating my rights and I will kill you."
>
> At that point, the officers decided to contact a negotiator to help them deal with the situation. In the meantime, however, Officer Butler was able to contact Defendant by telephone. While the two were speaking on the phone, Defendant fired a shot inside the house. An officer eventually convinced Defendant to come outside the home. After a brief struggle, he was taken into custody. Officers then entered the home and performed a protective sweep to make sure that nobody else was inside. They found no other occupants, but observed numerous firearms in plain view. After Defendant was taken into custody, he told a police officer that he had a Beretta 9mm, a Glock .45, an SKS sniper rifle, two 30-30 rifles and several shotguns in his residence. However, he refused to give officers consent to search his home at that time.

9 F. App'x at 885.  The defendant was transported to a hospital for a mental evaluation, where he

allegedly gave an officer consent to search his home.  <u>See</u> 9 F. App'x at 885-86.  The officer

informed other officers who were still present at the defendant's residence that the defendant gave

consent, and the officers entered the home and began securing the firearms; they also found

marijuana and drug paraphernalia.  <u>See</u> 9 F. App'x at 886.  The officers then exited the residence

and obtained a search warrant.  <u>See</u> 9 F. App'x at 886.  In addressing the defendant's motion to

suppress evidence, in which the defendant argued that the officers' forced entry, protective sweep

and consent search violated his Fourth Amendment rights, the district court found that "the first entry . . . was justified by exigent circumstances." 9 F. App'x at 886. "Those circumstances include Ms. Shively's indication that Defendant was suicidal, Defendant's failure to respond to the officers' efforts to contact him inside the home and the presence of Defendant's vehicles indicating that he was likely inside." 9 F. App'x at 886. The Tenth Circuit "conclude[d] the district court did not err" and affirmed the district court's decision without written analysis. 9 F. App'x at 886-87.

In Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324 (4th Cir. 2009), the United States Court of Appeals for the Fourth Circuit held that exigent circumstances permitted officers to seize an individual from his home without a warrant. See 555 F.3d at 334. The individual began to feel nauseous and flighty, and attempted to call his doctor at the Veterans Administration ("VA"). Id. at 328. He did not reach his doctor, but spoke to an unidentified female. See 555 F.3d at 328. "A police dispatcher subsequently contacted Burke County Deputies Steven Parlier and Yongla 'Joe' Lo to report that Cloaninger had threatened suicide and to request that they conduct a welfare check at Cloaninger's house." 555 F.3d at 328. When Lo arrived at the residence, he told Parlier that Cloaninger had made "previous suicide threats and that when other officers had responded to those threats firearms had been found in the residence." 555 F.3d at 328. The officers' attempts to communicate with Cloaninger failed, and their supervisor felt the "circumstances were too volatile for any of the officers to leave the scene to obtain [an emergency commitment order]." 555 F.3d at 328-29. The officers pulled the individual out of his house, cuffed him, and took him to a magistrate's officer, where they obtained an emergency commitment order. See 555 F.3d at 329. The Fourth Circuit found that exigent circumstances permitted the officers to seize the man, stating:

> Regardless of Cloaninger's disputed behavior, the initial VA call, coupled with

knowledge of Cloaninger's prior suicide threats and the belief that he possessed firearms, established to an objectively reasonable police officer that Cloaninger was a danger to himself. Moreover, Treadway concluded that the situation at the house was too unstable for any of the three officers there to leave the premises to obtain the emergency commitment order. Accordingly, the circumstances facing the defendants were exigent and we hold that the undisputed facts in this case establish that the officers' conduct was objectively reasonable.

555 F.3d at 334.

In <u>Ziegler v. Aukerman</u>, 512 F.3d 777 (6th Cir. 2008), the United States Court of Appeals for the Sixth Circuit found that the officer "acted reasonably in taking Mrs. Ziegler into custody at her home without waiting for a warrant." 512 F.3d at 786. The Sixth Circuit stated:

> Here, Officer Jonoshies took Plaintiff into custody "outside her house . . . on the walkway or driveway connected to the house" after receiving a call from a 911 dispatcher that Plaintiff was suicidal and that there was a clinical certificate requesting that she be returned to the hospital. The mere fact that the hospital classified Plaintiff as suicidal is enough to show that she was a danger to herself. Whether the present danger required swift action must be determined by looking at all the facts. In addition to the 911 call informing Officer Jonoshies that Plaintiff was suicidal, the call also informed Officer Jonoshies that there was a clinical certificate ordering him to take Plaintiff to the hospital. A reasonable officer would infer from this information that Plaintiff was at a high risk to commit the dangerous act, as her mental state had been examined by medical professionals, and had been determined to be so severe as to require immediate hospitalization. In addition, inherent in the fact that the certificate was requesting that Plaintiff be "brought back" to the hospital is the fact that Plaintiff had at some point been at the hospital and presumably left without being discharged. This fact increases the likelihood that Plaintiff had a mental state that required immediate attention, as she likely left before doctors had completed treating her.

> The type of danger at issue should also be considered. The act of suicide requires no help from another individual and can be accomplished very quickly. To require that an officer who has received information from a credible source, or sources, that an individual is a suicidal risk, wait to obtain a warrant before saving that victim, would likely result in countless preventable deaths. Surely the "chief evil" the Fourth Amendment was designed to protect against was not intended to be taken this far.

