Hon. James O. Browning
United States Courthouse
333 Lomas Blvd NW, Ste 660
Albuquerque, NM 87102

26 June 2012
10-01534-JB

Your Honor:

I submit this petition to the Court to request that it open a judicial investigation into prosecutorial misconduct. Since this unethical and criminal activity involves both federal and state Executive Branch entities, only a judicial authority could be assured to maintain the requisite independence and objectivity. On the surface, these activities may appear to be a state issue, in that they involve charges brought by the State of New Mexico. However, these charges were brought at the behest of, and in collaboration with, a federal prosecutor solely to provide the federal government with a seven month headstart, a tactical advantage over the defense, and to manufacture a predicate felony for the federal transportation charge, which was unsupported and later dismissed.

While prosecutorial actions were most egregious in my case, in that they involve false charges and withholding of material evidence from the state grand jury, collaboration to use state prosecutorial authority to unethically advantage federal prosecutors has been employed in cases other than mine. I was charged by the State of New Mexico with two counts of criminal sexual penetration in the second degree, and with four counts of producing child pornography. At the time of the indictment, prosecutors had affirmative evidence that the alleged crimes had not even happened; not merely a case of insufficient evidence to support the allegations. These charges were brought in collaboration with AUSA Charlyn Rees to justify an unreasonably high $200,000 cash bond. This denied me liberty, due process of law, and irreperably prejudiced my defense against subsequent federal charges.

Included with this petition are several articles which describe both

the prejudicial implications of the prosecutorial misconduct, and a more accurate account of events than has been presented by the prosecution. Although the intended focus is on the effects of the misconduct, some background information not directly related to the misconduct was unavoidable. I realize that with this genre of crime, some prosecutors believe it permissible to suspend the Rule of Law, or consider it a quaint concept. However because of the emotions generated in such cases, Justices Stewart and Stevens wrote that it is precisely this emotional content "that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all" (Nix v Williams, 467 US 431, 451, 1984). This prosecutorial team has maintained a resolute disregard for those guarantees.

If the Court determines that a judicial inquiry is not warranted, I ask that this petition, and the enclosed articles be entered into the record for use in any subsequent judicial actions.

Respectfully,

*Edward S. Christy*

Edward Christy
TCDF, 1707496
Box 837
Estancia, NM 87016

encl:
    Misconduct and Prejudice  (2 sheets)
    Internet History  (2 sheets)
    Instant Case  (2 sheets)
    Pre-sentence Report  (1 sheet)

Misconduct and Prejudice (1):

At my sentencing hearing, Mr. McMillian raised the issue of the New Mexico charges, which were dismissed when the state's speedy trial limit expired. He requested, and was denied, that references to these charges be removed from the plea and the PSR. The Court rightly concluded that the charges were an historical fact, and should be noted as such. However, the Court has never been informed as to the circumstances surrounding those charges.

Two undeniable factors, which are supported by evidence, form the basis to question the validity of the charges: 1) that prosecutors had evidence at the time of the indictment that the crimes had not even occurred, and 2) that the federal prosecutor colluded with state prosecutors in the bringing of those charges. These charges were criminal sexual penetration in the second degree, and the production of child pornography. As noted previously by this Court, if consentual sex had occurred, it would not have been unlawful under New Mexico law. I find it curious that AUSA Rees still felt it necessary to defend that charge as late as the sentencing hearing; even misquoting the New Mexico statute in order to do so. The production charge was simply manufactured to support Deputy Littlefield's completely erroneous assertion of camera flashes, which in turn was used to justify the warrantless assault on my home. I had taken a single non-pornographic photo of Kyra. At the time, she was slicing vegetables after I'd taught her how to properly use a kitchen knife. The focus and look of accomplishment on her face deserved a photo. Prosecutors have admitted this photo was non-pornographic, it did not show genetalia, and she had chosen to wear the "chamber maid" costume which had been provided by her father. Kyra has confirmed that paternal gift in one of her statements to investigators, I believe.

