**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 0 4 2014

**MATTHEW J. DYKMAN**
**CLERK**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Respondent, | ) |
| v. | ) Crim. No. CR 10-1534 JB . |
| EDWARD CHRISTY, | ) |
| Defendant-Petitioner. | ) |

MOTION FOR LEAVE TO PROCEED PRO SE; AND

MOTION FOR RELEASE PENDING APPEAL

RELIEF REQUESTED

Now comes Edward Christy, pro se, and moves this Honorable Court to:

1) grant the movant's release pending resolution of the decision by the Supreme Court, and any resultant proceedings in the lower courts; and

2) to consider and enter into the record the documents included with this motion, i.e.,

    a) Appendix A: Document in Support of Motion

    b) Appendix B: Movant's initial letter, with enclosures, to United States Attorney (USA) Kenneth Gonzales requesting charges of perjury be brought against Deputy David Littlefield of the Bernalillo County Sheriff's Office (BCSO).

    c) Appendix C: Movant's second letter to USA Gonzales expanding the investigatory request to include crimes committed by Assistant United States Attorney (AUSA) Charlyn Rees and others;

3) to allow this motion to proceed pro se; and

1

4) to order production of discovery as requested in Appendix A, pp 10-11, and that the Court rule on this discovery request independent of its determination regarding release.

BASIS FOR RELIEF

In accordance with 18 U.S.C. §3143(b), the Court may order release pending appeal or a petition for a writ of certiorari if the judicial officer finds --

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community, and

(B) that the appeal is not for the purpose of a delay and raises a substantial question of law or fact likely to result in --

   (i)   reversal,

   (ii)  an order for a new trial, or

   (iii) a reduced sentence to a term of imprisonment less than the total time already served plus the expected duration of the appeal process.

A petition for a writ of certiorari was filed by counsel with the Supreme Court of the United States on 27 May, 2014.  The petition before that Court addresses substantial constitutional questions, which are essential to Fourth Amendment jurisprudence.

JUSTIFICATION

Leave to Proceed Pro Se:

Although the movant is represented by counsel, after five (5) years of fighting criminal charges, defense funds have been exhausted.  My counsel, Mr. Lee McMillian, must focus efforts on the petition for a writ of certiorari and the subsequent brief.  This effort has been further compromised by the

2

unfortunate death of Mr. McMillian's brother, during the week of May 12, 2014.
Given these factors, the movant is compelled to proceed pro se in this motion,
and petitions the Court for leave to do so.

Release Pending Appeal:

The Supreme Court is being asked to determine whether the extreme expansion
of the inevitable discovery doctrine by this Court, as upheld by the Tenth
Circuit Court of Appeals, will be sustained.  That expansion of the doctrine
is at odds with virtually all of the other circuits in that the decision was
based solely on disputed probable cause, and on assurances by police that
they would have acted properly had they not chosen to avoid the warrant require-
ment of the Fourth Amendment.  The government stipulated to a joint investi-
gation, and offered no evidence of steps taken to obtain a warrant, or any
other demonstrated historical actions by police to support government assert-
ions of inevitability.

As subsidiary matters, the Supreme Court may choose to address three other
essential concerns:

1) Whether members of a single investigative team can be considered
   "wholly independent" of one another for the purpose of applying the
   independent source or inevitable discovery doctrines.

2) Whether an officer's mistake of law can provide a legal, objectively
   reasonable basis for an otherwise unconstitutional search and seizure.

3) Whether probable cause for a violation of 18 U.S.C.§2422(a), or
   18 U.S.C. §2423(a) can be sustained when there exists no underlying
   "sexual activity for which any person can be charged with a criminal
   offense," i.e. NM Stat. Ann. §30-9-11(G).

If that Court decides favorably regarding any of these issues, the result
is likely to result in a reversal of my conviction, or a sentence below that
which I have already served.

Risk of Flight:

I pose absolutely no flight risk because; a) I intend to stay and fight this case until every legal option is exhausted, 2) I have already served over one half of the sentence imposed by this Court, 3) the government has confiscated my passport, and 4) I have extraordinary connections to the city of Albuquerque.

My residency in Albuquerque bagan in 1961, and was interrupted only twice. The first was for three years from 1968 to 1971 after my mother was remarried. Other than this current period of incarceration, the only other interruption was during six years of military service, when the city was my home of record. I graduated from the University of New Mexico in 1986, have since spent my entire working life in Albuquerque, and have owned three homes there. I currently have two sisters, as well as adult nephews and nieces living there. The city has been my home for well over half of my life.


Risk to the Community:

I represent no danger to any individual or to the community.  In its zeal to portray me in a nefarious light, the government offered only conjecture as to past behavior, non-corroborated innuendos, assertions of phantom victims and, in at least one instance, perjured testimony.  In collaboration with AUSA Charlyn Rees, I was indicted by the State of New Mexico for the production of child pornography, when that charge was known by all to be demonstrably untrue.  This cabal, led by AUSA Rees, also obtained a state indictment for criminal sexual penetration when, as determined by this Court, consentual sexual activity, even if true, would not constitute a crime under New Mexico law.  However, either charge could provide the predicate crime required for a federal indictment under 18 U.S.C. §2423(a).  Descriptions of the government's

criminal and ethical abuses are outlined in Appendix A, and will not be re-iterated here.

The government offered no categorical or particularized documentation to support its assertion that I represent a danger.  Recidivism for those convicted of sex offenses is among the lowest for all criminal categories. Depending on which figures are to be believed, this ranges from 9% to 15%. That is contrasted with those for drug related offenses, which are in excess of 50%.  Even at 15%, that small section of the bell curve includes those who have permanent psychological damage, are sociopathic or unrepentent pedophiles.  There is simply no credible statistical or psychological evidence to indicate that sex offenders represent an elevated threat to society.

Nor did the government introduce evidence or testimony to refute my psychological profile as determined by Dr. Carmen Petzold, a nationally recog-nized expert regarding sex offenders.  At sentencing, Dr. Petzold presented results derived from a battery of tests which are widely acknowledged by the psychological community, and from fourteen (14) hours of personal interviews with me.  Even after adjusting for the government's requests for corrections, Dr. Petzold reported my risk for recidivism as among the lowest she had ever seen.  The government's only tangible response was to wave in the air  a report written at the Bureau of Prisons (BOP) facility in Butner, SC.  This was a non-scientific "study" which did not employ a statistically valid population sample, had no control group, has not been peer reviewed, and thus remains unvalidated.

I submit to the Court that my total lack of any criminal record, an unbiased psychological evaluation indicating a near zero probability for recidivism, and favorable categorical statistical indicators, overwhelm prosecutorial conjecture.

Request for Discovery:

As outlined in Appendix A, government agents from various jurisdictions engaged in criminal and ethical violations.  These involved perjury, conspiracy, and obstruction of justice.  Although the existing record contains sufficient indicators of these crimes, the Court may find corroborating evidence in the discovery requested in Appendix A, pp 10-11.

Despite repeated requests to USA Kenneth Gonzales to open an inquiry into these matters, he has declined.  Whether these refusals are a legitimate exercise of prosecutorial discretion, or an attempt to cover up criminal activity within his office, is not a question I can answer.  However, the requested discovery should clear up many uncertainties, and I petition the Court to order that the requested discovery be supplied to the Court and to the defense.