512 F.3d at 985-86 (footnote omitted).

The United States argues that exigent circumstances would have justified entry into Christy's

residence, based on the information law enforcement officers learned regarding K.Y.'s mental state. On November 9, 2009, McCarthy and McCormick conducted an interview with K.Y.'s parents; during the interview, K.Y.'s mother told the detectives that K.Y. was diagnosed with depression; that K.Y. had attempted suicide on several occasions, the last occasion being in March 2009; that K.Y. liked to cut her wrists; and that K.Y. had mental health issues for which she was on medication. See Aug. 3, 2011 Tr. at 49:23-50:9 (Kastrin, McCarthy). K.Y.'s parents told McCarthy and McCormick that K.Y. was not on medication when she left, and that they were very concerned about her well-being and her safety. See Aug. 3, 2011 Tr. at 450:6-9 (Kastrin, McCarthy). Her parents also told McCarthy and McCormick that they believed K.Y. posed a risk of suicide or harm to herself. See Aug. 3, 2011 Tr. at 50:10-12 (Kastrin, McCarthy). McCarthy and McCormick searched K.Y.'s bedroom, where they located numerous journals, writing, and drawings. See Aug. 3, 2011 Tr. at 50:16-17 (McCarthy). In the journals, K.Y. wrote that she enjoys cutting herself to relieve stress; she also wrote about her research regarding how a human body can lose one-eighth of its blood before dying and how she "likes to lose one-eighth of her blood." Aug. 3, 2011 Tr. at 50:17-21 (McCarthy). K.Y. wrote the last journal entry either the same week or the week before she went missing. See Aug. 3, 2011 Tr. at 50:24-51:1(Kastrin, McCarthy). The journal entries spanned a lengthy period of time; there was some consistency in the entries regarding "thoughts of suicide, cutting, blood loss, bondage, rape, [and] things of that nature," and, as far as McCarthy understood, the journal entries were made while K.Y. was medicated. Aug. 3, 2011 Tr. at 64:13-23 (Kastrin, McCarthy). The information that K.Y.'s parents relayed to McCarthy and McCormick about K.Y.'s mental health, in combination with K.Y.'s journals, led McCarthy to believe that K.Y. posed a suicide threat:

> [W]e now had reason to believe that she was in the presence of an adult male that she

had met on line for sexual purposes, she's 16, she's not allowed to give consent, she can't give consent for sexual -- to have a sexual relationship.  We believed that she was in danger of herself and of the male that she was with.

Aug. 3, 2011 Tr. at 51:7-13(McCarthy).  McCarthy was also concerned that K.Y. was no longer on her medication.  See Aug. 3, 2011 Tr. at 51:13-15 (Kastrin, McCarthy).  McCarthy believed that the circumstances presented an emergency situation, because there was evidence that K.Y. posed an active suicide risk, because K.Y. was off her medications and  was possibly with an adult male in another state.  See Aug. 3, 2011 Tr. at 53:1-7 (Kastrin, McCarthy).  McCarthy believed that K.Y. posed a risk of harm to herself and that the adult male posed a risk of harm to K.Y., because K.Y. could not consent to sexual activity with the adult male given that the age of consent in California is eighteen.  See Aug. 3, 2011 Tr. at 53:8-12 (Kastrin, McCarthy).  Although K.Y. wrote a runaway note, in which she stated that she was safe and that she would call later, these statements did not allay McCarthy's worries that the situation presented an emergency.  See Aug. 3, 2011 Tr. at 65:14-23 (Kastrin, McCarthy).  McCarthy contacted the BCSO and asked BCSO to do a welfare check. See Aug. 3, 2011 Tr. at 53:13-18 (Kastrin, McCarthy).  In McCarthy's initial call to the BCSO, she did not mention anything about K.Y.'s mental health.  See id. at 54:1-5 (Kastrin, McCarthy).  She called the BCSO back approximately an hour later and told them about K.Y.'s mental health issues -- that she was depressed, had attempted suicide in the past, and was off her medications.  See Aug. 3, 2011 Tr. at 54:14-24 (Kastrin, McCarthy).  See also CAD Report at 2 (stating that, at "19[:]49 THE DET FROM CALI CALLED ADV THE SUBJ IS SUICIDAL, OFF MEDS & DEPRESSED").  Littlefield has concluded that, had he not forced entry into Christy's residence when he did, he would have entered the residence at a later time, because BCSO was later given information that K.Y. was considered suicidal, off her medication, and a danger to herself.  See Aug. 3, 2011 Tr. at 76:19-22 (Kastrin, Littlefield).

-76-

Exigent circumstances would not have justified warrantless entry into Christy's residence. For emergency circumstances to justify a warrantless entry into a home, "the officers [must] have [had] an objectively reasonable basis to believe there [wa]s an <u>immediate</u> need to protect the lives or safety of themselves or others." <u>United States v. Najar</u>, 451 F.3d at 717-18 (emphasis added). The cases that have allowed a warrantless entry because of the risk of suicide have involved a more pronounced and immediate risk of suicide than that protected here. Unlike <u>United States v. Shively</u>, where the Tenth Circuit affirmed the district court's conclusion that the first entry into the residence was justified by exigent circumstances when the defendant's ex-wife informed officers that the defendant called their son and told him, "in slurred speech, that he had ingested a large quantity of drugs in an attempt to kill himself," 9 F. App'x at 886, the law enforcement officers did not have information that K.Y. was attempting suicide. They knew only that K.Y. had previously attempted suicide, the last occasion being in March 2009, approximately seven months before the deputies were called to do a welfare check. The deputies' knowledge that K.Y. was depressed and off her medication, and that she had previously attempted suicide, is not an objectively reasonable basis that there was an <u>immediate</u> need to protect K.Y. from herself.[9]  <u>See Cloaninger ex rel. Estate of</u>