In short, the two charges mentioned above were both baseless, and obtained as a result of criminal misconduct in that prosecutors withheld exculpatory material evidence from the grand jury. That evidence included the fact that I had taken no pornographic photos of Kyra or anyone, adult or minor; the age of consent in New Mexico, and that if consentual sex had occurred,

Misconduct and Prejudice (2):
it would not have been unlawful; that Kyra's response to the question of whether I'd forced her to do anything she did not want to do, sexual or otherwise, was "No, He was really sweet." The production charge was totally fabricated, and any CSP charge was, as previously found by this Court, baseless. No plea was offered by the state, and even though the defense had declared itself ready for trial, the prosecution never requested a trial date. The state simply had no intent to prosecute.

The fact that this state scenario was orchestrated at the behest of AUSA Rees in order to provide the federal government with a 7-month headstart on the defense is supported by evidence already in the record. This unethical tactic by the prosecution caused permanent prejudice to my federal defense. That prejudice was evident from the detention hearing. Because federal prosecutors had not provided the defense with any discovery, Mr. McMillian was unable to refute the numerous unsubstantiated and intentionally misleading innuendos offered by the prosecution. Having gone unrebutted, they were credited as statements of fact in the Court's decision. Indeed, complete discovery was not supplied to the defense until well into the next year. Additional prejudice resulted from my inability to meaningfully participate in my own defense for those seven months, that I was unable to work and earn funds for my defense, was forced to spend nearly $30,000 defending against charges which the state had no intent to prosecute, and from the manufactured predicate for the initial federal charge. Under state law the defense was entitled to an interview with Kyra, which would have provided much exculpatory evidence. Although the trial judge was attempting to arrange an interview, ADA (now Judge) Brett Loveless withheld information that she would be in Albuquerque a mere 12 days later for a federal grand jury. This delayed the possibility of an interview until after the date that prosecutors had planned to place me in federal custody. That was no accident.

Had state and federal prosecutors acted truthfully, ethically, and within the law to only bring charges for which evidence existed, this case would have been concluded long ago; avoiding unnecessary demands on this Court as well as great expense to both the defendant and the taxpayers. I do not

2

Misconduct and Prejudice (3):

believe that absent the prosecution's constitutional violations, the government would have had a clear path to the initial federal indictment, a conviction, or the leverage needed to extract a plea. By conspiring to deny my 5th, 6th and 8th Amendment rights, the prosecution virtually assured that the truth of this case could never be recovered. The seven month delay diminished Kyra's memory of events due to the passage of time, psychoactive medications, and perhaps induced memories. Had I not been unconstitutionally denied a reasonable bail, I would have been in a position to scrutinize discovery word-by-word and frame-by-frame with a knowledge of events that only I possessed. I realize that many accused are denied that ability. But my denial was achieved unlawfully. The defense may well have prevailed on the state charges, but was denied the opportunity through federal-state collusion. The CSP charge was known to be false, the production charge was entirely manufactured, and the greater protections of the New Mexico Constitution would have provided additional relief.

When prosecutors chose to disparage my constitutional rights, they injected ambiguity and uncertainty as to the facts of the case, and to its ultimate outcome. Had the government not intentionally engaged in constitutional violations, any question of guilt or innocence would have been a function only of verifiable evidence, which could have been considered by an objective finder of fact. The prosecution has done nothing to mitigate the uncertainty it created through those constitutional violations. As written by Justice Stevens in Nix v Williams (467 US 431, 457, 1984), "...to the extent uncertainty was created by the constitutional violation, the prosecution was required to resolve the uncertainty through proof." Mine is not simply an instance of aggresive prosecution or an inadvertent error, but an intentional subversion of the judicial process. At minimum, the government should be required to provide justification for the two New Mexico felonies which formed the foundation for subsequent federal actions.

Internet History (1):

Building on the un-rebutted misinformation provided at the detention hearing, the prosecution has gone to great lengths to portray my internet activity in a nefarious light. AUSA Rees has made claims that I had been meeting minors online for sex. She has produced no evidence to support her assertion simply because no meeting ever happened, not once. The best this prosecutor could do was to insinuate that the comment "not far by airplane" in one of her exhibits was an offer to visit. Any objective reading would show that comment was a parenthetical remark akin to, "Hey, that is within walking distance." Also, the remark was made prior to any mention of age, and it was obvious that this person was an adult posing as a 12-year-old girl in order to obtain photos. Not only were these repeated requests denied, but the party alleged to be me insisted that he did not trade photos. Ms. Rees claimed to have evidence that I had traded child pornography, but has produced none. I know that she could not provide proof of a single photo that I had traded. Additionally I believe that if she could, there would have been no hesitation to charge me with receipt and distribution, which she had not. The prosecution asserted that I had searched the internet to obtain child pornography. Googling about the problem of child pornography is not equivalent to looking to obtain pornography; nor had I entered any web sites which might offer such material. The prosecution pointed to chat groups I allegedly joined. However, it failed to demonstrate any participation other than possibly observing the activity.