Conclusion:

In developing the Court's perception of my character and danger to society, the government itself engaged in criminal and unethical behavior.  Whatever our criminal justice system is to become, it can not be that the government is allowed to deceive the courts with impunity, and to cover up its own misconduct, simply in order to chalk up a win.  If history teaches anything, it is that a government must not be allowed to use a despised population to erode the rights of all.

I petition the Court to consider the enclosed documents, and to grant the relief requested in this motion.

Respectfully submitted,

Edward Christy
54280 051
F.C.I. Elkton
P.O. Box 10
Lisbon, OH 44432

NOTICE OF SERVICE

I HEREBY CERTIFY that on *June 2, 2014*, I placed the forgoing pleading

in the institutional mail system at F.C.I. Elkton, addressed to

Kenneth Gonzales
United States Attorney
P.O. Box 607
Albuquerque, NM 87103


*Edward S. Christy*

Date: *June 2, 2014*



encl:
    Appendix A: Document in Support of Motion (20 pages)
    Appendix B: Initial Letter (with enclosures) to USA Kenneth Gonzales
    Appendix B: Second Letter to USA Kenneth Gonzales


cc:
    Mr. Lee McMillian
    507 Nebraska St.
    South Houston, TX 77587

# APPENDIX A

## DOCUMENT IN SUPPORT OF MOTION

**Table of Contents:**

Opening Remarks ............................................... ii

Introduction .................................................. ii

Section I

1) Conspiracy to Deny Constitutional Rights ................... 1

2) Denial of Due Process of Law .............................. 4

    a) Pretextual Custodial Detention and Interrogation ....... 4

    b) Denial of Sixth Amendment Right to Counsel ............ 5

    c) Fraudulent Search and Arrest Warrants, Malicious Prosecution ... 6

    d) Manipulated Grand Jury, False Imprisonment,

       and Obstruction of Justice ........................... 6

    e) Excessive Bail ...................................... 7

3) Excessive Force Under Color of Law ........................ 8

4) Request for Discovery ..................................... 10

Section II

1) Introduction ............................................. 12

2) Online Activity .......................................... 12

3) Chat .................................................... 14

4) Government Mendacity ..................................... 15

5) Conclusion .............................................. 17

**Opening Remarks:**

Movant petitions the Court to accept and to consider this document in con-
junction with the movant's instant motion.  In the preceeding years, the movant
has become incrementally aware of a variety of actions by government agents
that are illegal or unethical.  The Court must certainly appreciate the
difficulty of performing an investigation while one is incarcerated.  Access
to both legal documents and evidence is severely restricted.  This is partic-
ularly true when one is held in "protective custody" involving 23 hour per
day lockdown with severely restricted communications -- a condition exper-
ienced for over two years.  Transfers between institutions always involve dis-
rupted access to documents and, in some cases, legal materials cannot be trans-
ferred, or are simply lost.  It has only been since June 2013 that the movant
has been in a stable environment with consistent access to legal research,
the ability to receive and retain evidentiary materials, and reasonable access
to counsel.  In that period, the movant has developed an understanding of
long-suspected government misconduct, which is summarized here.

**Introduction:**

In response to Judge Learned Hand's exhortation to "[d]o justice," Justice
Oliver Wendell Holmes retorted, "That's not my job.  My job is to play the
game according to the rules."  Whether or not one agrees with Mr. Justice
Holmes, prosecutors in the instant case embraced neither of those judicial
virtues.  Rather, a desire to win at any cost trumped both due process of law
and the "special role played by the American prosecutor in the search for
truth" in criminal proceedings.  Although the Supreme Court has not explicitly
extended this mandate to police, the Sixth Circuit Court of Appeals has said,
"the police also play a unique and significant role ... and are thus also
bound by the government's constitutional obligation to insure that a miscarriage
of justice does not occur" (Moldowan v City of Warren, 573 F.3d 309, 336 (10th,
2009)).  In the instant case, police and prosecutors at both the state and
federal levels consistently and deliberately subverted the judicial process.

This document is divided into two sections.  The first systematically chron-
icles, to the best ability of the movant, specific illegal and unethical
abuses of process by government officials.  The second section illuminates

and attempts to debunk government assertions which, while perhaps not unlawful, are prejudicial, untrue and generally not probative in the government's case in chief.

This document and its associated motion are neither superficial, frivolous nor motivated solely by the movant's desire to prevail in the instant case. As a former Army officer, the movant once took an oath to defend the Constitution against domestic as well as foreign enemies.  One would be hard pressed to find a better definition of a domestic enemy of the Constitution than a prosecutor who uses her, or his, constitutional authority to unlawfully deprive fellow citizens of rights guaranteed by that very document.  It makes little difference whether prosecutors were motivated by ambition, zealotry, or perhaps some higher motive.  As written by the Supreme Court in Napue v Illinois, 360 US 264 (SC, 1959), "[a] lie is a lie, no matter what its subject ...." Movant is aware of the government's formidable arsenal of vindictive prose- cutorial tools, but believes events must be brought to light in order to maintain the integrity of the judicial process.

Section I:

1) Conspiracy to Deny Constitutional Rights

Movant contends there was (and is) an active conspiracy to deprive the movant of rights secured by the Constitution of the United States under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.  The conspirators include AUSA Charlyn Rees, Judge (then ADA) Brett Loveless, ADA Lisa Trabaudo, FBI Special Agent Mary Adkins, Detective Paul Carvo, Detective Weylen Proctor, Deputy David Littlefield, and other unnamed conspirators.  Conspiracy is not a singular event; rather, it constitutes an ongoing offense, which can be presumed to continue until contrary is proven.  Questionable conduct was displayed as late as a suppression hearing held on Sep. 3, 2011, and at a sentencing hearing held on May 28, 2012.  In the former, Deputy David Littlefield clearly offered perjured testimony.  At the latter hearing, AUSA Rees persisted in her ruse that the movant had committed a sex crime, i.e. Second Degree Criminal Sexual Penetration.  This was long after being advised by the Federal District Court that such a crime could not have been committed under New Mexico law, i.e. NM Stat. Ann. §30-9-11(E)(5).

There can be little doubt that New Mexico state prosecutors, specifically (then) ADA Brett Loveless, brought manufactured charges which were known to be false, pursued a malicious sham prosecution, arranged for an unreasonable bail, and withheld material exculpatory evidence from a grand jury.  This was a very high profile case due mainly to a media campaign by former sheriff Darren White.  As such, it is highly unlikely that ADA Loveless made those decisions unilaterally in a vaccuum.  Of particular relevance to the Court in the context of this motion is the extent of federal collusion, and whether the illegal actions by the State of New Mexico were merely a ruse which was contrived with a purpose to illegally advantage a federal prosecution.  Such an arrangement by the federal government would not only be a misuse of the dual sovereignty doctrine, but would constitute an intentional federal denial of constitutional rights.  These questions can be answered with existing evidence in the record, by requiring testimony, and by examining communications records, i.e. emails and phone records.

Currently there exists in the record considerable direct and circumstantial evidence to indicate federal involvement and intent.

1

- Special Agent Adkins was contacted by the New Mexico District Attorney's office (Lois Kinch) within minutes of the entry.

- Special Agent Adkins interviewed the movant's houseguest after what was ostensibly a state action.

- AUSA Rees admitted to involvement in deliberations regarding state charges and reviewed the state search warrant application.

- Special Agent Adkins testified that she was involved in the decision to obtain a state rather than a federal warrant.