_____

[9] The Court addressed whether the risk of sexual contact between Christy and K.Y. created exigent circumstances in its Amended Memorandum Opinion and Order. While the Tenth Circuit stated, without any analysis or further discussion, in <u>United States v. Cunningham</u>, "the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home," 413 F.3d at 1205, thus suggesting that the government could rely on evidence that was unconstitutionally seized, the Court is reluctant to put too much reliance on this one phrase in this sentence. In <u>United States v. Cunningham</u>, it may not have been that the consideration of the unconstitutionally seized evident made any different. In this case, however, whether the Court considers the evidence unconstitutionally seized could make a difference. If the words "independent investigation" are to have any meaning, the government should not be able to rely on the evidence found in an unconstitutional means. The only new argument that the United States has set forth is that exigent circumstances existed, because K.Y. was suicidal and depressed. This new argument is thus all that the Court will take into account in this Memorandum Opinion and Order. If the United States meant to argue that the combination of sexual contact between Christy and K.Y. and

Cloaninger v. McDevitt, 555 F.3d at 328 n.2, 334 (holding that "the circumstances facing the [officers] were exigent," and holding that "the undisputed facts . . . establish that the officers' conduct was objectively reasonable," when the VA called 911 and told the dispatcher that Cloaninger "had threatened suicide," "coupled with knowledge of Cloaninger's prior suicide threats and the belief that he possessed firearms, established to an objectively reasonable police officer that Cloaninger was a danger to himself"); Ziegler v Aukerman, 512 F.3d at 785-86 (finding that the officer acted "reasonably in taking [Plaintiff] into custody at her home without waiting for a warrant," when the officer received a "call from a 911 dispatcher that Plaintiff was suicidal and that there was a clinical certificate requesting that she be returned to the hospital," because a "reasonable officer would infer from this information that Plaintiff was at a high risk to commit the dangerous act, as her mental state had been examined by medical professionals, and had been determined to be so severe as to require immediate hospitalization").  Because the deputies did not have an objectively reasonable basis that there was an immediate need to protect K.Y. from taking her own life, exigent circumstances would not have justified entry into Christy's residence.  Exigent circumstances thus would not have led the deputies to inevitably discover the evidence.  See United States v. Cunningham, 413 F.3d at 1203 (citation omitted).

It is important to recognize that there is not a suicide exception to the warrant requirement; there is an exigent circumstances exception.  The self harm must still be exigent.  A sizeable segment of the United States population has attempted suicide, see Suicide in the U.S.: Statistics and Prevention, National Institute of Mental Health, http://www.nimh.nih.gov/health/publications/

K.Y.'s depression and suicidal history created exigent circumstances, the Court's analysis would not change. Neither set of facts was sufficient to establish exigent circumstances; all together, they are inadequate. That K.Y. was a person who had struggled with suicide and depression in the past, and was having consensual sex, does not add up to exigent circumstances.

suicide-in-the-us-statistics-and-prevention/index.shtml#CDC-Web-Tool (last visited August 23, 2011)(stating that, in 2007, suicide was the tenth leading cause of death in the United States, that the overall rate was 11.3 suicide deaths per 100,000 people, and that an estimated eleven attempted suicides occur per every suicide death); here, the last attempt was seven months before the deputies were called to do a welfare check.  A sizeable percentage of the United States population is also depressed.  See Current Depression Among Adults -- United States, 2006 and 2008, Morbidity and Mortality Weekly Report, October 1, 2010 Erratum (stating that 9.1% of the population in the United States is depressed); An Estimated 1 in 10 U.S. Adults Report Depression, Centers for Disease Control and Prevention, http://www.cdc.gov/features/dsdepression/ (last visited August 29, 2011).  Also, people go on and off medication.  People who struggle with suicide and depression, and are not consistent with their medication, do not give up all rights to Fourth Amendment protection; the government still needs to secure a warrant unless the risk of harm to self is imminent or immediate.  Just as a felon might harm again, a felon does not lose all constitutional protection unless the felon is reasonably likely to be placing another in danger of imminent harm.  A person susceptible to suicide and depression is not in a materially different position.  Moreover, the people who are with people who have attempted suicide and are depressed do not lose all their constitutional rights, too.  If the exigent circumstances exception is to have any meaningful limits, the courts still must require an immediate need to protect someone from harm; if there is not an immediate need, the government still needs to get a warrant.  Individual need is on a spectrum, and the Court does not want to unduly chill police from protecting people who are suicidal.  On this spectrum, however, the risk of harm was not imminent or immediate.

**B.      LAW ENFORCEMENT OFFICERS WOULD HAVE OBTAINED A WARRANT AND THE EVIDENCE WOULD HAVE BEEN DISCOVERED HAD THE DEPUTIES NOT CONDUCTED AN ILLEGAL SEARCH.**

The United States argues that the Court should apply the inevitable discovery doctrine, because, excluding all the information that the deputies learned when they looked in and subsequently entered Christy's residence, they still had sufficient probable cause to get a warrant. It argues that, although there was no attempt at obtaining a warrant before the deputies made entry, it was because the deputies believed that exigent circumstances justified entry and that the process of obtaining a warrant would no doubt have soon commenced after the deputies verified that Christy lived there had they not believed exigent circumstances justified their immediate entry. The United States argues that there was probable cause to search Christy's residence and vehicle for California, New Mexico, and federal crimes. It also argues that there is no evidence that the deputies jumped the gun because they lacked probable cause.

Christy argues that the United States cannot meet the burden of showing that the evidence would have been inevitably discovered. He argues that no independent investigation could possibly have existed, because all the officers, deputies, and agents involved were working from the same information and sources, and that courts are not permitted to speculate that at some future time a legal warrant might have been obtained.

"The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Cunningham, 413 F.3d at 1203 (quoting United States v. Owens, 782 F.2d at 152; citing Nix v. Williams, 467 U.S. at 444, 448; United States v. Romero, 692 F.2d at 704).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."