Although I can not stipulate to specific chat content, I have interacted with diverse individuals regarding a variety of topics. Perhaps I should not have played at being an internet detective. Perhaps I should not have allowed conversations to, at times, sink into some rather low topics and remarks. That chat was never with minors, nor was it fantasy or roleplay. These conversations were intended to gain confidence and candor from others. Verifying a person online is a task that is easy only for police with subpoena powers. Otherwise, it is a laborious effort requiring an extended period of time. I notified authorities a number of times when I both believed a genuine minor was in trouble, and I had enough information to locate the person with

5

Internet History (2):
Only a modicum of effort by authorities, I believe that three of these incidents can be validated. Each time I notified authorities, I was rebuffed, and no action was taken. This is similar to the inaction in my case by the government where, if they actually believed the alleged chat to be real, they may have had a treasure trove of leads to both minors in trouble, and to real abusers. However, no leads were followed.

A 16-year-old in Portland confided in me that she was being drawn into prostitution out of economic desperation. Authorities declined to act even though I provided enough data to locate this girl. They can not be blamed for her subsequent pregnancy or miscarriage, but they didn't help either. How many 15-year-old girls could have given birth in Toronto during a specific 3 month period? A detective there said she simply did not have the manpower to follow up on every lead like mine. A 15-year-old girl near Louisville was shocked when I showed her a Google Maps picture of her house, and warned her to leak fewer clues when online. She was looking for men, and one might just find her. She abruptly cut off contact when I suggested that at 15, having been with 9 men was something she might want to reconsider. I had police in Texas notified after a girl there declined my urgings to call them herself. In my internet use, there are many cases of helping, and none of my meeting minors.

There were no "sexually explicit" conversations with minors in the sense of discussing sexual acts between us. Frank and open conversations about their situations vis-a-vis abuse at home sometimes transpired. These were informational in content and not titilating. Though she portrayed herself to be 18, this is even true in the conversations with Kyra which were entered into evidence. In the very few instances where explicit sexual references are evident, they were initiated by her. I was always able to deflect those within a few sentences. My interest was in determining her truthfulness, and the extent of the abuse she was experiencing, or had experienced, at home.

Regarding my intellect, the prosecution wants to have it both ways. Ms. Rees would have me be so shrewd that I evaded capture for years,

Internet History (3):

yet stupid enough to have made no attempt to cover my tracks in Kyra's case, leaving a trail a blind man could follow. I'm an electrical engineer. I know how internet service providers assign IP addresses. I know how cell phones login to towers. Had I intended something nefarious, I would have made all internet contacts from various WiFi hotspots. I would have purchased a "throwaway" phone at Walmart. I certainly would not have looked for minors on a dating site for adults, of which I was a paying member. The site had my credit card information. The prosecution believes I was smart enough to avoid all internet police traps, yet I was so incompetent that I was never able to connect with a minor. The prosecution's scenario requires a certain cognitive dissonance. The simplest answer to that conundrum is that I wasn't looking to meet minors. That is both the simple and the true conclusion.

Instant Case (1):

As stated by AUSA Rees at a summer 2011 hearing, and as testified to by a nationally recognized psychological expert in the field, I am neither a predator nor a pedophile. The prosecution's anecdotal narrative about me is a direct extension of the fraudulent state charges brought against me. They were the foundational "big lies" which made subsequent unsubstianted assertions and innuendos sound plausable.

I will explicitly state that I am neither confirming nor denying the element of intent as specified in the charges to which I pled. However, I will say that I had no intent to bring Kyra to New Mexico, except as a last option, and certainly not to have sex, muchless to commit CSPII. I will go so far as to say that I never initiated sex; I stopped sex; I avoided sex and do not believe that I legally consented.