- The two contrived state charges, i.e. second degree criminal sexual penetration, and the production of child pornography, could provide the predicate felony required for a federal indictment under 18 U.S.C. 2423(a), which required a New Mexico criminal sexual activity involving K.Y. Movant submits that those specific charges were manufactured for that purpose.

Circumstantial Indicators of a Federal Accomodation:

- Movant was held by the state precisely until its speedy trial limit expired before his transfer to federal custody.

- During those six months, the state never offered a plea nor did it enter into plea negotiations. The state never requested a trial date, even though the defense had declared itself ready for trial.

- ADA Loveless fought to delay defense interviews with K.Y. and deputies -- a right under New Mexico, but not federal law. Specifically, at an April 15, 2010 bond hearing, he contrived to postpone interviews until after the movant's federal transfer date. The trial judge was trying to expedite these interviews, and ADA Loveless withheld information that K.Y. would be in Albuquerque a mere 12 days later for a federal grand jury held on April 27, 2010.

- At a bond hearing the previous month (March, 2010) ADA Lisa Trabaudo argued for maintaining the $200,000 cash bond because, as she asserted, "we" have a grand jury scheduled for April, 2010, and "we" expect additional charges. She was referring to a federal grand jury, not to a state proceeding. Precisely who "we" were was not specified, but serves to indicate a federal nexus.

Detective Proctor testified to a conversation with Agent Adkins the night of the movant's arrest, in which he was informed that the BCSO was to take the lead because there were "insufficient criteria" for federal charges. On redirect, AUSA Rees attempted to discredit her own witness by pointing out that he had not been a party to the conversation between AUSA Rees and

Agent Adkins.  Thus he could not testify as to the content of that phone call.
However, in testimony, he had only relayed the contents of his subsequent
conversation with Agent Adkins.  Later, upon cross examination by Mr. McMillian,
Agent Adkins is recorded in the transcript as literally stammering a denial
of the contents of her phone conversation with Detective Proctor.  It is the
movant's belief that the bogus state charges were specifically contrived to
provide the missing criteria for federal charges, and as a ruse to unconsti-
tutionally detain the movant for the purpose of bypassing the requirements
of the Speedy Trial Act (STA).  The Tenth Circuit Court of Appeals agrees
with the majority of the courts that the so called "ruse exception" to the
STA applies when a defendant demonstrates that the primary or exclusive purpose
of a state detention is to hold the defendant for a future federal prosecution
(U.S. v Pasillas-Castanon, 525 F.3d 994, 996-997 (10th Cir., 2008)).  Movant
believes that these conditions have been met in the instant case.

The Tenth Circuit Court of Appeals has issued no decision regarding the ques-
tion of a predicate felony based on state law that does not proscribe activities
allegedly committed by the accused.  However, the Seventh Circuit Court of
Appeals informs that issue in U.S. v Taylor, 640 F.3d 255 (7th Cir., 2011),
in which it reversed a conviction and instructed the lower court to enter
a judgement of acquittal because the Indiana statutes did not describe "sexual
activity" within the meaning of 18 U.S.C. §2422(b).  The instant case does
not require such a nuanced reading of the law, because the activities alleged
in the state and federal indictments were simply not unlawful under NM Stat.
Ann. 30-9-11(E)(5).

Movant submits to the Court that this abuse of the dual sovereignty doctrine
by state and federal prosecutors is not an isolated incident, but represents
a repeated practice.  Movant is aware of at least one other case with a similar
profile.  In the 2010 case of Mr. Norman Elquest, state charges were used
to detain a suspect, with no apparent good faith prosecution, until the state's
speedy trial limit was reached; at which time, Mr. Elquest was transferred
to federal custody.  Movant is not privy to the details of the inter-jurisdictional
coordination in that case.  However, AUSA Rees appears to be the kingpin in
this collusive federal-state process.  Movant urges the Court to explore
Mr. Elquest's treatment if it believes that inquiry would illuminate circum-
stances in the instant case.

## 2) Denial of Due Process of Law

### a) Pretextual Custodial Detention and Interrogation

The illegal search and seizure of the movant's home was intentional, preplanned, intended only to detain the movant, and merely the first link in a chain to bring fraudulent charges. The relevant issue here is not the illegality of the search and seizure itself, but how government intentions and actions imply due process concerns. Deputy David Littlefield claimed to have seen camera flashes, when no pictures had been taken. In subsequent testimony, the deputy revealed that, before even reaching the property, he had somehow intuited the production of pornography, which was used as a pretext for the illegal entry. He was the only one of the initial three deputies who reported seeing camera flashes. Deputy Littlefield perjured himself when he testified to having seen the movant's computer through the window; thus attempting to bolster his false claim of seeing camera flashes. This testimony was demonstrably untrue, and was so noted by the federal trial judge. Without additional evidence in the form of testimony and emails, it is unclear whether this testimony was suborned by AUSA Rees, or whether the deputy offered the perjured testimony only of his own accord.

While ostensibly performing a protective sweep, which was not justified by any objective indication of other occupants or danger to officers, Deputy Littlefield stopped to report by radio that he had found "video recording equipment," which was merely home theater equipment. A protective sweep is explicitly not a search for evidence; which begs the question of why he felt compelled to radio in an erroneous report of recording equipment. The deputy also stated in his police report that there were cameras at the north and south ends of the room, which there were not. This fixation on cameras, Deputy Littlefield's testimony that he had arrived at the movant's residence already anticipating the discovery of child pornography production, the arrival within minutes of a backup force totalling 8 to 10 deputies, and the duty sergeant (Taylor) being "enroute" when she approved the invasion, all indicate the premeditated nature of the illegal search and seizure; even prompting the trial judge to rhetorically ask, "This wasn't a normal welfare check was it?"

Movant believes that there was BCSO activity prior to the 1812 MST start of the computer-aided dispatch (CAD) log that was entered into evidence. Deputy

Littlefield testified that he had pulled this standard welfare check from a "routine call pool." However, events indicate otherwise. California detective Carvo had declared an emergency (exigency) and had indicators of an Albuquerque connection at least 4-1/2 hours before the illegal entry. Either the detective was extraordinarily remiss in not alerting New Mexico officials prior to 1750 MST, or he did make prior contact that was not revealed to the Court or to the defense. That uncertainty can be removed by examining phone records and emails to determine when California officials first contacted state or federal counterparts in New Mexico.

b) Denial of Right to Counsel

The prosecution has consistently asserted that no mention of counsel was made until the end of Detective Proctor's interview; at which time, the detective dutifully ended the interview. This is not strictly true. Prior to the signing of the Miranda consent form, Detective Proctor engaged the movant in a coercive discussion regarding an attorney. Due to the movant's lack of access to source materials, the conversation is only paraphrased below.

> Detective Proctor returned to the interview room with a consent form and told the movant that he needed to have some "routine" consent forms signed. The movant inquired as to what would happen if he did not sign the forms. The detective replied that it might be until "tomorrow afternoon" (it was now 11 PM) before a lawyer could be found. Movant replied with the question, "You mean I'll have to stay in this little room until then?" The detective merely shrugged his shoulders and replied, "Yeah."