United States v. Cunningham, 413 F.3d at 1203 (citation omitted).  The Tenth Circuit has stated that "the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct."  United States v. Larsen, 127 F.3d at 986. The only requirement is "that the investigation that inevitably would have led to the evidence be independent of the constitutional violation."  United States v. Larsen, 127 F.3d at 987 (citations omitted).  Although "[t]he fact that another investigation was already underway when a constitutional violation occurred is strong proof that it was independent of the illegal investigation," it is "possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d at 987 (citations omitted).  In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203.  The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205.  The Tenth Circuit adopted factors that the United States Court of Appeals for the Second Circuit set forth to help courts determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant:"

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the  search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

223 F.3d at 1204 (citing United States v. Cabassa, 62 F.3d 470, 473-74 & n.2 (2d Cir.1995)) (internal quotations and citations omitted). The Tenth Circuit has stated that "[t]he extent to which the warrant process has been completed at the time those seeking the warrant learn of the search, and whether a warrant is ultimately obtained, are factors entitled to great importance in determining whether the evidence would have inevitably been discovered pursuant to a warrant." United States v. Souza, 223 F.3d at 1204.

In United States v. Souza, the Tenth Circuit addressed whether the inevitable discovery exception applied. See 223 F.3d at 1203. The Tenth Circuit stated:

> In those cases where, although police had announced an intent to secure a warrant, courts have declined to apply the inevitable discovery exception, the reason was that, after weighing the probability of obtaining a warrant and the probability that the evidence would have been discovered pursuant to the warrant, the contingencies involved were too uncertain to justify application of the doctrine. For example, in Cabassa, police officers entered an apartment before a search warrant had been issued, even though the process for securing a warrant had already been started, because of the officers' fear that their position near the apartment would be discovered and the evidence disappear. See id. at 474. The Second Circuit refused to apply the inevitable discovery exception because the government's showing of probable cause was not overwhelming, thus raising questions whether a magistrate judge would have issued a warrant, and because of the uncertainty whether, if the police had waited for a search warrant, the evidence would have been in the apartment when a lawful search occurred. See id. at 474. See also [United States v.] Mejia, 69 F.3d [309,] 319 [(9th Cir. 1995)](noting that, in addition to the fact that the police took no steps to secure a warrant, "it is unclear whether there was competent evidence that would have supported an application for a warrant"); Allen, 159 F.3d at 842-43 (declining to apply the inevitable discovery exception because the police did not have probable cause at the time of the illegal search and no evidence indicated that the officers ever contemplated obtaining a search warrant).
>
> In contrast, courts have applied the inevitable discovery exception when, after an analysis of the relevant contingencies, they have been reasonably certain that the evidence would have been discovered pursuant to a search warrant. In United States v. Lamas, 930 F.2d 1099 (5th Cir.1991), the police decided to secure the house of a drug dealer, Lamas, to prevent the destruction or removal of evidence they believed was inside the house. See id. at 1100. The officers conducted a valid cursory protective search for weapons and other persons and, while inside, Officer Garcia attempted to convince Lamas to consent to a full search. See id. at 1100-01. At some

point while Officer Garcia was talking with Lamas, but before Lamas consented to the search, Officer DuBois left to prepare an affidavit to obtain a search warrant for the house.  See id. at 1101. As Officer DuBois was walking to his car, another officer stopped him and informed him that Lamas had consented, involuntarily it turned out, to a search of the house.  See id.  Officer DuBois then abandoned his plans to secure a search warrant and returned to the house.  See id. The Fifth Circuit found that the existence of probable cause to search the house, the officers' securing the house until a warrant could be obtained, and one of the officers leaving the house to get a search warrant before the invalid consent was obtained was sufficient to support application of the inevitable discovery exception.  See id. at 1103.  See also United States v. Ford, 22 F.3d 374, 378 (1st Cir.1994)(applying inevitable discovery exception after finding that both probable cause to search and that the seized evidence would have been discovered following the authorized search was undisputed); United States v. Buchanan, 910 F.2d 1571, 1574 (7th Cir.1990)(applying inevitable discovery exception after finding that probable cause to search a room for a gun existed and that narcotics would have inevitably been found in the search); United States v. Whitehorn, 829 F.2d 1225, 1231 (2d Cir.1987)(applying inevitable discovery exception after finding that the police had "overwhelming probable cause" to search a house in which evidence reasonably could be expected to be found and that they were proceeding to secure a search warrant when the illegal search occurred).

223 F.3d at 1204.  The Tenth Circuit stated that, in the case before it, the probability was "very high

that the evidence would have been discovered pursuant to a search warrant."  223 F.3d at 1205.

Regarding the first factor, the Tenth Circuit stated:

First, the prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit stated:

Second, at the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

-83-

223 F.3d at 1205-06.  The Tenth Circuit noted that a sergeant eventually obtained a search warrant. See 223 F.3d at 1206.  The Tenth Circuit also stated, third, unlike "Cabassa, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  223 F.3d at 1206.  The Tenth Circuit thus stated that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

223 F.3d at 1206.

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it] [was] convinced that without Mr. Cummingham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered."  413 F.3d at 1205.  The Tenth Circuit found that the case before it squared with United States v. Souza.  See 413 F.3d at 1204.  The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time  those seeking the warrant learn of the search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the AUSA, the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at

the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home."  413 F.3d at 1205.  Regarding the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue.  Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in <u>Souza</u>, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found.

413 F.3d at 1205 (internal citations omitted).  The Tenth Circuit thus applied the inevitable discovery doctrine.  <u>See</u> 413 F.3d at 1205.

    In <u>United States v. Owens</u>, the Tenth Circuit concluded "that the inevitable discovery

exception to the exclusionary rule c[ould not] be invoked because of the highly speculative assumption of 'inevitability' that would be required to apply it." 782 F.2d at 153.  In United States v. Owens, police arrested the room's occupant, entered the room, and then opened and searched a drawer as well as a closed bag inside that drawer, discovering illegal drugs.  See 782 F.2d at 148-49. Although marijuana, white power, and drug paraphernalia were in plain view, and the police had full control over the room, they did not make an attempt to seek a warrant.  See 782 F.2d at 149.  The Tenth Circuit stated: "Here, the unconstitutional search of the closed bag inside the closed dresser drawer tainted the only police investigation that was ongoing. Clearly these officers were not conducting an independent investigation that inevitably would have uncovered the cocaine." 782 F.2d at 152-53.