Regarding initiation, in discovery it was stated that Kyra said she initiated sex. In the same document it was reported that she told of the incident where I woke to find her performing fellatio, which I stopped. When she protested that I'd not ejaculated, I spoke of the Chinese Taoist medical belief that men can reach orgasm without ejaculation. This seemed to placate her concern for me. In the same document, Kyra was reported to have confirmed the events of Monday morning. The alarm sounded at 6AM, when I woke to find a lovely, naked young woman cuddled up to me. I avoided sex by leaving bed and suggesting we begin our day in the hottub, which was my habit, and then have breakfast. Even though sex would have been legal, that was not why Kyra was in New Mexico. There was no sex on Monday.

The question of consent requires some background. When Kyra and I arrived in Albuquerque, we shopped for dinner, cooked dinner, ate and cleaned up. Kyra had slept, was not tired and asked to watch some pornography. To her surprise, I had none. Of more than 300 DVDs, the closest I had to the "bachelor party" variety she wanted was a single DVD, which has been described by some as "erotica." That did not interest her, so she asked me

Instant Case (2):
to put on a mainstream film called "Orphan", which she had brought. At that point, I had been up for 40 hours, had driven 24, had just finished a meal, and the coffee was wearing off. Sex was not on my priority list, but sleep was.

When the movie began, I lay down on the couch and immediately fell into a deep, deep sleep. I was not nude at the time, but was probably in boxers and a t-shirt, which is my typical at home relaxing attire. From that point, about 10-11 PM, until Monday morning, I have only intermittent, "tunnel vision" waking memories. It was from these and what Kyra told me the next day, that I merely concluded that sex may have occurred. I have, and had, no direct memory of sexual activity. One of the intermittent memories was waking briefly to find an erection with a condom, which I removed. That was the single condom reported by BCSO. If I recall, tests did not exclude either Kyra or myself as DNA donors. However, tests for semen were inconclusive, so I assume there was no ejaculation. I will not burden the Court with other graphic snippets of memory, and I apologize if I have offended. Due to my sleep-deprived diminished mental capacity, I am not sure I consented to having sex, if it had occurred.

Ms. Kastrin stated that the prosecution "believe[s]" that I knew of Kyra's age from the beginning. Kyra portrayed herself to me as an 18-year-old who was desperate to leave an emotionally, psychologically, and sexually abusive homelife. It was only a few days before I picked her up that I learned the truth of her age in a phone conversation. The prosecution bases its belief on a single statement from Kyra that she "told them all" her true age. The term "them all" refers to the numerous men on multiple websites, whom she was enticing to take her away. There is no indication that I was specifically told. I also point out that Kyra admitted to being desperate to leave home, of lying to me, and to telling "him what he wanted to hear." What I "wanted" to hear was that she was an 18-year-old who needed help, and that is what I was told. Although I was not informed of this, she later told police she was taking medications for "delusional thinking."

Kyra was desperate to leave a homelife that distressed her enough to

Instant Case (3):

attempt suicide on numerous occasions, engage in self mutilation, and to put herself at the mercy of the streets. She later told police that her father had threatened to put her in an asylum, which is why she wanted to leave. However in addition to what I was told, there are significant indications of molestation. Kyra arrived with two bags containing lingerie, corsets, various costumes and frilly Victorian items, none of which she could wear in public. As she stated, I bought her a dress at Walmart to give her an alternative. She also had an assortment of dog collars, leashes and something she termed a "posture collar"; which she described as a device to immobilize a person's neck and head. In his investigation, Mr. McMillian discovered some disturbing insights into the family. The father's vanity license plate is "BEAST66". More to the point, his wireless router name is, or was, "essnemm." By any phonetic pronunciation, this is the same as "S&M," a common contraction for sadism and masochism. The family website had a photo of a young Kyra "milking the cow." That is, she was tugging on the human-sized nipples of two inverted baby bottles. Mr. McMillian later confirmed that is a term commonly used in the S&M community to describe the act of milking a human female. I believe Kyra had a good reason to lie in order to escape. When asked why she had not called someone, she replied that she only wanted out, and did not want to get her family into trouble. As an aside, I find it disturbing that she was returned to that environment along with her 13-year-old sister, without so much as a social worker being informed of possible abuse. That was despite police being aware of much of this from Kyra's statements and journal.