This conversation was certainly coercive due to the threat that the movant would be held in a small interrogation room for up to an additional 15 hours after having been pre-soaked for 4 hours in the back of unheated police cars, in November, being allowed to wear nothing but underwear, a t-shirt, shoes and handcuffs, followed by an hour in that cold, 5'x 8' interrogation room which did not contain a toilet or access to fresh water. This would have amounted to approximately 20 hours of custodial detention without the benefit of counsel or being afforded the opportunity to make a phone call. New Mexico law requires that a detainee be offered telephone access within 20 minutes of his detention at police headquarters.

c) Fraudulent Search and Arrest Warrants, and Malicious Prosecution

After the assault on the movant's home, and in conjunction with AUSA Charlyn Rees, (then) ADA Brett Loveless and Detective Weylen Proctor contrived the crimes of criminal sexual penetration and the production of child pornography in order to obtain a search warrant fourteen hours later to paper over the violation.  This was followed in the afternoon by an arrest warrant attesting to the same concocted crimes.  The warrants were based on Deputy Littlefield's false assertions regarding cameras, and on interviews with the movant and his houseguest.  The irony is that these interviews indicated that no New Mexico law had been broken; notably laws regarding criminal sexual penetration or the production of child pornography, which were the criminal activities alleged in both warrants.  As noted by the Federal District Court, even if consentual sex had indeed occurred, it would not have been criminal.  The movant's guest informed Special Agent Adkins that the movant had not forced her to do any-thing, and that he had taken no photos.

It was known by all officials at the time when state and federal prosecutors reviewed the state warrant applications that no sex crime had occurred to support the applications, nor was any other state crime indicated.  In bringing charges which were known to have no factual or legal basis, Detective Proctor, ADA Loveless and AUSA Rees displayed a reckless disregard for the truth, which clearly violated the standards adopted by the Tenth Circuit Court of Appeals in its analysis of the requirements set forth in Franks v Deleware (see Stewart v Donges, 915 F.2d 572, 582-583 (10th Cir., 1990)).  Special Agent Adkins later testified that a federal warrant was not sought because the FBI Evidence Recov-ery Team (ERT) was unavailable.  This is questionable because the ERT was available the following day, when the state warrant was actually obtained and served; and when, as the agent testified, she would have obtained a federal warrant.

d) Manupulated Grand Jury, False Imprisonment and Obstruction of Justice

Charges for which the government had affirmative evidence to the contrary were presented to a state grand jury.  Prosecutors withheld material exculpatory evidence from that grand jury in order to obtain indictments for two second-degree offenses -- i.e. criminal sexual penetration and the production of child pornography -- which could be used to support subsequent federal charges.

That evidence included the fact that the movant had taken no pornographic photos, and none that he had taken were found; that his guest had stipulated that no photos had been taken, and that photos of her were produced by her and her 13-year-old sister, and distributed unsolicited to the movant and at least one other male; and finally, that criminal sexual penetration could not have occurred due to the age of consent, and there being evidence and statements contrary to any assertion by the state of force or coercion.

The Supreme Court has been unambiguous in its assertion of "the special role played by the American prosecutor in the search for truth" in criminal cases (Strickler v Greene, 144 LED2D 286, 301-302, 572 US 263, 281 (SC, 1999)); a perspective adopted in the American Bar Association's Rules of Professional Conduct, Rule 3.8 cmt (2002).  The decision in Napue v Illinois, 360 US 264, 270 (SC, 1959) makes it clear that "the district attorney has the responsibility and duty to correct what he knows to be false."

e) Excessive Bail

Movant was subsequently held unconstitutionally by the state under an onerous and unreasonable $200,000 cash-only bond until the state's speedy trial limit was reached, and the movant was transferred to federal custody.  Both the detention and the bond were justified by the fraudulently-obtained indictments; which indictments were subsequently used as the predicate felony to justify a federal indictment.  The state's charges of criminal sexual penetration and the production of child pornography have been thoroughly discredited by the Federal District Court.  At best, the state might have been able to sustain a charge of contributing to the delinquency of a minor; the charge of denial of parental rights could not be upheld due to plain language considerations, i.e. the time of the taking.  However, these latter two crimes were not the crimes which state and federal authorities used to support the arrest warrant and to justify the grossly disproportiante amount of bail.  Rather, the two totally unsupported sex crimes were contrived for that purpose.

In U.S. v Bajakajian, 524 US 321, 334 (SC, 1999), the Supreme Court spoke of "excessive" as that which is "grossly disproportional [sic] to the gravity of the defendant's offense."  In light of the government's fabricated crimes, the bail imposed upon the movant could be considered as nothing other than excessive.

## 3) Excessive Force Under Color of Law

Bernalillo County Sheriff's Office (BCSO) deputies conducted an illegal warrant-less search and seizure after dark by executing an unreasonable and unlawful entry. Neither these facts nor the illegality of the search and seizure are in dispute; having been determined to be unlawful by the Federal District Court. Movant is not attempting to address the question of suppression of evidence, which is being considered by the Tenth Circuit Court of Appeals. Rather, this article illustrates a distinct constitutional issue, i.e. excessive force. In Cortez v McCauley, 438 F.3d 980, 996 (10th Cir., 2006) -- a civil suit ironically involving parallel circumstances and one of the deputies who forced entry in the instant case --, The Tenth Circuit Court of Appeals stated that, "Any force that law enforcement officers apply in order to affect a seizure is, by definition, excessive if the seizure is unlawful." In the instant case, the search and seizure by the BCSO were predicated on a manufactured exigency, with no objective fear of danger to officers, and with no probable cause to believe that a crime had been committed in their jurisdiction; nor did they have a warrant or detainer from any extra-jurisdictional entity, i.e. The State of California, or a federal magistrate. Deputies had been, ostensibly, dispatched only to perform a "welfare check," which normally involves simply knocking at the front door.

In Florida v Jardines, 185 LED2D 495, 502 (SC, 2013), the Supreme Court held that, "A police officer not armed with a warrant may approach a home in hopes of speaking to its occupants because that is no more than a private citizen might do." Making a "stealthy approach" to sneak up to a private residence after dark and, after not being able to obtain a view through a first window (see Deputy Craver's police report), peeping through a defect in the blinds of a second like a common thief, and forcing entry clearly exceeds the limits binding a private citizen. By searching and then forcibly entering the movant's home with no legal justification or permission in a preplanned assault, deputies abdicated their authority as law enforcement officers, and became mere vigilantes. Because deputies were intentionally operating unlawfully, their armed forced entry and aggravated battery on the movant, with only imagined officer safety concerns (deputies were so unconcerned about safety that a routine NCIC background check was not performed), clearly represented excessive

force and constituted a criminal home invasion; which recklessly endangered the two occupants. Movant was shoved to the floor at gunpoint, handcuffed and detained with no legal justification. The vigilantes chased and terrorized his guest, whom they abducted against her will from his home. The BCSO had received no request from her legal guardians to remove her or to return her, and had no authority to force her to leave the movant's home, where she had sought refuge.

## 4) Request for Discovery

Movant petitions the Court to authorize the movant, or his representative, to obtain the following:

1. All emails regarding the instant case which were exchanged during the period from 8 Nov., 2009 to 1 June, 2010 between or among the following individual or entities:

   a) AUSA Charlyn Rees
   b) USA Kenneth Gonzales (or his predecessor)
   c) ADA (now Judge) Brett Loveless
   d) ADA Lisa Trabaudo
   e) FBI Special Agent Mary Adkins
   f) LA County Detective Paul Carvo
   g) BCSO Detective Weylen Proctor
   h) District Attorney Kari Brandenberg
   i) The Office of the LA County District Attorney
   j) The Office of the U.S. Attorney for Northern New Mexico.