In its motion to reconsider, the United States concedes that "there was no attempt by deputies to obtain a warrant prior to making entry" into Christy's residence.  Motion to Reconsider at 13. In United States v. Souza, the Tenth Circuit stated that "steps taken to obtain a warrant prior to the unlawful search" is "the prerequisite to a consideration of the inevitable discovery exception in these cases."  United States v. Souza, 223 F.3d at 1205.  In United States v. Sanders, 43 F. App'x 249 (10th Cir. 2002), however, the Tenth Circuit revisited this language:

> While Mr. Sanders does not raise this point, we have, in a case post-dating Larsen, referred to "steps taken to obtain a warrant prior to the unlawful search" as "prerequisite" to application of the inevitable discovery doctrine.  Souza, 223 F.3d at 1205.  The 'prerequisite' description, however, constitutes dicta -- and probably inadvertent dicta at that -- in an opinion that, in another part, explicitly acknowledges, without challenging, the holding of Larsen.  See id. at 1203 n. 7 ("Larsen focused solely on whether the inevitable discovery rule requires proof of a separate investigation ongoing at the time of the constitutional violation.").  In any case, we are bound by our holding in Larsen until that holding is called into question by Supreme Court precedent or reviewed by our court en banc.  See Haynes v. Williams, 88 F.3d 898, 900 & n. 4 (10th Cir.1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.").

43 F. App'x at 254 n.2.  The Court thus believes that, under current Tenth Circuit precedent, the inevitable discovery doctrine is applicable in cases where the independent lawful investigation was not ongoing at the time the evidence was found unlawfully.  See United States v. Larsen, 127 F.3d at 986 ("We conclude the inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct.").

After considering the four factors that the Tenth Circuit set forth in United States v. Souza, the Court finds that the deputies would have inevitably discovered the evidence the Court suppressed in its Amended Memorandum Opinion and Order.

The deputies did not take any steps to obtain a warrant before entering Christy's residence.  The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence.  See Motion to Reconsider at 13 ("[T]here was no attempt by deputies to obtain a warrant prior to making entry . . . .  Thus, although the warrant process had not commenced before the initial entry into the Defendant's house, it no doubt would have commenced soon after the deputies verified that Christy lived there . . . .").  This factor thus weighs against applying the inevitable discovery exception.

The Court must also look at the "strength of the showing of probable cause at the time the search occurred."  United States v. Cunningham, 413 F.3d at 1204 (citation omitted).  At the hearing on July 8, 2011, the Court asked the United States to set forth its best scenario for inevitable discovery.  The United States asserted that a federal agent would have obtained a federal warrant based on federal crimes.  See July 8, 2011 Tr. at 25:21-26:7 (Rees).  Because Adkins was the FBI agent involved with the case, the Court will begin its analysis with her.

The Court finds that Adkins did not have strong probable cause that Christy committed

crimes.  The search of Christy's residence occurred at 6:42 p.m.  See CAD Report at 1.  The task force member called Adkins to Christy's residence to assist the BCSO sometime between six and seven.  See Aug. 3, 2011 Tr. at 7:12-18 (Rees, Adkins).  It is thus possible -- based on the record before the Court -- that Adkins had no knowledge of the case, and thus no probable cause that Christy committed crimes at the time the search occurred.  Assuming that Adkins had some knowledge of the case before the search occurred, however, the Court will address whether Adkins had strong probable cause at the time of the search.  Before Adkins got to Christy's residence, she knew that an individual had traveled to California, picked up a minor, and brought her back to New Mexico without her parents' permission.  See Aug. 3, 2011 Tr. at 22:16-20 (McMillian, Adkins).  At the hearing on August 3, 2011, Adkins testified that she had probable cause, "based upon the evidence [she] learned that particular evening," for "a search warrant for [the federal crimes of] production of child pornography, possession of child pornography, kidnapping, and . . . traveler or the enticement statute."  Aug. 3, 2011 Tr. at 14:18-24  (Rees, Adkins).  Adkins believes that she would have had probable cause for the federal crimes of production and possession of child pornography, based on Littlefield's "approach and view through the window," and the later "statements made by the victim," from whom Adkins learned that she sent explicit pictures of herself.  Aug. 3, 2011 Tr. at 15:1-11 (Rees, Adkins).  This information, however, is fruit of illegal searches of Christy's residence.  This information thus does not support a showing of probable cause.  Adkins testified that she believes that, "in theory," if she spoke to the Westminster Police Department, she would have acquired information that the victim sent explicit images of herself that were consistent with child pornography.  Aug. 3, 2011 Tr. at 15:12-19 (Rees, Adkins).  The Court does not believe that speculation about what information Adkins might have learned is sufficient to support probable cause.  Cf. United States v. Owens, 782 F.2d at 153 ("We conclude that the

-88-

inevitable discovery exception to the exclusionary rule cannot be invoked because of the highly speculative assumption of 'inevitability' that would be required to apply it here."). The Court thus finds that Adkins did not have strong probable cause for the federal crimes of production of child pornography and possession of child pornography.