When I discovered Kyra's true age, I sent an email calling off the meeting. I did not hear from her the next morning, nor could I reach her on the phone. She had spoken of suicide on a number of occasions, and I felt at least partially responsible for her emotional condition. I made the snap decision on Saturday morning to at least drive out when I could not contact her. I had already arranged to stay in California for two days, when I believed Kyra to be 18. My intention was to resolve her situation while there, only taking her to New Mexico if that failed.

The prosecution claimed that I had solicited pornographic photos from

Instant Case (4):

Kyra, though I had not. I once requested a non-pornographic photo to help confirm her identity. The pornographic pictures were produced by Kyra's 13-year-old sister and distributed to me and at least one other male. As verified by an email, these were not requested or sanctioned by me. Again, this was when I still believed her to be 18.

Prosecutors asserted I'd removed the battery from Kyra's phone so that she could not be traced. As mentioned in one of the prosecution exhibits, Kyra intended to destroy her phone to avoid detection. When she got into the car, she asked me to crush it. I suggested she hang on to it in case she wanted to call her parents. She replied that she never wanted to call them, and repeated her request. I finally convinced her that removing the battery would disable detection, thus saving her phone.

Prosecutors claimed that I had sent Kyra instructions regarding how to obscure her trail. I had not, I don't believe. Prosecutors produced a printout of a file allegedly found on my computer, and simply declared that it was an email. However, unlike the "Dear Jane" and "resume" emails which I sent, this third printout had no email header. Even if it had been sent, it would have been while I believed her to be 18.

Pre-sentence Report (1):

When I was finally able to read the PSR in early February 2012, I was astounded by the amount of inaccurate information that it contained. Much was recycled from the detention hearing which, as asserted in the "Misconduct and Prejudice" article, was irreperably tainted by the fallout from the fraudulent state charges. Mr. McMillian addressed the major misstatements in the objections to the PSR that he filed. However, I wish to refute a number of seemingly small inaccuracies, which are intended only to inflame rather than to inform readers, and to prejudice the Court, Bureau of Prisons and probation officials.

- "...admitted he performed oral sex..." (Item 19) That admission was never made. Rather it was only Detective Proctor's interpretation.
- "...having her touch and rub his penis." (Item 19) This is simply a lie on the part of Detective Proctor. I had repeatedly denied any memory of such actions. One can only assume the detective decided to include that statement anyway because it sounds so tawdry, and may elicit an emotional response.
- "...buying dog cages and bondage items to satisfy Jane Doe's sexual fantasies." (Item 19)
  - Bondage items were not purchased, nor was any purchase referenced in discovery.
  - Kyra clearly requested the dog crate to sleep in, not for sexual activity. This request is reflected in discovery, and there was no sexual contact in the cage.
  - "...Jane Doe's sexual fantasies." This is simply editorial license on the part of the probation department.
- "...wearing only underwear." Kyra was wearing the "chamber maid" costume that was purchased for her by her father. This is reflected in Kyra's statement.
- "...cyber sex with a webcam." (Item 19) I did not participate in cyber sex with either a webcam, or by voice. I don't believe textual conversations would fall into this category either. This was simply a gratuitous assertion that has no

Pre-sentence Report (2):
  basis in either fact or discovery, and is a perfect example of the intentional disinformation offered by the government.
- "...sex... which included bondage." (Item 20)  There was never any sex with bondage, nor was such activity referenced in discovery.
- Substance abuse (Item 95) is nearly all invented. With the exception of trying marijuana at age 17, all the rest was imagined by probation, particularly cocaine and marijuana references. I did not admit to having an alcohol problem or that alcohol influenced my online behavior. Probation asked if it was a possibility that alcohol had played a role, and whether I would be willing to attend counseling regarding that topic. I did not deny it was possible, and was certainly happy to explore the subject. The numbers "12 to 24 beers" per weekend was totally a probation fabrication, which is a far cry from my actual habits.
- "...inserted a 'butt plug' to 'make her last longer'." (Item 26) Kyra stated in her grand jury testimony that she had inserted this item. This is consistent with her having inserted what she termed a "medicine ball" when pictures were taken by her younger sister.

Edward Christy
TCDF 1702496
Box 837
Estancia, NM 87016

Hon. James O. Browning
United States Courthouse
333 Lomas Blvd, NW, Ste. 660
Albuquerque, NM 87102

INMATE CORRESPONDENCE