   These emails can be obtained both from individuals and from the custodians of documents for each of the affected agencies. These emails are necessary to determine the extent of collusion between the parties, the precise nature of any collusiion, and the timeline of events. Movant had requested some of these documents to be produced for the sentencing hearing, but was denied this request by the Court. Prosecutors had claimed work product privilege. However, any state work product assertions are moot, as the state is time-barred from refiling its charges. Any federal claims of work product privilege can be satisfied by reviewing specific documents in camera.

2. Phone records from the offices and personal cell phones for Detective Paul Carvo and Detective Claudia (Fletes) McCarthy during the period including 8 Nov., 2009 to 9 NOv., 2009. Elements that should not be redacted are:

   a) all area codes;
   b) all non-personal numbers for area codes 505 and 575.

   Personal phone numbers for individuals in New Mexico should have only three-digit exchange identifiers redacted. This will allow identification of official contacts using private phones.

   The requested phone records are necessary to pinpoint precisely when California investigators first contacted their counterparts in New Mexico, and to establish the timeline for such communications.

3. Vehicle and/or officer location data for specific BCSO deputies in the period from 1200 MST, 9 Nov., 2009 to 1900 MST, 9 Nov., 2009. These data may be contained in computer-aided dispatch (CAD) logs; or from GPS reporting systems, if such devices were in use by the BCSO during that period. Location data are needed for deputies with "MAN" numbers:

   a) 183    Deputy David Littlefield
   b) 337    Deputy Justin McKinney
   c) 271    Deputy John McCauley
   d) 209    Deputy Santiago Roybal
   e) S24    Sergeant Taylor
   f) L10    Unidentified Lieutenant
   g) PD873 Unidentified officer.

These officers and their trainee deputies were enroute or on-scene and involved in the assault on the movant's home. Given the unusual massing of forces within five minutes of Deputy Littlefield requesting backup, movant contends that deputies had been prenotified and perhaps pre-positioned. This fact would contradict Deputy Littlefield's testimony indicating that the assault was not preplanned.

4. Transcripts from the New Mexico state grand jury held on     Nov., 2009, and from the federal grand jury conducted on 27 April, 2010 are necessary. At the heart of this motion is the contention of illegal collusion by state and federal officials to bring fraudulent state charges in order to provide a predicate felony for federal assertions of a violation of 18 U.S.C. 2423(a). The state felony indictments were obtained by first not informing the state grand jury as to the nature of the law, and by then withholding material evidence from that grand jury. Transcripts are necessary to precisely determine what was presented to the grand juries. Movant contends that the need to correct a manifest injustice overrides the requirement of grand jury secrecy. Indeed, the government has already provided a portion of the federal grand jury transcript in discovery. Movant was granted permission to appeal in forma pauperis and, as per 28 U.S.C. 753(f), petitions the Court to order the United States to pay fees for any transcripts that the court allows in discovery.

5. Movant petitions that all documents requested above be made available to the defense with sufficient time for an adequate review.

## Section II

### 1) Introduction:

With the Court's indulgence, this section will be somewhat less formal and more personal than the previous.  I will write in the first person because it is cumbersome to refer to oneself in the third.  This is not an attempt to address questions of my guilt or innocence, but rather to illuminate the prejudicial effects of assertions made by state and federal actors.  So, other than to assert my actual and legal innocence, no defense issues will be raised, unless they bear on the question of government malfeasance.  I will make every attempt to present only verifiable accusations; and will try to clearly identify those occasions where I diverge to speculation or opinion.

Government arguments to date have been characterized by innuendos, twisting of facts, presenting non-probative but highly prejudicial, unverified asser- tions and, in some cases, outright fabrications.  The latter is certainly exemplified by Deputy Littlefield's perjurous statements, but the perceptual damage has primarily accumulated bit-by-bit.  I would ask the Court to consider a metaphor from my childhood.  I was raised on an Iowa farm, and know that when cleaning out a barn, large piles can be created one pitchfork-full at a time.  However, every farm boy understands that no matter how formidible the pile, it is still composed of manure.  Although it is impossible to address every inaccuracy in this short document, I would like to deconstruct a portion of the government's pile.

### 2) Online Activity:

Without producing any substantial evidence, the government has falsely por- trayed my online activity as a long-term predatory venture.  It asserted many online victims, but not one of those alleged phantom victims was produced, nor even contacted.  I will state now for the record that there were none. With all due respect to the Court, I find many of the statements in its MOO dated 28 June, 2010, to be themselves unfounded, and merely indicate the effectiveness of the government's campaign to prejudice the Court.  The Court said that, "By his admission, Christy has engaged in multiple acts of hands- on victimization of children," and that "he [Christy] has not denied that he had sex with multiple under-aged children."  That denial was not forthcoming only because I'd never been asked the question, nor did the government offer

more than supposition.  With the Court's permission, I will deny those accusations now, and also deny I'd made any admission of hands-on victimization.  There must be a technical term of which I am unaware due to my lack of legal training, so I will offer a colloquial substitute.  On the subject of those alleged victims, and the plethora of unsubstantiated innuendos, I would ask the prosecution to simply "put up or shut up" (PUSU).  This rank and baseless speculation as to undiscovered crimes is both irresponsible and of the type that was lambasted by the Seventh Circuit Court of Appeals in U.S. v Bradley, 628 F.3d 394, 398-399 (7th Cir., 2010).  With no other genre of crime, except perhaps communism in the 1950's or witchcraft in 1692, would the prosecution feel safe to present simple imagination as fact.

My actual online activities were in stark opposition to that portrayed by the government.  Over the course of time, I have engaged in a number of online conversations.  As testified to by Detective Carvo, people lie on the internet "all the time."  As such, it is very difficult to ferret out the true circumstances; a process often requiring months, and reviewing prior conversations for consistency.  I have spoken with those whom I believed were potential abusers, and to some who claimed to be abused.  With potential abusers (or those simply living a fantasy), interrogatories sometimes involve talk that "wallows in the mud" in order to gain confidence and candor.  Often just being a non-judgemental ear is all that is required for those speaking of being abused.  In the course of events, there have been at least two times, that could be verified, when I notified authorities after coming to believe a minor was authentic and in trouble, and that I had enough information so that police could find those persons with minimal effort.  In each case, I was told by authorities that they would not investigate.  A detective in Toronto would not expend the resources to examine birth records within a 4-month period, in order to check whether a 15-year-old had given birth.  Even though a few phone calls to local high schools could probably have identified two young women about whom I supplied considerable information, officials in Portland, OR declined to investigate.  This was even after being informed that one 16-year-old had already been induced into prostitution.  A claim by the government that I was somehow a serial predator is merely prosecutorial wishful thinking, and character assassination.

3) Chat:

The prosecution has entered into evidence snippets of online chats alleged to be between myself, unknown persons and K.Y.  I will not stipulate to the validity of these documents, but will discuss content only because they were entered into evidence.  I have carefully read these documents and fail to see any objective support for the government's assertions of attempts to coerce, entice, or persuade anyone to engage in sexual activity; the plain language definitions of these words would preclude such an interpretation.  Nor were there discussions of explicit sexual activities or proposals to perform such acts.  That is unless one stretches the definition of "sexually explicit" to include interrogatories regarding one's homelife.  Even in the conversations allegedly with K.Y. during the period before I discovered her true age, only two mentions of engaging in specific sexual acts occurred; these were proposed by K.Y. and deflected within a couple of sentences.