Adkins believed that she had probable cause to write a search warrant for the federal crime of enticement or coercion, because she was aware of evidence that K.Y. and Christy used the internet and cellular telephones to communicate, and that Christy traveled across state lines to meet K.Y. and to transport her to Albuquerque. See Aug. 3, 2011 Tr. at 17:7-16 (Rees, Adkins). Before Adkins spoke to Proctor and other BCSO deputies following the search of Christy's residence, however, she knew only that an individual had traveled to California, picked up a minor, and brought her back to New Mexico without her parent's permission. Section 2422 of Title 18 of the United States Code -- which codifies the federal crime of coercion and enticement -- states: "Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate. . . commerce . . . to engage . . . in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so [shall be punished]." 18 U.S.C. § 2422. Because Adkins did not have any information that Christy enticed or coerced K.Y. to travel in interstate commerce to engage in sexual activity for which he could be charged with a criminal offense at the time of the search, Adkins did not have strong probable cause for this crime. Adkins believes that she would have had probable cause for the federal crime of kidnaping, because she was aware of evidence that Christy took K.Y. from her residence in California without her parents' permission. See Aug. 3, 2011 Tr. at 16:13-23 (Rees, Adkins). Section 1201 of Title 18 of the United States Code -- which criminalizes kidnaping -- states: "Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . . the

person is willfully transported in interstate . . . commerce . . . shall be punished[.]" 18 U.S.C. § 1201.

Christy could not have kidnaped K.Y. if K.Y. consented to traveling to New Mexico with him.  See

United States v. Toledo, 985 F.2d 1462, 1468 (10th Cir. 1993)("The record contains conflicting

information regarding [the minor] Stephanie's consent to accompany Mr. Toledo to California.

Consequently, we believe that Mr. Toledo was entitled to an instruction that no federal crime was

committed if Stephanie willingly consented to the interstate travel.").  Because Adkins did not know

the circumstances of the transportation when she arrived on the scene, before she spoke to BCSO

deputies after they finished searching Christy's residence, see Aug. 3, 2011 Tr. at 25:17-18

(McMillian, Adkins), Adkins did not have strong probable cause for the federal crime of kidnapping.

The Court thus finds that Adkins did not have strong probable cause that Christy committed crimes.

       The Court finds that Carvo had strong probable cause that Christy committed crimes.  At the

time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual

intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail

transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to

run away with Christy.  See Aug. 3, 2011 Tr. at 101:2-9 (Rees, Carvo).  Section 261.5 of the

California Penal Code states:

>        Unlawful sexual intercourse is an act of sexual intercourse accomplished with
> a person who is not the spouse of the perpetrator, if the person is a minor. For the
> purposes of this section, a "minor" is a person under the age of 18 years and an
> "adult" is a person who is at least 18 years of age.
>
> . . . .
>
>        Any person who engages in an act of unlawful sexual intercourse with a
> minor who is more than three years younger than the perpetrator is guilty of either
> a misdemeanor or a felony, and shall be punished by imprisonment in a county jail
> not exceeding one year, or by imprisonment in the state prison.

Cal. Penal Code § 261.5(a), (c).  Carvo knew that K.Y. was a minor, that there was a large age

difference between the two, and that Christy was an adult man.  See Aug. 3, 2011 Tr. at 89:25-90:4

(Rees, Carvo).  Carvo knew that Christy and K.Y. exchanged naked pictures through electronic mail

transmissions.  Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the

belief that there was a sexual relationship or sexual interest between the two was reasonable."

Amended Memorandum Opinion and Order at 57.  These circumstances are sufficient to form "a

reasonable ground for belief of [Christy's] guilt,"  Maryland v. Pringle, 540 U.S. 366, 371

(2003)(citation omitted), for the California crime of unlawful sexual intercourse.[10]

---

[10] In the hearing on April 21, 2011, Rees asked Carvo what crimes he had determined that
Christy "likely committed."  Apr. 21, 2011 Tr. at 92:10 (Rees).  Carvo responded: "Enticement of
a minor through the Internet, child pornography, receiving and distribution of child pornography,
distribution of harmful matter to a child, custodial interference, and transportation of a minor across
state lines."  Apr. 21, 2011 Tr. at 92:11-14 (Carvo).  Carvo testified that these are all California and
federal crimes.  See Apr. 21, 2011 Tr. at 92:15-17 (Rees, Carvo).  In the hearing on August 3, 2011,
Carvo testified that he had probable cause for more crimes than he testified he had probable cause
for in the April 21, 2011 hearing.  At the August 3, 2011 hearing, Carvo testified that he believed
he had probable cause for the California crimes of: (i) child abduction, see California Penal Code
§§ 278 and 278.5; (ii) illegal contact with a minor, see California Penal Code § 278.3; (iii) showing
or sending harmful matter to a minor, see California Penal Code § 288.2; (iv) arranging a meeting
with a minor for sexual purposes, see California Penal Code § 288.4; (v) attending a meeting with
a minor for sexual purposes or for a lewd act, see California Penal Code § 288.4B; (vi) annoying or
molesting a child, see California Penal Code § 647.6; (vii) unlawful sexual intercourse, see
California Penal Code § 261.5; (viii) possession of child pornography, see California Penal Code
§ 311.11; (ix) production of child pornography, see California Penal Code § 311.4; and (x) unlawful
oral copulation with a minor, see California Penal Code § 288A.  See Aug. 3, 2011 Tr. at 88:21-
89:21 (Rees, Carvo).  Carvo also testified that he believed that he had probable cause for the federal
crimes of production of child pornography, see 18 U.S.C. § 2251; possession of child pornography,
see 18 U.S.C. § 2252; coercion or enticement of a minor, see 18 U.S.C. § 2422; and transportation
of a minor for sexual purposes, see 18 U.S.C. § 2423.  See Aug. 3, 2011 Tr. at 106:4-11 (Rees,
Carvo).  It troubles the Court that, at the second suppression hearing, testified that he had probable
cause for a significantly larger amount of crimes than he testified he had probable cause for at the
first hearing.  If Carvo is just now -- at the end of the summer of 2011 -- thinking of the crimes, it
may be difficult to say it was inevitable he would have gotten a search warrant based on the crime
in 2009.  On the other hand, the United States did not fully develop its argument at the first hearing.
Neither Carvo nor the United States was apparently very exhaustive at the April 21, 2011 hearing,
as the inevitable discovery argument was briefly mentioned and was largely a throw-away argument.
Although it troubles the Court that it finds that Carvo had probable cause for a California crime for
which he did not originally testify he had probable cause, the Court does not believe that the greater

Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico. See Aug. 3, 2011 Tr. at 107:12-21 (Rees, Carvo). Section 2422 of Title 18 of the United States Code states:

> Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 2422. Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had " "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the

---

detail at the August 3, 2011 hearing changes its conclusion that it should apply the inevitable discovery doctrine.

deputies' entry into Christy's residence and subsequent interview of Christy.  United States v. Cunningham, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  See Aug. 3, 2011 Tr. at 110:11-18 (Rees, Carvo).  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  Aug. 3, 2011 Tr. at 109:6-13 (Rees, Carvo).  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  See Aug. 3, 2011 Tr. at 109:14-19 (Rees, Carvo).  Carvo is cross designated to acquire both state and federal search warrants.  See Aug. 3, 2011 Tr. at 88:2-4 (Rees, Carvo).  This factor thus weighs in favor of application of the inevitable-discovery doctrine.  See United States v. Cunningham, 413 F.3d at 1205 (finding that the law enforcement officers ultimately obtained a warrant, albeit based in part on information illegally obtained, and holding that the inevitable discovery doctrine applied).

There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." United States v. Cunningham, 413 F.3d at 1205. The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence. This factor thus weighs in favor of application of the inevitable discovery doctrine.

The Court will apply the inevitable discovery doctrine.

Although [the Court] is very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces [the Court] that this is one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206. After considering the factors that the Tenth Circuit adopted, the Court believes that "the probability is very high that the evidence would have been discovered pursuant to a search warrant." United States v. Souza, 223 F.3d at 1205. The evidence takes this case out of the sphere of speculation and into the sphere in which there is a high probability that Carvo would have obtained the evidence. Carvo had strong probable cause for violations of California state law and federal law, and he would have asked the BCSO or Albuquerque FBI to obtain search warrants. See Aug. 3, 2011 Tr. at 109:1-13 (Rees, Carvo). To acquire search warrants for California crimes with evidence in New Mexico, Carvo could have written search warrant affidavits, sent them to a detective in New Mexico, and had the New Mexico detective seek search warrants incorporating the affidavits. See Aug. 3, 2011 Tr. at 105:11-18 (Rees, Carvo). New Mexico courts can issue warrants for the search and seizure of any "property which has been obtained or is possessed in a manner which constitutes a criminal offense;" any "property designed or intended for use or which is or has been used as the means of committing a criminal offense;" or any "property which would be material evidence in a criminal prosecution."

Rule 5-211 NMRA.[11]  If neither the BCSO nor the Albuquerque FBI could or would  obtain search

_____

[11] Rule 5-211 NMRA states:

A warrant may be issued by the court to search for and seize any:

> (1) property which has been obtained or is possessed in a manner which constitutes a criminal offense;
>
> (2) property designed or intended for use or which is or has been used as the means of committing a criminal offense; [or]
>
> (3) property which would be material evidence in a criminal prosecution[.]

Rule 5-211 NMRA.  Rule 5-211 is patterned after rule 41 of the Federal Rules of Criminal Procedure.  See Rule 5-211 NMRA committee commentary.  Rule 41 states:

> **(c) Persons or Property Subject to Search or Seizure.** A warrant may be issued for any of the following:
>
> **(1)** evidence of a crime;
>
> **(2)** contraband, fruits of crime, or other items illegally possessed;
>
> **(3)** property designed for use, intended for use, or used in committing a crime; or
>
> **(4)** a person to be arrested or a person who is unlawfully restrained.

Fed. R. Crim. P. 41.  This portion of rule 41 appears to be the part of the rule on which rule 5-211 was patterned.  The Court notes, however, that rule 41 also states:

> **(b) Authority to Issue a Warrant.** At the request of a federal law enforcement officer or an attorney for the government:
>
> **(1)** a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district;
>
> **(2)** a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;

**(3)** a magistrate judge -- in an investigation of domestic terrorism or international terrorism -- with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;

**(4)** a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and

**(5)** a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:

> **(A)** a United States territory, possession, or commonwealth;

> **(B)** the premises--no matter who owns them--of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land used for the mission's purposes; or

> **(C)** a residence and any appurtenant land owned or leased by the United States and used by United States personnel assigned to a United States diplomatic or consular mission in a foreign state.

Fed. R. Crim. P. 41. This rule places limits on the authority to issuance of warrants, but it appears that the purpose behind the rule is to limit the issuing court so that the court cannot issue a warrant for a person or property located outside of the court's jurisdiction. The rule does not state, however, that an issuing court cannot issue a warrant to search for and seize a person or property located within the district for a crime committed outside of the district, and there does not appear to be a sound reason to read into the rule a limit no present.

There is no New Mexico case law interpreting rule 5-211, but the plain language does not limit New Mexico state court warrants to those based on violations of New Mexico state law. See State ex rel. Klineline v. Blackhurst, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988)(stating that s court's central concern, in construing a particular statute, is to determine and give effect to the intent of the legislature, using the plain language of the statute as the primary indicator of its intent).