The government insinuated that the much-discussed "not far by airplane" comment was somehow an offer to visit.  Any rational reading would note that was a parenthetical remark akin to, "Hey, that is within walking distance," made within the first few sentences, and before any mention of age.  A further reading of the text would indicate to any thoughtful person -- and certainly to a trained police officer -- that this chat involved an adult who was attempting a ruse in order to obtain child pornography.  No seasoned police officer would be naive  enough to believe that a 12-year-old girl would be online trying to obtain pornographic photos of other 12-year-old girls.  It should be noted that those repeated attempts to obtain pornography were unambiguously rebuffed.  Detective Proctor testified that he had evidence I'd "traded" child pornography; although he has presented nothing to substantiate that charge, nor can he, because I didn't trade child pornography (PUSU).

I find the government's actions regarding this alleged chat to be cynical at best and unconscionable at worst.  These "chats" often indicated ongoing abuse, and the government made no attempt to investigate.  That means they either knew the chats were not genuine, or that they had some ulterior motive for not following up.  If the former, the government presented evidence that it knew to be false.  The latter would indicate a callous and inexcusable dis-regard for the safety of actual minor victims, in order to not jeporadize their prosecution of me.  To sacrifice minor victims such is shameful.

## 4) Government Mendacity:

Judge Alex Kozinski, now Chief Judge of the Ninth Circuit Court of Appeals, once remarked that it is an "open secret" among judges, prosecutors and defense attorneys that police routinely lie on the witness stand. Most on the public side of the bar would consider as an appalling revelation that which prosecutors consider to be business as usual. Although I expected the prosecution to play hardball and to tell the narrative in terms favorable to the prosecution, I was not prepared for both the depth and breadth of official mendacity. Not only were there the "big lies," i.e. false charges, perjury, etc., but government agents at every level felt it necessary to invent circumstances large and small.

After the detention hearing in June, 2010, Mr. McMillian and I discussed the government's plethora of unfounded innuendos. I was rightly advised that these had nothing to do with the facts of the case, and rebuttal would only deplete my already strained resources as well as take the Court's time. For those reasons, I decided to allow the government's untrue and unfounded speculation to go unrebutted. However, had I known that, through the magic of "qui tacet consentire videtur," these would transform into assumed fact, I would have protested each. I will not again allow a single speculative utterance from the prosecution to pass without objection. I would like to present just a few examples of the government's falsehoods and twisting the truth.

Many of the untruths and inaccuracies promulgated by government agents are so trivial that they are individually inconsequential. So I am left confused as to why government agents would even bother making such statements, particularly since they contain no evidentiary relevance. Perhaps lying in order to denegrate the accused is so ingrained in the prosecutorial mindset that it goes unnoticed; like blinking one's eyes. Some were simple fabrications, and some were gratuitous attempts to demean. These misstatements are so numerous that I won't mention more than a few in order to illustrate for the Court the depth of the government's manure pile.

In warrant affidavits, Detective Proctor insisted that K.Y. was somehow in "bondage;" a statement contradicted by my guest's own statement that we were "walking around," and my statement that we had sat down to watch TV just prior to the invasion of my home. Deputies also reported that she ran from them

when they forced entry; which could only be accomplished by Houdini if one
was tied up, as she was alleged to be. In his police report, Deputy Craver
said he was "stationed" at the window and watching at the time of entry. He
made no report of K.Y. being "tied up by her wrists and neck," or any other
bondage for that matter. In the progress of time, this convenient fiction
morphed into K.Y. being suspended from the rafters by her neck. In the small
excerpt from the federal grand jury transcript provided in discovery K.Y. stated,
"I was not hanging by my neck, obviously." As an aside to the Court, this
was not in response to a question regarding hanging by her neck. It would
have been impossible for her to have known of that fiction unless her testi-
mony was somehow coached. K.Y. also seemed to get off script at the end of
her testimony by indicating that she had not seen pornography on, nor had she
searched, my computer. The transcript clearly registered surprise in AUSA
McNabb when K.Y. responded negatively.

Detective Proctor stated in the affidavits that I'd had K.Y. "touch and rub"
my penis, presumably through my clothing. Since this would not have been
unlawful even if it had occurred, there is no apparant good reason for his
lying about that after my having adamantly denied it. Perhaps he or his
handlers wanted that statement for its simple tawdry effect.

In the same affidavit, the detective indicated I had purchased "bondage items"
to facilitate K.Y.'s sexual fantasies. There were no purchases of bondage
items, and certainly no record of purchases; but such references could prejudice
a magistrate. His reference to K.Y.'s "sexual fantasies" was totally gratuitous
and simply added for emotional impact.

In his supplemental report, Detective Proctor opined as to how inconvenient
for typing was the arrangement of my laptop on an elevated mobile stand, and
implied that it could only be used as a camera platform. This was a red herring
in an attempt to support his false claim of child pornography production.
He, of course, declined to mention the wireless keyboard and mouse in the tray
under the desk; equipment that made the arrangement unusually functional for
conventional computer use. In that same report, the detective stated that
I'd taken a neighborhood boy on "multiple overnight SCUBA trips." There was
only a single day trip with no overnight component, which was taken at his
request and with parental permission. That act of neighborliness apparently
did not sound nefarious enough, so the detective invented his own facts.

Government witnesses testified that, in their "training and experience" those who have child victims take photos of their conquests. The government proclaimed that I had multiple underage victims. Tellingly, they produced not a single erotic or pornographic photo of anyone, adult or minor, that I had taken. Several conclusions could be drawn from this: that I was the one in a million predator who did not take victim photos; that I had cleverly managed to hide all such photos; or that the officers could not plant such specific photographs, as they did other pornography. The simplest, and correct, answer is that I had no victims, a conclusion which did not fit the government's tale.

Government mendacity was not limited to police, but continued with the Presentence Report (PSR); which was little more than an echo chamber for unverified and unadjudicated prosecutorial assertions. The probation officer simply misrepresented the facts of her interview with me. She determined alcohol was a factor contributing to my behavior, although that contradicted what was said during that interview. I was asked if alcohol contributed and replied that I didn't think so, but would be willing to explore the possibility with competent counselors. That is a far cry from her assertion that I'd admitted that alcohol was involved. I have no idea where the cocaine reference came from, as that subject never arose, except perhaps in the blanket question regarding other drugs. I thought it clever on her part to include a concrete reference to the age 25, which would tend to make the assertion sound as if it was based in fact. By age 24, I was a combat engineer officer in the 82nd Airborne Division; not a hotbed of cocaine use. The probation officer chose to imply that I had lied as to my military rank, even though she had been sent confirmation of my reserve captaincy. I suspect this young woman has no concept of what it means to serve, and does not understand that misrepresenting one's service is disrespectful to those who have served, both living and dead.

5) Conclusion:

I will not take more of the Court's time with additional details of government distortions -- which are legion. I only hope that the discussions in these articles, along with Judge Kozinski's observations will prompt the Court toward a healthy skepticism as to government veracity in my case.