There is no sound reason to give the language a narrow reading that the plain language does not suggest. Courts in other jurisdictions have held that a court may issue a warrant to seize property located in the issuing state if it constitutes evidence of a crime committed in another jurisdiction. See State v. Heylmun, 708 P.2d 778, 780 (Ct. App. Ariz. 1985)("Nothing in either [definition in the Arizona statutes regarding search warrants] indicates in any way that jurisdiction to search is limited to crimes committed in Arizona."); State v. Intercontinental, Ltd., 486 A.2d 174,

warrants, he would have sought a federal search warrant himself.  See Aug. 3, 2011 Tr. at 109:14-19

(Rees, Carvo).  There is evidence in the record that law enforcement officers have had no issues with

a federal judge refusing to issue a search warrant in similar cases.  See Aug. 3, 2011 Tr. at 14:4-11

(Rees, Adkins).  See also July 8, 2011 Tr. at 56:23-57:2 (Court, Rees)("THE COURT: . . . [S]o the

only thing we'd be talking about here for purpose of a Rule 41 search warrant would be one of the

United States magistrate judges here?  MS. REES: Right.  I never had an issue with not being able

to [obtain a warrant.]").  Carvo would have sought a search warrant for Christy's cellular telephone,

Christy's vehicle, Christy's residence, Christy's computer, any digital media that had the capability

of storing pictures, any evidence of contact between Christy and K.Y., any evidence that K.Y. had

been in Christy's residence, and DNA evidence.  See Aug. 3, 2011 Tr. at 108:9-5(Rees, Carvo).

After Carvo found evidence supporting his strong probable cause that Christy committed California

and federal crimes, he would have interviewed Christy.  Cf. Motion to Reconsider at 15

("Investigators also inevitably would have interviewed the Defendant in light of the evidence found

in both his house and vehicle.").  The evidence that Carvo inevitably would have sought and

obtained is the same as the evidence that the Court previously suppressed, which was evidence from

Christy's residence, from Christy's vehicle, and from Christy's cellular telephone; DNA evidence

from Christy, and Christy's interview.  Although the United States presented several scenarios of

how law enforcement officers would have obtained a warrant, the Court does not believe that this

multiple choice presentation prevents it from applying the inevitable discovery doctrine.  It would

not make sense for two law enforcement agencies to obtain search warrants for the same evidence,

178 (Md. Ct. App. 1984)("[T]he only jurisdictional requirement imposed by § 551(a) is that the property to be seized be located within the territorial jurisdiction of the issuing judge. It is not essential that the crime alleged in the application for the search warrant be committed within the judge's territorial jurisdiction.").

and, as Adkins testified, in her experience, if both the FBI and a state agency have probable cause for crimes, both agencies do not obtain a search warrant.  See Aug. 3, 2011 Tr. at 11:12-19 (Rees, Adkins).

This case is unlike the scenario in United States v. Owens, where the Tenth Circuit declined to apply the inevitable discovery doctrine to the search of a motel room.  See 782 F.2d at 151-52. In United States v. Owens, police arrested the room's occupant, entered the room, and then opened and searched a drawer as well as a closed bag inside that drawer, discovering illegal drugs.  See 782 F.2d at 148-49.  Although marijuana, white power, and drug paraphernalia were in plain view, and the police had full control over the room, they did not make an attempt to seek a warrant.  See 782 F.2d at 149.  Declining to apply the inevitable discovery doctrine, the Tenth Circuit concluded that the illegal searches of the drawer and bag "tainted the only police investigation that was ongoing." 782 F.2d at 152.  Thus, there did not exist any prior and independent investigation that would have inevitably led to discovery of the concealed illegal drugs.  See id. at 152.  The Tenth Circuit concluded that "the inevitable discovery exception to the exclusionary rule cannot be invoked because of the highly speculative assumption of 'inevitability' that would be required to apply it." 782 F.2d at 152.  Unlike United States v. Owens, there was a prior and independent investigation -- an investigation in Westminster California -- before BCSO deputies began their investigation. Although the BCSO deputies' action tainted their investigation, it did not taint the investigation of the detectives in California, such as Carvo, who had strong probable cause and would have asked BCSO or the Albuquerque FBI to obtain a warrant, and, who would have sought a warrant himself had BCSO or the FBI not obtained a warrant.  The Court thus finds United States v. Owens distinguishable.

Because "a proper consideration of the relevant factors convinces [the Court] that the

challenged evidence would inevitably have been discovered by independent lawful means," the Court will apply the inevitable discovery doctrine.  United States v. Souza, 223 F.3d at 1206.

**IT IS ORDERED** that the United States' Motion to Reconsider Suppression Order *(Doc. 127)* and Reopen the Suppression Hearing, filed June 9, 2011 (Doc. 133), is granted in part and denied in part.  The Court reopens the suppression hearing and will, pursuant to Plaintiff United States of America's request, reconsider its Amended Memorandum Opinion and Order, filed May 25, 2011 (Doc. 127).[12]  The Court does not change anything in the Fourth Amendment search and seizure analysis in the May 25, 2011 Amended Memorandum Opinion and Order, but will change the order parts in light of the new and/or more fully developed argument and evidence on the inevitable discovery exception to the suppression rule.  The Court finds that the United States did not mistakenly concede that, when deputies looked through a crack in the blinds, it was a search; the peering through the cracks in the blinds was a search and, because it was warrantless, was an unconstitutional search.  The Court will apply the collective-knowledge doctrine to its analysis of exigent circumstances and probable cause.  The Court finds that exigent circumstances would not have justified the deputies' entry into Christy's residence.  The Court will, however, consider the United States' new or more fully developed arguments on the inevitable discovery exception to the suppression rule in opposition to the motion to suppress and will deny the Defendant's Motion to Suppress Evidence and Statements, filed February 14, 2011 (Doc. 41), because Orange County Investigator Paul Carvo would have obtained search warrants and inevitably discovered the evidence the Court earlier suppressed.

---

[12] The Court attempted to address every theory of inevitable discovery that the United States advanced and believes it sufficiently addressed each theory of which it was made aware.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Kenneth J.  Gonzales
  United States Attorney
Charlyn E. Rees
Holland S. Kastrin
  Assistant United States Attorneys
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

Lee P. McMillian
Law Offices of Lee McMillian, P.C.
South Houston, Texas

     _Attorney for the Defendant_