APPENDIX B

INITIAL LETTER TO USA KENNETH GONZALES

SEPTEMBER 25, 2013

Mr. Kenneth Gonzales                                    September 25, 2013
United States Attorney
P.O. Box 607
Albuquerque, NM 87103

Dear Mr. Gonzales:

I would like to bring to your attention the commission of a crime against
the United States, and to formally request that your office investigate and
initiate prosecution.  If your office declines to investigate or to prosecute,
I further request that written justification for that decision be provided
to my attorney, Mr. Lee McMillian at 507 Nebraska St., South Houston, TX,
77587.

I believe that in sworn testimony before the United States District Court
for the District of New Mexico, Deputy David Littlefield of the Bernalillo
County Sheriff's Office willfully committed perjury in violation of 18 U.S.C.
1621 and 1623; which testimony was essential to establishing a critical material
element -- i.e. exigent circumstances -- in support of a government argument
in a criminal case.  In a Memorandum and Order issued by U.S. District Judge
James O. Browning, the Court discredited a portion of the deputy's testimony
as being demonstrably false (see encl 1).  This assertion of a false material
fact was not simply a one-off slip of the tongue.  Rather, the deputy persisted
in his false statements under questioning by both government and defense
attorneys.  The Tenth Circuit Court of Appeals has clearly articulated that
the factual predicates of perjury are, "... that a witness (1) gives false
testimony under oath (2) concerning a material matter (3) with willful intent
to provide false testimony, rather than as a result of confusion or faulty
memory" (U.S v Stoner, 466 Fed. Appx. 720, 729, (10th Cir., March 12, 2012)).

If your office requires further elaboration or clarification on my part, please
contact me through Mr. McMillian at the address provided above.

Thank you,

Edward S. Christy

Edward S. Christy
54280-051
F.C.I. Elkton
Lisbon, OH 44432

encl
        Browning M.O.O., Sep. 2, 2011, p 12
        Transcript, Aug. 3, 2011, pp 78, 82-85

Encl 1 - page 10 of 40
Case 2:10-cr-01534-JAP   Document 242   Filed 06/04/14   Page 31 of 40
Case 1:10-cr-01534-JB   Document 175   Filed 09/02/11   Page 12 of 100

leaves in the driveway is consistent with disturbance from the tires of a car -- there are two tracks where the leaves are disturbed.  See Government's Exhibit J.

54.     From the Court's independent review of the photographs, the Court does not agree that the front door did not look like the door people used.  Littlefield could not see the back porch, so he could not have reasonably made a comparison before he went to the back porch.  The back porch is messy and looks like a back porch; the front porch looks neat and inviting.  See Government's Exhibit I; Government's Exhibit M; Government's Exhibit N.

*Front door looked used.*

*≠*

55.     After Littlefield looked in Christy's window, he believed that he had probable cause that Christy had committed production of child pornography, because he saw a flash that was consistent with a camera flash, because he saw K.Y. in various states of undress, and because it looked like K.Y. was staged.  See Aug. 3, 2011 Tr. at 73:12-74:4 (Kastrin, Littlefield).

56.     When Littlefield looked in the window, he did not see a camera and could not,[5] physically, have seen the computer on Christy's desk.[5]  See Aug. 3, 2011 Tr. at 78:7-12 (McMillian, Littlefield).[6]  ███████████████

*Lie about computer*

57.     Littlefield later shared what he saw when he looked into the window with Proctor to

---

[5] Had the Court found that Littlefield's act of peering through the crack in the blinds was not a search, whether Littlefield saw the computer would have been important in the Court's analysis of whether Adkins or Carvo had probable cause for child pornography.  Because the Court finds, however, that Littlefield's act was a search, this finding of fact, and whether Littlefield could physically see the computer, is not significant.  ███████████

[6] Although Littlefield testified that, when he looked in the crack in the blinds, he saw a computer that was pointed in the direction of the juvenile, see Aug. 3, 2011 Tr. at 78:10-14 (McMillian, Littlefield), the Court does not credit this testimony.  The United States produced pictures of the window, and the pictures showed the crack in the blinds and the computer as it was when Littlefield looked through the crack.  The crack in the blinds was small, appearing no more than an inch in height, and the computer was on the wall near the window.  It is not a reasonable conclusion or finding that Littlefield was able to position himself in a manner which would have allowed him to see the computer.

1   Q.   Okay.  And as far as you knew, was there any simulated

2   sexual act in the nude pictures?

3   A.   No, sir.

4   Q.   Was there any actual sexual act in any of the pictures, as

5   far as you knew?

6   A.   No, sir.

7   Q.   Okay.  And when you looked in the window -- You looked in

8   the window, right?

9   A.   Yes, sir I did.

10   Q.   Did you see a camera?

11   A.  . No, sir, I did not.

12   Q.   Okay.

13   A.   I did see a computer that was pointed in her direction,

14   laptop, but I didn't see an actual camera, no, sir.

*Lie and pictures show it pointed directly ahead. First reference w/ McMillian cross*

15   Q.   And custodial interference.  How long -- You understand

16   that in New Mexico if a person who has no right to custody of a

17   child returns a child within 14 days felony charges would be

18   dismissed, right?

19   A.   If the felony charges are going to be dismissed by

20   statute, it doesn't mean that it can't be charged, sir.  It's

21   still a crime.

22   Q.   And, also, I understand that if that -- a person having

23   possession and custody of a child -- a person under 18, only

24   violates that statute if the child was present in New Mexico at

25   the time of the taking.  Do you understand that, too?  Right?

Encl 2 - page 2 of 5
Case 1:10-cr-01534-JAP   Document 242   Filed 06/04/14   Page 33 of 40
Kastrin redirect.
82

1    free will.   Although there had been -- As I stated, although

2    there had been e-mails that were being exchanged, there was

3    nothing in the information that was provided to us from

4    Westminster that said -- I mean, we knew that they had been in

5    contact with the parents, that she had left a note saying, I'm

6    with this individual, and I never want to see you again, or

7    anything like that.

8    Q.   You didn't have information at that point that she had

9    left a runaway note?

10   A.   No.   There was no indication of what the circumstances

11   were --

12   Q.   'And so --

13   A.   -- behind her disappearing from California.

14   Q.   And is it your testimony that while you knew that they had

15   been engaging in consensual discussions over the Internet, you

16   did not know whether she had consented to cross state lines

17   with him?

18   A.   Yes, sir.

19   Q.   And was that the basis of your fear of kidnapping?

20   A.   Yes, ma'am.

21   Q.   You were asked if, when you looked through the window, you

22   saw a camera.   What did you see that made you believe that

23   there was the production of child pornography going on?

24   A.   Initially when I saw the flashes, it looked like a camera

25   flash.   Then when I did look through the window, there was a

*(handwritten note in margin: laptop lie first references with Kastrin)*

1    laptop computer in place.

2    Q.   Do you know whether you can take photos with a computer?

3    A.   Yes, you can.

4    Q.   Do you know whether you take a video with the computer?

5    A.   Yes, ma'am.

6    Q.   What was the position of the computer that you saw?

7    A.   It was positioned, basically, directional for where she

8    was placed in the room.

9    Q.   Okay.  You were testifying about unlawful custodial

10   interference.  When you went out there, did you have any idea

11   how long he was going to -- intended to keep this child?

12   A.   No, ma'am.

13   Q.   Thirteen days?  Twelve days?  Any idea?

14   A.   No, ma'am.

15   Q.   Okay.

16           MS. KASTRIN:  One moment, Your Honor.

17           THE COURT:  Certainly.

18           MS. KASTRIN:  No further questions.

19           THE COURT:  Thank you, Ms. Kastrin.

20           Did you have something further?

21           MR. McMILLIAN:  Just a couple, Your Honor.

22           THE COURT:  That's fine.

23           MR. McMILLIAN:  Something came up.

24           THE COURT:  All right.

25

Encl 2 – page 4 of 5
Case 1:10-cr-01534-JAP   Document 242   Filed 06/04/14   Page 35 of 40
McMillian Recross                                                           84

Computer
file
continued
on recross

1                        RECROSS-EXAMINATION

2    BY MR. McMILLIAN:

3    A.    Have you got the pictures, sir?

4    Q.    Pictures?

5            So it's your contention that you could see the

6    direction of the computer through that crack in the window?

7    A.    Yes, I could.  Actually, when I looked through, I could

8    see the computer, yes, I could.

9    Q.    What kind of computer was it?

10   A.    It appeared to be a laptop.

11   Q.    Can you see this?

12           MR. McMILLIAN:  May I approach the witness, Your

13   Honor?

14           THE COURT:  You may.

15   A.    It's a laptop.  I can see it when you put it up on the

16   thing, sir.  I can see it.

17   Q.    (By Mr. McMillian)  Okay.  You're saying that you looked

18   through this crack and saw this computer?

19   A.    Yes, sir.

20   Q.    That's Government Exhibit Q.

21           I show you Government Exhibit P.  That's the same

22   crack right there, is it not?

23   A.    It's hard to tell from that picture.  It looks like it

24   might be.

25   Q.    That's a pretty thick wall that you're looking past, past

```
 1   that nail and through that crack there?'
 2   A.    Uh-huh.
 3   Q.    And you're saying that you looked through that crack and
 4   saw this computer right here?
 5   A.    Yes, sir, I did.
 6   Q.    Okay.
 7               MR. McMILLIAN:  Pass the witness.
 8               THE COURT:  All right.  Thank you, Mr. McMillian.
 9               Ms. Kastrin, do you have further redirect of
10   Mr. Littlefield?
11               MS. KASTRIN:  No, Your Honor.
12               THE COURT:  All right.  Thank you, Ms. Kastrin.
13               All right.  Mr. Littlefield, you may step down.
14               Is there any reason Mr. Littlefield cannot be excused
15   from the proceedings?
16               MS. KASTRIN:  No, Your Honor.
17               THE COURT:  Mr. McMillian?
18               MR. McMILLIAN:  No, Your Honor.
19               THE COURT:  All right.  You're excused from the
20   proceedings.  Thank you for your testimony.
21               THE WITNESS:  Thank you, sir.
22               THE COURT:  All right.  Does the United States have
23   its next witness or evidence?
24               MS. REES:  'He is on his way in the elevator, Your
25   Honor.
```

APPENDIX C

SECOND LETTER TO USA KENNETH GONZALES

MARCH 22, 2014

22 March, 2014

Mr. Kenneth Gonzales
United States Attorney
P.O. Box 607
Albuquerque, NM 87103

Dear Mr. Gonzales:

In my letter to you dated September 25, 2013, I requested that your office
investigate and bring charges against Deputy David Littlefield of the Bern-
alillo County Sheriff's Office (BCSO) for the crime of perjury.  With that
request, I submitted excerpts from the applicable transcripts, and from a
Memorandum Opinion and Order written by Federal Judge James O. Browning.  These
should have provided sufficient probable cause to obtain an  indictment.  Your
office declined despite my attorney, Mr. Lee McMillian, concurring with the
request.

You will find enclosed a document detailing evidence for crimes against the
United States committed by a member of your staff and officials of the State
of New Mexico.  This document was prepared for the Federal District Court,
but should provide your office with sufficient background information for a
directed investigation.  Most particularly, the request for discovery offers
a roadmap for investigators.

I am formally requesting that your office present to a federal grand jury
information concerning the breach of criminal laws of the United States, as
detailed below.  I further request that I either be subpoenaed to testify,
or be allowed to present a sworn deposition, and that this letter, along with
the complete and unredacted enclosed document be provided to that grand jury.
My intimate familiarity with the details of the alleged crimes will greatly
assist the grand jury's inquiry.

Specific Allegations:

1. On November 9, 2009, members of the BCSO conducted an unlawful search
   followed by an illegal, armed breakin of my home, which deprived me of
   rights under the Fourth Amendment.  This was in violation of 18 USC §242,
   involving the use of dangerous weapons.  This statute was violated by deputies
   David Littlefield, Justin McKinney, John McCauley and Santiago Roybal.

2. The illegal search and seizure were premeditated and preplanned.  This
   implicates the deputies referenced above, a Sergeant Taylor (first name
   unknown, BCSO "MAN" number S24), and unnamed coconspirators, with a violation
   of 18 USC §241 and 18 USC §371.

3. In subsequent search and arrest warrants, BCSO detective Weylen Proctor
   and ADA (now Judge) Brett Loveless alleged crimes, i.e. second degree
   criminal sexual penetration, and the production of child pornography, for
   which they had no basis in either fact or law, and for which affirmative
   evidence to the contrary was present.  Doing so violated my Fifth Amend-
   ment rights to libery and due process, and was a criminal act under 18 USC
   §242 and 18 USC §241.

4. These malicious false charges were orchestrated by AUSA Charlyn Rees in order to provide a predicate felony to validate a federal indictment under 18 USC §2423, six months later. The state indictments for false charges allowed an onerous $200,000 cash bond in violation of the Eighth Amendment, and deprived me of liberty without due process; a violation of the Fifth Amendment. By colluding together in bringing those fraudulent charges, AUSA Rees and ADA Loveless violated 18 USC §242, 18 USC §241, and 18 USC §371.

5. In bringing federal indictments six months later for a violation of 18 USC §2423, AUSA Rees knowingly misrepresented the validity of the required predicate felony, i.e. NM Stat. Ann. §30-9-11(E)(5); which misrepresentation violated 18 USC §1623.

6. As outlined in my letter of September 25, 2013, Deputy David Littlefield committed perjury in violation of 18 USC §1621.

7. AUSA Charlyn Rees knew of the falsity of Deputy Littlefield's perjured testimony, and proceeded to secure such testimony, which violated 18 USC §1503 and 18 USC §1622.

These violations of the United States' criminal code are serious crimes in their own right. However, when considering the damage done to our constitutional judicial process when such actions are perpetrated by the very persons responsible for upholding that process, these crimes become horrendous. I understand that an internal investigation such as I am requesting could be uncomfortable for you, even though these events occurred under your predecessor. However sir, you have an option to simply do the right thing, or to sweep this pernicious criminality under the rug.

Yours truly,

*Edward S. Christy*

Edward S. Christy
54280051
FCI Elkton
P.O. Box 10
Lisbon, OH  44432

encl
    Statement to the Court (20 pages)
    Letter of September 25, 2013 (7 pages)

cc
    Mr. Lee McMillian
    Mr. Brad Heath, USAToday

NAME: Edward Christy
REG.# 54280-051
Federal Correctional Institution Elkton
P.O. Box 10
Lisbon OH 44432

RECEIVED

JUN 4 2014

MATTHEW J. DYKMAN
CLERK

⟨⟨54280-051⟩⟩
James O Browning
U.S. District Court Judge
333 Lomas BLVD NW
Suite 660
Albuquerque, NM 87102
United States

Legal Mail